# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SAN DIEGO DIVISION

| | |
|---|---|
| AMERANTH, INC.<br><br>v.<br><br>DOMINO'S PIZZA, INC. and<br>DOMINO'S PIZZA, LLC | Lead Case No.: 3:12-cv-0733-DMS-WVG<br><br>**EXHIBIT 11 –**<br>**DEFENDANTS DOMINO'S PIZZA,**<br>**INC.'S AND DOMINO'S PIZZA, LLC'S**<br>**RENEWED MOTION TO DECLARE**<br>**CASE EXCEPTIONAL AND AWARD**<br>**ATTORNEY FEES AND NON-TAXABLE**<br>**COSTS** |

Page 385

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


IN RE: AMERANTH PATENT LITIGATION        )

                                         )

                                         ) 3:11-CV-01810-DMS-WVG

                                         )

_____ )



*** CONFIDENTIAL — ATTORNEYS' EYES ONLY ***

VIDEOTAPED 30(b)(6) DEPOSITION OF KEITH R. McNALLY

VOLUME II

TAKEN TUESDAY, MARCH 13, 2018

SAN DIEGO, CALIFORNIA



Reported by Audra E. Cramer, CSR No. 9901

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 386

1           VOLUME TWO OF THE VIDEOTAPED 30(b)(6) DEPOSITION OF

2     KEITH R. McNALLY, TAKEN ON BEHALF OF THE DEFENDANTS,

3     AT 9:04 A.M., TUESDAY, MARCH 13, 2018, AT

4     11988 EL CAMINO REAL, SAN DIEGO, CALIFORNIA, BEFORE

5     AUDRA E. CRAMER, CSR NO. 9901, PURSUANT TO NOTICE.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 387

1    APPEARANCES OF COUNSEL

2    FOR PLAINTIFF:

3              CALDARELLI HEJMANOWSKI PAGE & LEER LLP

4              BY:  WILLIAM J. CALDARELLI, ESQUIRE

5              12340 EL CAMINO REAL, SUITE 430

6              SAN DIEGO, CALIFORNIA 92130

7              (858) 720-8080

8              wjc@chpllaw.com

9

10   FOR ORACLE CORPORATION:

11             WEIL, GOTSHAL & MANGES LLP

12             BY:  BRIAN CHANG, ESQUIRE

13             201 REDWOOD SHORES PARKWAY

14             REDWOOD SHORES, CALIFORNIA 94065

15             (650) 802-3000

16             brian.chang@weil.com

17

18   FOR DOMINO'S PIZZA, INC.:

19             BROOKS KUSHMAN PC

20             BY:  THOMAS W. CUNNINGHAM, ESQUIRE

21             1000 TOWN CENTER, 22ND FLOOR

               SOUTHFIELD, MICHIGAN 48075

22             (248) 358-4400

Page 713

1   wrong, but let's just say for the sake of

2   argument that actual reduction of practice

3   requires something like a physical manifestation

4   as opposed to just sort of the mental part of

5   the invention.

6        A.   Uh-huh.

7        Q.   So did that system that you showed in

8   November of 1998 at the trade show in Chicago --

9   I'm sorry -- Atlanta -- excuse me -- have a

10  cascaded set of linked graphical user interface

11  screens for a wireless handheld computing device

12  in the system that includes a different number

13  of user interface screens from at least one

14  other wireless handheld computing device in the

15  system?

16       A.   I believe it did.

17       Q.   And how did -- how was that shown?

18       A.   One on the TransPad and one on the

19  UltraPad, different versions.

20       Q.   And so how was the code prepared such

21  that is the cascaded set of linked graphical

22  user interface screens could be shown on the

Page 714

1   TransPad and the UltraPad at the same time?

2          MR. CALDARELLI:  Lacks foundation.

3   Asked and answered.

4          THE WITNESS:  I don't remember those

5   details.

6   BY MR. YU:

7      Q.   Are there any witnesses that could

8   corroborate your account that you showed the

9   system that worked that had the UltraPad -- the

10  Japanese UltraPad and the TransPad working

11  together and synchronized in real time at the

12  same time in November of 1998?

13         MR. CALDARELLI:  Lacks foundation.

14  Misstates testimony.

15         THE WITNESS:  Mr. Bergfeld, I believe

16  Ms. Sanders, and perhaps Mr. Harker, if you ask

17  him, he would have seen it.

18  BY MR. YU:

19     Q.   Okay.  I think we'll have to ask them.

20     A.   Okay.

21     Q.   Going back to Exhibit 47 -- this is the

22  four-page brochure.

Page 715

1       A.    Uh-huh.

2       Q.    On page -- and we're looking at the

3    diagram on page 6366.

4             Do you recall?

5       A.    Uh-huh.

6       Q.    I believe you testified that this was

7    an artist's rendition of the 21st Century

8    Restaurant system at that time?

9       A.    Not exactly.

10      Q.    Okay.

11      A.    I said the screen on the TransPad was

12   an artist's rendition.  That's what I said.

13      Q.    Okay.  Do you know who prepared this

14   figure?

15      A.    Some graphic person that I don't

16   recall.

17      Q.    And did you work with this graphics

18   person to prepare this figure?

19      A.    No.

20      Q.    Who did?

21      A.    Someone at Synerdyne, I believe.

22      Q.    And did the person at -- did Synerdyne

Page 716

1  prepare the system that is purportedly

2  illustrated in -- on page 6366.

3      A.   No.

4      Q.   Who did?

5      A.   Mr. Roof, myself, Mr. Bergfeld and

6  software personnel and a couple other

7  assistants.

8      Q.   So how did Synerdyne have the

9  information to work with the graphics person to

10 put together the figure on page 6366?

11     A.   It was prepared a year or 18 months or

12 so in advance.  We just slapped in graphically

13 here an old artist's conception of a TransPad.

14     Q.   And I apologize, but I think we're

15 talking -- you know, we're not talking on the

16 same wavelength again.

17          Are you saying that the figure on

18 page 6366, the entire figure, was prepared a

19 year or 18 months prior November of 1998?

20     A.   No, yeah, we're not communicating very

21 well.

22          As I said, only that artist's rendition

Page 717

1  on the screen of the TransPad.  This figure I

2  was involved in updating within a week or two

3  prior to the -- must have been around the first

4  of November, because I know we had a week or two

5  lead for the printers, because we printed out a

6  hundred or so of these for the show.

7          So only that screen had -- it had been

8  canned by some graphics person at Synerdyne a

9  year or so before just to show a conception of

10 how the TransPad could be sold in the

11 hospitality market.

12     Q.   Okay.  And so it is your testimony that

13 at this November 1998 show in Atlanta you

14 demonstrated the system that included both the

15 UltraPad and the TransPad?

16     A.   Yes.

17     Q.   Working at the same time?

18     A.   The best of my recollection, yes.

19     Q.   In the same system?

20     A.   Yes.

21     Q.   And that the programmable handheld menu

22 configuration on both the UltraPad and the

3/13/2018                    In Re: Ameranth Patent Litigation   Keith McNally 30(b)(6), Vol. II
                             Confidential - Attorneys' Eyes Only

Page 718

1   TransPad could be synchronized in real time; you

2   demonstrated that at the trade show in November

3   of 1998?

4       A.   In a very rudimentary sense.

5       Q.   How so?

6       A.   I can't remember the details of exactly

7   how we demonstrated, but it certainly wasn't a

8   full -- a fully capable system.  It was much

9   more just -- just an early prototype.

10      Q.   And you understand that it's very

11  important for me to know the specifics?

12           Do you understand that, sir?

13      A.   Of course I do.

14      Q.   Okay.  So I want you to try as best as

15  you can to tell me how the system was

16  demonstrated at the trade show in November of

17  1998 in this very rudimentary fashion that

18  you've described?

19           Can you be any more specific than that?

20      A.   No.

21      Q.   How is your memory good enough, then,

22  to know that the system included every one of

# United States Court of Appeals
# for the Federal Circuit

---

AMERANTH, INC.,

*Plaintiff – Appellant,*

v.

DOMINO'S PIZZA, LLC, DOMINO'S PIZZA, INC.,

*Defendants – Appellees,*

PAPA JOHN'S USA, INC., OPENTABLE, INC., GRUBHUB, INC., SEAMLESS NORTH AMERICA, LLC, O-WEB TECHNOLOGIES LTD., HOTELS.COM, L.P., STUBHUB, INC., TICKETMASTER, LLC, LIVE NATION ENTERTAINMENT, INC., TRAVELOCITY.COM LP, HOTEL TONIGHT, INC., ORBITZ, LLC, EXPEDIA, INC., FANDANGO, INC., HOTWIRE, INC., KAYAK SOFTWARE CORPORATION, EMN8, INC., HILTON INTERNATIONAL CO., HILTON RESORTS CORPORATION, HILTON WORLDWIDE, INC., USABLENET, INC., STARWOOD HOTELS & RESORTS WORLDWIDE INC., MOBO SYSTEMS, INC., AGILYSYS, INC., ATX INNOVATION, INC., BEST WESTERN INTERNATIONAL, INC., HYATT CORPORATION, ORDR.IN, INC., NAAMA NETWORKS, INC., MARRIOTT HOTEL SERVICES, INC., MARRIOTT INTERNATIONAL, INC., RITZ CARLTON HOTEL COMPANY, LLC, RENAISSANCE HOTEL OPERATING COMPANY, APPLE, INC., TICKETBISCUIT, LLC, EVENTBRITE, INC., TICKETFLY, INC., STARBUCKS CORPORATION, IPDEV CO., ORACLE CORPORATION,

*Defendants.*

---

*Appeal from the United States District Court for the Southern District of California in Case Nos. 3:11-cv-1810-DMS-WVG, 3:12-cv-00733-DMS-WVG, Judge Dana M. Sabraw*

---

## APPELLANT'S OPENING BRIEF

---

Richard C. Weinblatt
STAMOULIS & WEINBLATT LLC
Two Fox Point Centre
6 Denny Road, Suite 307 Wilmington, DE 19809
(302) 999-1540
Email: weinblatt@swdelaw.com
*Attorneys for Appellant, Ameranth, Inc.*

December 27, 2018

| UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT | |
|---|---|
| Ameranth, Inc. _____    **v.** | Domino's Pizza, LLC and Domino's Pizza, Inc. |

### Case No.  <u>2019-1141, 2019-1144</u>

### CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus)☐ (name of party)

Ameranth, Inc. _____

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held Companies that own 10 % or more of stock in the party |
|---|---|---|
| Ameranth, Inc. | N/A | None |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Caldarelli, Hejmanowski, Page & Leer, LLP:  William J. Caldarelli
Fabiano Law Firm, P.C:  Michael D. Fabiano
Osborne Law LLC:  John W. Osborne
Watts Law Offices:  Ethan M. Watts

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).

*Ameranth, Inc. v. Live Nation Ent., Inc.*, Case No. 3:12-cv-1648-DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Papa John's USA, Inc.*, Case No. 3:12-cv-729 DMS (WVG) (S.D. Cal., filed Mar. 27, 2012); *Ameranth, Inc. v. Open Table, Inc.*, Case No. 3:12-cv-731 DMS (WVG) (S S.D. Cal., filed Mar. 27, 2012); *Ameranth, Inc. v. O-Web Techs. Ltd.*, Case No. 3:12-cv-732 DMS (WVG) (S.D. Cal., filed Mar. 27, 2012); *Ameranth, Inc. v. GrubHub, Inc.*, Case No. 3:12-cv-739 DMS (WVG) (S.D. Cal., filed Mar. 27, 2012); *Ameranth, Inc. v. Agilysys, Inc.*, Case No. 3:12-cv-858 H (MDD) (S.D. Cal., filed Apr. 6, 2012); *Ameranth, Inc. v. Hyatt Hotels Corp.*, Case No. 3:12-cv-1627 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc v. Starwood Hotels and Resorts Worldwide, Inc.*, Case No. 3:12-cv-1629 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Best Western International, Inc.*, Case No. 3:12-cv-1630 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Marriott Internat'l, Inc.*, Case No. 3:12-cv-1631 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Hotel Tonight, Inc.*, Case No. 3:12-cv-1633 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Hotels.com, LP*, Case No. 3:12-cv-1634 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Hilton Resorts Corp.*, Case No. 3:12-cv-1636 DMS (WVG) (S.D. Cal., filed July 2, 2012); *Ameranth, Inc. v. Kayak Software Corp.*, Case No. 3:12-cv-1640 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Mobo Systems, Inc.*, Case No. 3:12-cv-1642 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Orbitz, LLC*, Case No. 3:12-cv-1644 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Stubhub, Inc.*, Case No. 3:12-cv-1646 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Ticketmaster, LLC*, Case No. 3:12-cv-1648 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Travelocity.com, LP*, Case No. 3:12-cv-1649 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Usablenet, Inc.*, Case No. 3:12-cv-1650 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Fandango, Inc.*, Case No. 3:12-cv-1651 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Hotwire, Inc.*, Case No. 3:12-cv-1653 MMA (BGS) (S.D. Cal., filedJuly 2, 2012); *Ameranth, Inc. v. Expedia, Inc.*, Case No. 3:12-cv-1654 CAB (RBB) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Oracle Corp.*, Case No. 3:12-cv-1655 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. ATX Innovation, Inc.*, Case No. 3:12-cv-1656 ~~JLS~~ DMS (NLS) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Ticketbiscuit, LLC*, Case No. 3:13-cv-352- AJB (KSC) (S.D. Cal., filed Feb. 13, 2013); *Ameranth, Inc. v. Starbucks Corp.*, Case No. 3:13-cv-1072 MMA (BGS)(S.D. Cal., filed May 6, 2013); *Ameranth Inc. v. Splick-It, Inc.*, Case No. 3:17-cv-1093-DMS (WVG) (S.D. Cal., filed May 26, 2017); *In re: Ameranth Litig.*, Case No. 3:11-

| cv-1810 DMS (WVG) (S.D. Cal.). | |
| --- | --- |
| December 27, 2018<br>Date | /s/ Richard C. Weinblatt<br>Signature of counsel |
| Please Note: All questions must be answered<br><br>cc: | Richard C. Weinblatt<br>Printed name of counsel |

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF CONTENTS............................................................................ iv

TABLE OF AUTHORITIES .................................................................... vi

I.     STATEMENT OF RELATED CASES................................................ 1

II.    STATEMENT OF JURISDICTION ................................................... 3

III.   STATEMENT OF THE ISSUES ...................................................... 3

IV.    STATEMENT OF THE CASE............................................................ 4

V.     STATEMENT OF THE FACTS ......................................................... 5

  A.   The Patent-in-Suit ................................................................... 5

  B.   The Claims at Issue................................................................. 13

  C.   District Court Proceedings..................................................... 14

VI.    SUMMARY OF THE ARGUMENT ............................................... 15

VII.   APPLICABLE LEGAL PRINCIPLES............................................ 18

  A.   Standard of Review................................................................. 18

  B.   Legal Framework for a Motion for Summary Judgment...................... 18

  C.   Legal Framework for the § 101 Analysis. ............................. 19

VII.   ARGUMENT ........................................................................................ 22

  A.   The '077 Patent's Claims Are Patentable Under the *Alice* Framework ........................................................................... 22

  B.   The District Court Erred by Relying on the *Apple* Case. ................... 25

C.  Step 1: The '077 Patent's Claims Are Not Directed to an Abstract Idea ..................................................................................... 29

1.  Presupposing Ineligibiliy, the District Court Failed to Perform a Proper Analysis to Determine Whether the Claims Are Directed to an Abstract Idea ......................................... 32

2.  The Claims of the '077 Patent Are Comparable to Other Claims Found to Not Cover Abstract Ideas. ................................... 40

D.  Step 2: The Claims Recite Significantly More Than an Abstract Concept ..................................................................................... 46

E.  Claim 1 Is Not Representative .............................................................. 55

F.  The District Court Invalidated Claims Upon Which It Had No Subject Matter Jurisdiction .................................................................. 57

VIII. CONCLUSION AND PRAYER ................................................................. 59

ADDENDUM

ADDENDUM TABLE OF CONTENTS

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPE-FACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

# TABLE OF AUTHORITIES

## CASES

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018) ................................................................. 21, 47

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) .............................................................................. passim

*Allergan, Inc. v. Sandoz, Inc.*,
  681 Fed. Appx. 955 (Fed. Cir. 2017) ..................................................................58

*Amdocs (Israel) Limited v. Openet Telecom, Inc.*,
  841 F.3d 1288 (Fed. Cir. 2016) .........................................................................33

*Ancora Technologies, Inc. v. HTC America, Inc.*, 2018-1404,
  2018 WL 600502 (Fed. Cir. Nov. 16, 2018) ......................................................25

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................. 18, 19

*Animal Legal Def. Fund v. U.S. Food & Drug Admin.*,
  836 F.3d 987 (9th Cir. 2016) .................................................................... 19, 39

*Apple, Inc. v. Ameranth, Inc.*,
  842 F.3d 1229 (Fed. Cir. 2016) ................................................................. passim

*Association for Molecular Pathology v. Myriad Genetics, Inc.*,
  133 S. Ct. 2107 (2013) ......................................................................................22

*Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ................................................................ 47, 48

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) ................................................................ 21, 47

*Bilski v. Kappos*,
  561 U.S. 593 (2010) .................................................................................. 20, 21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..........................................................................................18

*Commil USA, LLC v. Cisco Systems, Inc.*,
  135 S. Ct. 1920 (2015) ........................................................................25

*Content Extraction & Transmission LLC v. Wells Fargo Bank*,
  776 F.3d 1343 (Fed. Cir. 2014) ...........................................................45

*Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*,
  880 F.3d 1356 (Fed. Cir. 2018) ........................................... 31, 41, 42, 44

*Data Engine Technologies LLC v. Google LLC*, 2017-1135,
  2018 WL 4868029 (Fed. Cir. Oct. 9, 2018) .................................... 25, 31, 32, 38

*Diamond v. Diehr*,
  450 U.S. 175 (1981)............................................................... 21, 54

*Direct Techs., LLC v. Electronic Arts, Inc.*,
  836 F.3d 1059 (9th Cir. 2016) ................................................... 19, 48

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) ................................................ passim

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
  879 F.3d 1299 (Fed. Cir. 2018) ...........................................................44

*Fox Group, Inc. v. Cree, Inc.*,
  700 F.3d 1300 (Fed. Cir. 2002) ...........................................................58

*Jones v. Hardy*,
  727 F.2d 1524 (Fed. Cir. 1984) ...........................................................21

*King Pharms., Inc. v. Eon Labs, Inc.*,
  616 F.3d 1267 (Fed. Cir. 2010) ...........................................................21

*Local Intelligence, LLC v. HTC America, Inc.*, Case No. 5:17-cv-06437-EJD,
  2018 WL 1697127 (N.D. Cal. Apr. 6, 2018)........................................ 41, 42, 43

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
  132 S. Ct. 1289 (2012)............................................................... passim

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016) ................................................ 18, 32

*O'Reilly v. Morse*,
   56 U.S. 62 (1854) ..................................................................... 32, 46

*Pan Pac. Retail Props., Inc. v. Gulf Ins. Co.*,
   471 F.3d 961 (9th Cir. 2006) .......................................... 19, 39, 48

*Plantronics, Inc. v. Aliph, Inc.*,
   724 F.3d 1343 (Fed. Cir. 2013) .........................................58

*Reid v. State Farm Mut. Auto. Ins. Co.*,
   784 F.2d 577 (5th Cir. 1986) .........................................19

*Scanner Technologies Corp. v. ICOS Vision Sys. Corp. N.V.*,
   528 F.3d 1365 (Fed. Cir. 2008) .........................................58

*Thales Visionix Inc. v. United States*,
   850 F.3d 1343 (Fed. Cir. 2017) .........................................44

*Uniloc USA, Inc. v. HTC America, Inc.*, No. C17-1558JLR,
   2018 WL 3008870 (W.D. Wash. June 15, 2018),
   *appeal docketed*, No. 18-2185 (Fed. Cir. July 23, 2018) ........................... 41, 42

*Universal Health Servs., Inc. v. Thompson*,
   363 F.3d 1013 (9th Cir. 2004) .........................................18

*Visual Memory, LLC v. NVIDIA Corp.*,
   867 F.3d 1253 (Fed. Cir. 2017) ................................................. passim

*Walker v. Sears, Roebuck & Co.*,
   853 F.2d 355 (5th Cir. 1988) .........................................19

**STATUTES**

28 U.S.C. § 1295 .......................................................................3

28 U.S.C. § 1338 .......................................................................3

28 U.S.C. § 1400 .......................................................................3

28 U.S.C. § 2107 .......................................................................3

35 U.S.C. § 101 ................................................................ passim

**RULES**

FED. R. APP. P. 4 ...................................................................................3

Fed. R. Civ. P. 56 ..................................................................................18

## I.   STATEMENT OF RELATED CASES

There have been no other appeals before this or any other appellate court stemming from the civil action giving rise to this appeal.  This Court decided a case involving claims of patents from the same patent family but with different claim scopes in *Apple, Inc. v. Ameranth Inc.*, 842 F.3d 1229 (Fed. Cir. 2016).  However, *Apple* does not qualify as a related case under Rule 47.5.

Counsel is aware of the following district court cases that involve the same patent that is at issue in this appeal:

*Ameranth, Inc. v. Live Nation Ent., Inc.*, Case No. 3:12-cv-1648-DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Papa John's USA, Inc.*, Case No. 3:12-cv-729 DMS (WVG) (S.D. Cal., filed Mar. 27, 2012); *Ameranth, Inc. v. Open Table, Inc.*, Case No. 3:12-cv-731 DMS (WVG) (S S.D. Cal., filed Mar. 27, 2012); *Ameranth, Inc. v. O-Web Techs. Ltd.*, Case No. 3:12-cv-732 DMS (WVG) (S.D. Cal., filed Mar. 27, 2012); *Ameranth, Inc. v. GrubHub, Inc.*, Case No. 3:12-cv-739 DMS (WVG) (S.D. Cal., filed Mar. 27, 2012); *Ameranth, Inc. v. Agilysys, Inc.*, Case No. 3:12-cv-858 H (MDD) (S.D. Cal., filed Apr. 6, 2012); *Ameranth, Inc. v. Hyatt Hotels Corp.*, Case No. 3:12-cv-1627 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc v. Starwood Hotels and Resorts Worldwide, Inc.*, Case No. 3:12-cv-1629 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Best Western International, Inc.*, Case No. 3:12-cv-1630 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Marriott Internat'l, Inc.*, Case No. 3:12-cv-1631 DMS

(WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Hotel Tonight, Inc.*, Case No. 3:12-cv-1633 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Hotels.com, LP*, Case No. 3:12-cv-1634 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Hilton Resorts Corp.*, Case No. 3:12-cv-1636 DMS (WVG) (S.D. Cal., filed July 2, 2012); *Ameranth, Inc. v. Kayak Software Corp.*, Case No. 3:12-cv-1640 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Mobo Systems, Inc.*, Case No. 3:12-cv-1642 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Orbitz, LLC*, Case No. 3:12-cv-1644 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Stubhub, Inc.*, Case No. 3:12-cv-1646 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Ticketmaster, LLC*, Case No. 3:12-cv-1648 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Travelocity.com, LP*, Case No. 3:12-cv-1649 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Usablenet, Inc.*, Case No. 3:12-cv-1650 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Fandango, Inc.*, Case No. 3:12-cv-1651 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Hotwire, Inc.*, Case No. 3:12-cv-1653 MMA (BGS) (S.D. Cal., filedJuly 2, 2012); *Ameranth, Inc. v. Expedia, Inc.*, Case No. 3:12-cv-1654 CAB (RBB) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Oracle Corp.*, Case No. 3:12-cv-1655 DMS (WVG) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. ATX Innovation, Inc.*, Case No. 3:12-cv-1656 JLS DMS (NLS) (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Ticketbiscuit,*

*LLC*, Case No. 3:13-cv-352- AJB (KSC) (S.D. Cal., filed Feb. 13, 2013); *Ameranth, Inc. v. Starbucks Corp.*, Case No. 3:13-cv-1072 MMA (BGS)(S.D. Cal., filed May 6, 2013); *Ameranth Inc. v. Splick-It, Inc.*, Case No. 3:17-cv-1093-DMS (WVG) (S.D. Cal., filed May 26, 2017); *In re: Ameranth Litig.*, Case No. 3:11-cv-1810 DMS (WVG) (S.D. Cal.).

## II.   STATEMENT OF JURISDICTION

Appellant, Ameranth, Inc. ("Ameranth"), brings this Appeal from the United States District Court for the Southern District of California (the "District Court") to the United States Court of Appeals for the Federal Circuit in accordance with 28 U.S.C. § 1295(a)(1). *See* FED. R. APP. P. 4(a)(4)(B)(i).

This is a case arising under the United States Patent Laws and jurisdiction exists in accordance with and pursuant to 28 U.S.C. §§ 1338(a) and 1400(b). Ameranth is appealing the order of the District Court finding claims 1, 4-9, 11, 13-18 of the patent-in-suit to be unpatentable under 35 U.S.C. § 101. The order is final because final judgment was entered on October 11, 2018.  Appx00001.

This appeal has been timely taken within  thirty (30) days of the entry of final judgment pursuant to 28 U.S.C. § 2107.  (Dkt. No. 1-2 at 1-3.)

## III.   STATEMENT OF THE ISSUES

1. Whether the District Court erred in granting Domino's Pizza, LLC and Domino's Pizza, Inc.'s motion for summary judgment and finding claims 1, 4-9, 11,

13-18, which included claims not asserted against Domino's Pizza, LLC and Domino's Pizza, Inc., of U.S. Patent No. 8,146,077 (the "'077 patent") invalid pursuant to 35 U.S.C. § 101;

2.  Whether the District Court erred in finding the '077 patent to be directed to an abstract idea; and, alternatively, whether the District Court erred in characterizing the claims overbroadly;

3.  Whether the District Court erred in finding insufficient meaningful limitations or inventive concept for transforming any claimed abstract idea into a patent-eligible application; and

4.  Whether the District Court erred by disregarding Ameranth, Inc.'s factual evidence including (a) the '077 patent's intrinsic record which detailed problems of the prior art, how the claimed inventions solved those problems, and included accolades for the claimed inventions, and (b) declarations that evidenced the technological improvements of the claimed inventions and the non-conventionality of the inventions when granting Domino's Pizza, LLC and Domino's Pizza, Inc.'s motion for summary judgment and finding claims invalid under § 101.

## IV.    STATEMENT OF THE CASE

This matter is the appeal of a patent infringement suit involving U.S. Patent No. 8,146,077  (the "'077 patent"), in which the District Court granted summary judgment, finding that claims 1, 4-9, 11, 13-18 of the '077 patent are unpatentable

under 35 U.S.C. § 101.  Following entry of judgment, Appx1, Ameranth timely

appealed to this Court.  (Dkt. No. 1-2 at 1-3.)

## V.   STATEMENT OF THE FACTS

### A. The Patent-in-Suit

As explained in the specification, "[a] principal object of the present invention

is to provide an improved information management and synchronous

communications system and method which facilitates user friendly and efficient

generation of computerized menus for restaurants and other applications that utilize

equipment with non-PC-standard graphical formats, display sizes and/or

applications."  '077 patent at 2:61-67 (emphasis added).[1]  Thus, the claims of the

'077 patent are directed to improved synchronization systems and methods for

integrating non-PC standard graphical formats, display sizes and/or applications.

The '077 patent claims describe how to solve technical problems for

information management and real time synchronous communications systems

between two or more different wireless handheld computing devices and a master

database.  *Id.* at 15:56-16:61, 17:35-18:47; 18:65-20:17.  The "how" of the claims

includes configuration software that is enabled to design and generate programmed

handheld menu configurations for the wireless devices by utilizing parameters from

---

[1] Unless otherwise noted, citations to the column and line numbers (e.g., X:Y) in this
brief refer to the '077 patent, Appx00276-00297.

the master database file structure that synchronizes in real-time information from the programmed handheld menu configuration ("PHMC") with analogous information in the master database.  *Id.* at 16:5-19, 17:52-18:1, 19:15-26; *see also id.* at 7:31-10:41, 11:15-31, 11:52-12:4, 15:4-25.   The "how" of the claims also includes configuration software that is further enabled to generate the different PHMC's in conformity with a customized display layout for the different wireless handheld computing devices and compatible with the sizes of their displays.  *Id.* at 16:20-29; 17:2-13; 19:30-38.

Prior to the inventions of the '077 patent, achieving full integration/synchronization with different handheld device types was impractical due to, among other reasons, the size, weight, cost, battery power, memory, wireless data transmission and rate constraints of the wireless devices known at the time.  *See* Appx1588-1589.   Indeed, there was no integrated solution to address these problems:

> to date, there is still no integrated solution to the ordering/waitlist/reservation problem discussed above. With the advent of the Palm® and other handheld wireless devices, however, the efforts to make such devices ubiquitous have begun to bear fruit at least in some areas, e.g., personal calendars.  However, substantial use of such devices in the restaurant and hospitality context has not occurred to date.  As discussed above, at least one of the reasons PDAs have not been quickly assimilated into the restaurant and hospitality industries is that their small display sizes are not readily amenable to display of menus as they are commonly printed on paper or displayed on, e.g., large, color desktop computer screens.  Another reason is that software for fully realizing the potential for wireless handheld computing

> devices has not previously been available.  Such features would include
> fast and automatic synchronization between a central database and
> multiple handheld devices, synchronization and communication
> between a World Wide Web ("Web") server and multiple handheld
> devices, a well-defined application program interface ("API") that
> enables third parties such as point of sale ("POS") companies, affinity
> program companies and internet content providers to fully integrate
> with computerized hospitality applications, real-time communication
> over the internet with direct connections or regular modem dialup
> connections and support for batch processing that can be done
> periodically throughout the day to keep multiple sites in synch with the
> central database.

'077 patent at 2:4-31.

As the '077 patent explains, due to the differences in screen sizes of mobile devices and the non-PC standard sizes and formats of their displays, there was no "user-friendly information management and communication capability not requiring extensive computer expertise . . . for use in everyday life such as for restaurant ordering, reservations, and wait-list management." *Id.* at 1:44-48.  To put this in perspective, without the inventions of the '077 patent, each type of handheld device running, for example, Palm, Windows CE, iOS, or Android, would need to be programmed individually, not only because of the different operating systems, but also because of the different non-standard PC display characteristics, such as display size and layout/orientation, of each type of handheld device.

The prosecution history consistently and further confirms the prior art problems and explains how the '077 patent's inventions solve them:

The present application and claims resulted from the first system to enable synchronization of information between wired, wireless and web-based hospitality systems for, among other things, generation of computerized menus, reservations etc. for environments which utilize computer equipment with nonstandard or different graphical formats, display sizes or applications.  Systems known at the time involved different sets of GUI-based information or data on different platforms (e.g., wired, wireless, internet) and the different platforms had very different user display characteristics.  The inability of one platform to readily use and display the information originated from another platform was a huge impediment to a fully-integrated hospitality system involving many different fixed, web and wireless system components.  The inventors conceived a system which ensured that all of the disparate components of the system could process, display and/or interact with the same information or data, while synchronously maintaining data consistency across the entire system.

Appx1588-1589.

The inventors of the presently-amended claims were the first to understand that to achieve full, real time and synchronous integration of a hospitality system including different display devices with "non-standard sized displays," the system would have to be capable of synchronously accommodating different display size and format requirements in real time and be capable of converting the data stored on the central database, by leveraging the data parameters from the central database (while knowing the relevant display characteristics of the target displays), and configuring/programming, generating and transmitting "menus" to each individual system node in a format that could be displayable, useful and actionable on the display of that particular device. . . . The inventors likewise appreciated that user inputs from these nodes would also have to be formatted and recognized by the synchronized system in real time to be the same as if they had been entered into the system from any other node in the system - otherwise the system would be dealing with inconsistent information and this would then not be a truly real time integrated, and synchronized system.

Appx1060-1061; *see also* Appx1590.

The '077 patent at Figure 5 shows a schematic representation of a display customization dialog box for generating the PHMC's in accordance with the customized display layout.   '077 patent at 5:62-63.



FIG.5

As explained in the specification:

> The preferred embodiment encompasses customized layout, views and fonts.  To set the focus on the view it is desired to change, click inside the desired window.  The main customizing dialog box is accessed by clicking on View>Customize View.  A dialog box 13, as shown in FIG. 5, will be displayed including tabs that allow the following options:  selection of Columns to display in the list view by choosing and arranging the fields to display in the Modifiers and Sub-Modifiers windows; formatting Columns by specifying the column widths and justification; selecting Filter allows restricting the list to display only the items that meet certain criteria.  For example, display of modifiers with codes between 500 and 550.  Selecting Sort allows sorting the modifiers or sub-modifiers according to any of the available fields such as Name, Code or Price. Selecting Style facilitates choice of font type, style, size, etc.

'077 patent at 10:20-34.

The specification also teaches the ability to size and simultaneously design/view multiple and different handheld customized display layouts for the claimed system with multiple handheld sizes/types on the back-end design system via the "splitter view" functionality:

> As stated, the preferred embodiment of the present invention includes the use of and compatibility with GUI technology. A drag-and-drop approach is used for organizing the tree structure 2 in the generated menu. Drag-and-drop is also used for assigning modifiers (modifiers can be dragged from the modifiers window 5 and dropped onto the menu item 4 for assignment). In-cell editing results in fast editing of items in building the menus. Customizable fonts enable users to change font types, style and size. Customizable layouts enable users to resize windows, change icons and display preferences. The inventive approach provides for fully persistent storage between sessions, even if a session is improperly or abruptly terminated. Font and the tree state (i.e., which nodes are expanded/collapsed) are stored between sessions. Layout for modifiers and sub-modifiers list views (filter, columns, formatting, font, etc.) are stored between sessions. The last database used is likewise stored between sessions. Splitter views allow the user to see different views at the same time. Each view is displayed on its own section of the screen. Views can be resized via the keyboard or a mouse by simply dragging the splitter in the middle.

*Id.* at 10:61-11:14.

Figure 7, reproduced below with annotations, shows a schematic representation of an exemplary customized display layout for a point of sale user interface on a wireless handheld device screen for use in displaying page menus as cascaded linked screens. '077 patent at 6:1-3, 11:33-44.



FIG.7

The system includes communication control software that "act[s] as a real time interface between the elements of the system and *any applicable communications protocol*." *Id.* at 19:27-29 (emphasis added). "This communications module is a layer that sits on top of any communication protocol and acts as an interface between hospitality applications and the communication protocol. This layer can be easily updated to work with a new communications protocol without having to modify the core hospitality applications." *Id.* at 12:42-47. As the specification explains:

> A single point of entry for all hospitality applications to communicate with one another wirelessly has also previously been unavailable. Such a single point of entry would work to keep all wireless handheld devices and linked Web sites in synch with the backoffice server (central database) so that the different components are in equilibrium at any given time and an overall consistency is achieved.

*Id.* at 2:31-38.

The specification also discloses the computer technology for the claimed system includes the claimed master database and software and specifically highlights that its technical database functions are advanced – including its API for database access and queries to/with its stored data and parameters:

> Advanced database functions are provided in the preferred embodiment of the invention, including an automated download process onto handheld devices and/or Web sites. In the preferred embodiment, the menu generation system of the present invention uses an API called ActiveX Data Objects ("ADO") for database access. ADO is useful in a variety of settings. It is built on top of OLE DB and can be used to talk to databases and, in the future, any data source with any OLE DB driver. Advanced querying is supported. The database can be queried on virtually all fields. Queries can be built using SQL syntax for experienced users or can be created using a query builder which guides users through the creating process.  Advanced error handling is supported.  . . . The advanced database functions produce well-designed databases that accommodate growth and scalability[.]

Id. at 11:52-12:2-4.

The specification further makes clear that the system including the advanced master menu/database file structures of the claimed inventions improves computer efficiency and operation:

> In the more general situation, menus can be generated in accordance with the present invention in a variety of situations.  For example, *the usable file structure* for a particular data processing application can be dictated by the user or an application program prior to or during the execution of the application program. *Efficiencies with respect to computational speed and equipment, e.g., storage and processor*, usage can thus be achieved along with the facilitation of display of the generated menu.

Id. 15:38-46 (emphasis added).

Another technical advantage of the invented technology is explained in the file history.  "[T]he handheld menu configuration is generated <u>from</u> the master menu even though the display configurations are different and with the menu configuration taking into account the known size of the handheld display into its configurations." Appx1074.  Thus, it eliminates the amount of user scrolling.  Appx1092 ("The presently claimed invention, *inter alia*, eliminates the need to rely entirely on scrolling in the display of menu or other hospitality information on small screen devices.  The generation of configured hospitality application information optimized for the handheld device user interface screen from a master database file structure as presently claimed substantially eliminates the need for such scrolling because the configured hospitality application information is generated specifically to satisfy the display constraints of the handheld display screen; i.e., the generation of configured screens unique for the handheld device substantially eliminates the need for scrolling because each screen fits properly on the display device and additional user screens are created and linked appropriately to provide a coherent, user friendly flow for the particular display device.").

## B. The Claims at Issue

Although the District Court ordered Ameranth to limit its case against Domino's to only five asserted claims of the '077 patent, Appx2192, its order granting summary judgment improperly extends to nine additional claims.  The

independent – and dependent – claims[2] are consistent with the inventions described in the specification.

## C. District Court Proceedings

On August 15, 2011, Ameranth filed a complaint against several defendants, including, but not limited to, Domino's Pizza, LLC and Domino's Pizza, Inc. (collectively, "Domino's") and Pizza Hut of America, Inc. and Pizza Hut, Inc. (collectively, "Pizza Hut"), asserting infringement of two patents, neither of which were the '077 patent.  Ameranth amended its complaint on September 20, 2013 to include infringement allegations regarding the '077 patent.  The District Court issued its claim construction ruling on December 28, 2017.  Appx4783.  About six months later, Pizza Hut filed a motion for summary judgment of unpatentability under 35 U.S.C. § 101, which identified the asserted claims as claims 1, 6, 8, 13 and 17, Appx6398, Ameranth opposed, and oral argument was scheduled for August 22, 2018; the parties resolved their dispute prior to the hearing, which was vacated.

On August 7, 2017, Ameranth asserted claims 1, 6, 9, 13 and 17 against Domino's in its Amended Disclosure of Asserted Claims and Infringement

---

[2] Although only claims 1, 6, 9, 13, and 17 were asserted against Domino's, Appx10198, because the District Court invalidated nine unasserted claims, this brief addresses all claims invalidated by the District Court without conceding it was proper for the Court to rule on those claims.

Contentions.  Appx2196.  More than a year later, Domino's moved to join Pizza

Hut's then-mooted motion for summary judgment, Ameranth opposed the joinder as

untimely, but the court permitted joinder while also permitting Ameranth to file a

supplemental brief, which Ameranth did.  Oral argument on Domino's motion

occurred on September 21, 2018.  Without applying any of its claim construction

rulings, the District Court erroneously held that Ameranth's asserted claims: "are

directed to a system for (1) configuring and transmitting hospitality information

from a master menu/database to wireless handheld devices with different display

screen sizes and (2) enabling real-time synchronous communications and formatting

between the wireless handheld devices and the master database," Appx10; are "not

directed to improving the capabilities of any particular computing device," Appx12;

do not contain an inventive concept, Appx15 ("[T]here is nothing in these elements,

either individually or in combination that "transform[s] the claimed abstract idea

into a patent-eligible application of the abstract idea."), and determined certain

claims – including unasserted claims –  of the '077 patent to be unpatentable under

§ 101.  *Id.*

## VI.   SUMMARY OF THE ARGUMENT

The District Court erred in finding claims of the '077 patent to be unpatentable

under 35 U.S.C. § 101, and committed reversible error in multiple respects.

The District Court ignored multiple claim elements in an effort to justify its

decision to analogize this case to *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229 (Fed.

Cir. 2016), and find certain claims of the '077 patent invalid under § 101.  However,

the scopes of the claims in the *Apple* case and this case are drastically different and

*Apple* is not applicable.  In *Apple*, the claims only included a single handheld device

type and were only about a menu wherein categories can be selected and a second

menu generated based on the selection(s), but with no details about how to customize,

configure, reformat, display, synchronize or maintain the synchronization of the

menus, and without consideration of the size of small, non-PC standard, handheld

displays; nor did the *Apple* claims require a system with at least two differently sized

handheld devices.  Here, the claims at issue recite a *particular way* of programming

and designing the software for such a system to permit a menu or hospitality

application information to be formatted for and displayed with a customized display

layout for multiple handheld devices having different small display screen sizes, with

different GUI screen counts, and to wirelessly synchronize the menu or hospitality

application information throughout the connected system.

The District Court also erred in ruling that the improved information

management and real time synchronous communications systems for use with

wireless handheld computing devices having various display characteristics, such as

display size and format, claimed in the '077 patent fall under the narrow exception

of an abstract idea.  The appealed claims cover tangible, improved systems which are designed to create customized GUIs that can be displayed on various small screen sizes of handheld devices and that are wirelessly synchronized across nodes in real time through use of "communications control software" (claim 13) or "menu configuration software" (claims 1 and 9).  This solved the technological problems presented by the varying small screen sizes of wireless handheld computing devices with various display sizes (which are small) while also being user-friendly, which obviated the need to have separate, individualized programming for each device. The claims also solved the problem of having to scroll through information in its entirety due to the prior art's inability to customize the format/layout for the size of the handheld devices' small screens.

The District Court erred by characterizing the claimed invention in an overly simplistic manner, omitting or ignoring claim elements, and failing to view the facts in the light most favorable to Ameranth.  Ameranth argued against routineness and conventionality and submitted three declarations providing compelling evidence in support of its arguments.  The court disregarded them all and mistakenly determined that Ameranth did not contest that hardware or software elements were typical or conventional.  The District Court also erred by failing to consider the intrinsic record which detailed problems of the prior art, how the claimed inventions solved them, and included many accolades for the claimed inventions.  The District Court must

be overturned because it unjustly destroyed a property right by overgeneralizing the claims and ignoring Ameranth's factual evidence confirming the improvements to the technology.

## VII.    Applicable Legal Principles

### A. Standard of Review.

This Court reviews this matter *de novo*. *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004) (summary judgment grant reviewed *de novo*); *see also McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1311 (Fed. Cir. 2016) (§ 101 patent-eligibility decisions reviewed *de novo*).

### B. Legal Framework for a Motion for Summary Judgment.

Summary judgment may be granted only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The moving party must make a showing by informing the court of the basis for its motion and identifying the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. 317 at 323; FED. R. CIV. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, the court "must consider

fact questions with deference to the nonmovant . . . [and] 'must review the facts drawing all inferences most favorable to the party opposing the motion.'" *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988) (quoting *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986)).  Summary judgment must be denied if the court finds some support for the allegations such that "reasonable minds could differ as to the import of the evidence." *Anderson*, 477 U.S. at 250-51.  Similarly, where evidence is genuinely disputed on a particular issue – such as by conflicting testimony – that "issue is inappropriate for resolution on summary judgment." *Direct Techs., LLC v. Electronic Arts, Inc.*, 836 F.3d 1059, 1067 (9th Cir. 2016); *Pan Pac. Retail Props., Inc. v. Gulf Ins. Co.*, 471 F.3d 961, 970 (9th Cir. 2006) ("[T]he district court erred in granting summary judgment to the defendants, resolving [an] issue in light of the disputed and conflicting evidence before it.").  In other words, "where the district court has made a factual determination, summary judgment cannot be appropriate." *Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987, 990 (9th Cir. 2016).

**C. Legal Framework for the § 101 Analysis.**

Section 101 provides that a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101.  Only three narrow exceptions to the broad patent-eligibility principles of 35 U.S.C. § 101 exist – "laws of nature, physical

phenomena, and abstract ideas." *Bilski v. Kappos*, 561 U.S. 593, 601-02 (2010)

("*Bilski II*").  The Supreme Court has never provided clear guidance as to what

constitutes an "abstract idea," *id*. at 621 (Stevens, J., concurring), but it did reiterate

its reluctance to broadly apply these three narrow exceptions:  "[W]e tread carefully

in construing this exclusionary principle, lest it swallow all of patent law.  At some

level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature,

natural phenomena, or abstract ideas.'" *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134

S. Ct. 2347, 2354 (2014) (quoting *Mayo Collaborative Services v. Prometheus

Labs., Inc.* 132 S. Ct. 1289*, 1293 (2012) (internal citation omitted)).[3]

Supreme Court precedent instructs a court to "first determine whether the

claims at issue are directed to a patent ineligible concept." *Id.* at 2355.  If this

threshold determination is met, the court moves to the second step of the inquiry and

"considers the elements of each claim both individually and 'as an ordered

combination' to determine whether the additional elements 'transform the nature of

the claim' into a patent-eligible application." *Id*. (quoting *Mayo*, 132 S. Ct. at 1298,

---

[3] This Court held a patent claim should not be found to be for an unpatentable abstract idea unless that abstractness "exhibit[s] itself ***so manifestly*** as to override the broad statutory categories of eligible subject matter." *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010) (emphasis added). Further, "inventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act." *Id.* at 869.

1297).  "[W]hether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact. Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018); *see also Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) ("Whether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact.").

Whether a claim satisfies § 101 requires viewing the claim as a whole, and not individual limitations. *Diamond v. Diehr*, 450 U.S. 175, 188-89 (1981); *King Pharms., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1277 (Fed. Cir. 2010) ("The Supreme Court has stated that a § 101 patentability analysis is directed to the claim as a whole, not individual limitations.").  By definition, "each claim must be considered as defining a separate invention." *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984) (citing 35 U.S.C. § 282).  "[I]t is irrelevant that any individual step or limitation of such processes by itself would be unpatentable under § 101." *In re Bilski*, 545 F.3d 943, 958 (Fed. Cir. 2008).

"[T]he concern that drives" § 101 jurisprudence is "one of pre-emption." *Alice*, 134 S. Ct. at 2354; *see also Bilski II*, 561 U.S. at 611-12 (finding claims covered ineligible subject matter because they "would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea.").

## VII.  ARGUMENT

### A. The '077 Patent's Claims Are Patentable Under the *Alice* Framework

In *Alice*, the Supreme Court formalized a framework to determine whether a patent claims a judicial exception (*i.e.*, an abstract idea, natural phenomenon, or law of nature).  134 S. Ct. at 2355.  A court must first ask "whether the **claims** at issue are **directed to** one of those patent-ineligible concepts"; if so, then the court must ask, "[w]hat else is there in the claims before us?"  *Id.* (emphasis added).  While the Supreme Court did not explicitly define the phrase "directed to," the wording of the *Alice* test confirms that the focus must be on what is *actually* claimed, not a single element of a claim.

When the facts are viewed, as they must be on a Rule 56 motion, in the light most favorable to Ameranth, there are meaningful limitations that preclude the '077 patent from impermissibly preempting "the basic tools of scientific and technological work" and "thereby thwarting the primary object of the patent laws."  *Id.* at 2354 (quoting *Association for Molecular Pathology v. Myriad Genetics*, Inc. 133 S. Ct. 2107, 2116 (2013)).  On their face, the claims of Ameranth's patent are directed to an improvement to the efficient functioning of computers, specifically a particular, information management and real time synchronous communications system with "customized display layouts" for use with multiple and different wireless handheld computing devices having various non-standard display characteristics, such as

physical display size and format, that creates a structured GUI with "cascaded sets of linked graphical user interface screens" and that also improves the efficient functioning of computers in multiple respects. Consequently, they claim patentable subject matter under § 101.

The District Court ignored the scopes and elements of the '077 patent's claims to analogize them to the earlier patent claims invalidated under § 101 in *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229 (Fed. Cir. 2016): claims 1-11 of U.S. Patent No. 6,384,850 (the "850 patent"), claims 1-10 of U.S. Patent No. 6,871,325 (the "325 patent"), and claims 1-16 of U.S. Patent No. 6,982,733 (the "'733 patent"). Although the '077 patent is in the same family as these other patents and shares the same specification with the '733 patent, its claim scope vastly differs and its claims include *a particular way* of programming and designing the software to permit a menu or hospitality application information to be displayed on various handheld devices having varied display screen sizes and to communicate and synchronize the menu or hospitality application information for consistency throughout the system.

The District Court disregarded Ameranth's factual evidence including accolades in the file history. *See* Appx1477 ("Ameranth's wireless handhelds were mentioned in "Restaurant Show Daily" in 1999 as one of the most interesting things seen at the show by an actual restaurant customer.); Appx1481 (An article from Hospitality Technology magazine dated July/August 1999 described the debut of Ameranth's new products and

partnerships at the National Restaurant Association ("NRA") show of May 1999 and
referred to the '"buzz" that Ameranth received from its exhibits.); Appx1491 (An e-
mail memorandum dated September 13, 1999 (provided to Ameranth at that time by
the author, Bob Nugent, VP of Food.com, then the world's largest online food ordering
company) reflected Food.com's internal assessment of Ameranth's technology and
confirms breakthrough aspects of Ameranth's inventions.); *see also* Appx1277-1278
(March 29, 2008 Memorandum For Record of John Harker, Director of Hospitality for
Symbol Technologies, confirmed that the '077 patent's inventions reflected a
"breakthrough" and solved previous computerized technical problems.); *see also*
Appx1278 (Mr. Harker's confirming strategic investments into Ameranth by Symbol
and Microsoft, then "the world's leading mobile computing and software companies,"
"validated that Ameranth's technology was truly unique and that it had developed and
owned a new and an unprecedented technology solution to solve a very important
market need.").  The District Court also disregarded the declaration of expert Michael
I. Shamos, Ph.D., the declaration of '077 patent lead inventor Keith R. McNally, and
the declaration of Douglas S. Dedo, who worked at Microsoft, was responsible for
product development and marketing of various mobile devices built on Microsoft's
Windows CE mobile operating system, and managed Microsoft's strategic
relationship with Ameranth during the relevant time period.  All of this evidence

confirms the '077 patent's claims were not well-understood, routine and/or conventional activity.

The District Court made the same error as the court that was reversed in *Data Engine Technologies LLC v. Google LLC*, 2017-1135, 2018 WL 4868029 (Fed. Cir. Oct. 9, 2018) – by declining to consider the accolades in the file history, it failed to acknowledge the technological improvement of the claimed inventions. *See id.* at *6, *6 n.2; *see also Ancora Technologies, Inc. v. HTC America, Inc.*, 2018-1404, 2018 WL 600502, at *4 (Fed. Cir. Nov. 16, 2018) ("The prosecution history reinforces what the patent itself indicates about the change in previous verification techniques for computer security.").

Accordingly, Domino's did not meet its burden of proof that the '077 patent's claims are invalid under § 101 and the District Court erred in its decision. *See Commil USA, LLC v. Cisco Systems, Inc.*, 135 S. Ct. 1920, 1928-29 (2015) (ruling that patents are presumed valid and the clear and convincing evidentiary standard applies to all challenges to a patent's validity).

**B. The District Court Erred by Relying on the *Apple* Case.**

The District Court did nothing more than latch onto text from the *Apple* case when considering Step 1 of *Alice* and summarily dismissed all the other critical elements and features of the '077 patent's claims:

> Here, the claims include additional limitations, namely, wireless handheld devices with different display screen sizes, and enabling real-time

synchronous communications and formatting between the devices in the system.  However, none of those limitations fills the void set out by the Federal Circuit in *Apple*.  In other words, despite the additional limitations, the claims here, like those in the related patents, "do not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim the resulting systems."

Appx11 (quoting *Apple*, 842 F.3d at 1241).

When deciding *Apple*, this Court ruled "[c]laim 1 of the '325 patent and claim 1 of the '733 patent are nearly identical to claim 1 of the '850 patent."  *Apple*, 842 F.3d at 1234.  When examining Step 1 of *Alice*, the Court held:

> [T]he claims in these patents are directed to an abstract idea.  The patents claim systems including menus with particular features.  They do not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim the resulting systems. Essentially, the claims are directed to certain functionality—here, the ability to generate menus with certain features. Alternatively, the claims are not directed to a specific improvement in the way computers operate.

*Id.* at 1241 (citation omitted).

If the District Court had not simply piggy-backed the *Apple* case, it would have determined the claims of the '077 patent teach a particular way of programming and designing the software to create menus for different, non-standard PC device types with different display sizes.  The claims detail how to synchronize in real-time information from the programmed handheld menu configuration with analogous information in the master database.  '077 patent at 16:5-19; 17:52-18:1; 19:15-26. Moreover, the claims also include details regarding configuration software that is further enabled to generate the programmed handheld menu configuration in

conformity with a customized display layout for the wireless handheld computing device and compatible with the displayable size of the handheld graphical user interface device. *Id.* at 16:20-29; 17:2-13; 19:30-38.

The District Court failed again in applying *Alice* Step 2. Appx14 ("Ameranth's argument, however, fails to acknowledge the Federal Circuit's decision in *Apple*, much less refute the court's statement that "'[t]he invention merely claims the addition of conventional computer components to well-known business practices.'" (quoting 842 F.3d at 1242)).

Turning to *Alice* Step 2 in the *Apple* case, this Court found:

> *The preferred embodiment of the claimed invention described in the specifications is a restaurant preparing a device that can be used by a server taking orders from a customer.* The claimed invention replaces a server's notepad or mental list with an electronic device programmed to allow menu items to be selected as a customer places an order. As noted above, the specifications describe the hardware elements of the invention as "typical" and the software programming needed as "commonly known." The invention merely claims the addition of conventional computer components to well-known business practices.
> Finally, Ameranth argued in its briefing and at oral argument that programming the software to perform various parts of the claimed systems' functionality was difficult, and that this difficulty indicates that the claims were not directed to an abstract idea. We disagree. The difficulty of the programming details for this functionality is immaterial because *these details are not recited in the actual claims.*

842 F.3d at 1242 (emphasis added).

Unlike the claims in *Apple,* the '077 patent's claims recite the programming/design details. The claims require configuration software that is

synchronized in real-time with information from the programmed handheld menu configuration with analogous information in the master database. *Id.* at 16:5-19; 17:52-18:1; 19:15-26.  The claimed configuration software is further enabled to generate the programmed handheld menu configuration in conformity with a customized display layout for the wireless handheld computing device and compatible with the displayable size of the handheld graphical user interface device. *Id.* at 16:20-29; 17:2-13; 19:30-38.

Further evidence the District Court presupposed ineligibility and sought to shoehorn the '077 patent's claims into *Apple* are the court's ignoring its own prior contradictory ruling.  In the summary judgment order, the court ruled "the claims of the '077 Patent are not directed to improving the capabilities of any particular computing device.  Rather, the '077 Patent is directed to 'computerization' of 'paper-based ordering, waitlist and reservations management ... in the hospitality industry.'" Appx12 (quoting '077 patent at 2:45-57).  However, the court in its summary judgement order and claim construction ruling cited to the specification and acknowledged the "principal objects" of the invention are directed to an **improved** information management and synchronous communication system:

> As indicated in the specification, there are four principal objects of the invention described and claimed in the '077 Patent: To provide an improved information management and synchronous communications system and method which (1) "facilitates user-friendly and efficient generation of computerized menus for restaurants and other applications that utilize equipment with non-PC-standard graphical formats, display

sizes and/or applications[,]" (2) "provides for entry, management and
communication of information from the operator as well as to and from
another computer, Web page menu, remote digital device using a
standard hardwired connection, the internet or a wireless link[,]["] (3) "is
small, affordable and lightweight yet incorporates a user-friendly
operator interface and displays menus in a readily comprehensible
format[,]" and (4) "enables automatic updating of both wireless and
internet menu systems when a new menu item is added, modified or
deleted from any element of the system."

Appx4784 (quoting '077 patent at 2:61-3:17); Appx4 (same).  These principal objects

are directed to the **improved computing system** and <u>not</u> to the "'computerization' of

'paper-based ordering, waitlist and reservations management ... in the hospitality

industry'", Appx12; thus, the District Court committed error by ignoring them.

## C. Step 1: The '077 Patent's Claims Are Not Directed to an Abstract Idea

Prior to Ameranth's inventions, it was not possible to automatically generate,

configure, and synchronize the menus for multiple disparate handheld devices with

different display sizes, a backoffice server and Web pages in real time.  *See*

Appx1588-1589 ("Systems known at the time involved different sets of GUI-based

information or data on different platforms (*e.g.*, wired, wireless, internet) and the

different platforms had very different user display characteristics.  The inability of

one platform to readily use and display the information originated from another

platform was a huge impediment to a fully-integrated hospitality system involving

many different fixed, web and wireless system components."); Appx927-928 ("Prior

to applicants' invention, the various hospitality software applications (*e.g.*, point of

sale, reservations, frequency/affinity, ticketing etc [*sic*]) were largely 'stand alone' and not integrated and synchronized with/between each other, not in 'real time' and certainly not across the vast array of devices, communications media and non standard display outputs . . . ."); *see also* Appx1277 ("This breakthrough Ameranth innovation solved a previously major hurdle as to how the hospitality 'point of sale' and property management system' (PMS) system user interfaces could easily be ported and transferred to wireless devices."). Consequently, there was no "user-friendly information management and communication capability not requiring extensive computer expertise . . . for use in everyday life such as for restaurant ordering, reservations, and wait-list management." '077 patent at 1:44-48. Likewise, because of the handheld device's small screens, before the '077 patent's claimed inventions, users typically had to scroll through all of the information to view it, and "[s]crolling is a very poor technique for displaying information on devices having limited display attributes such as small screen size because such an approach is painstakingly slow for operators and largely ineffective in a time critical hospitality application." Appx1092.

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), explains that if claims improve computer functionality and/or a technological process, they pass *Alice* Step 1 and are patent-eligible. *Id.* at 1334-35. In *Visual Memory, LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017), claims for an improved computer

memory system that provided flexibility and "obviate the need to design a separate

memory system for each type of processor, which proved to be costly and inefficient,

and, at the same time, avoid the performance problems of prior art memory systems"

were directed to a technological improvement and not abstract. *Id.* at 1259-60.

Likewise, claims directed to an improved user interface for computing devices with

small screens were not abstract because they permitted users "to more quickly access

desired data stored in, and functions of applications included in, the electronic

devices" and thus were an "improvement in the functioning of computers,

particularly those with small screens." *Core Wireless Licensing S.A.R.L. v. LG

Electronics, Inc.*, 880 F.3d 1356, 1359, 1363 (Fed. Cir. 2018).  This Court also found

a claim that "claims a particular manner of navigating three-dimensional

spreadsheets, implementing an improvement in electronic spreadsheet functionality"

not abstract, *Data Engine Technologies LLC v. Google LLC*, 2017-1135, 2018 WL

4868029, at *8 (Fed. Cir. Oct. 9, 2018); the claim at issue solved the prior art

problem of computer spreadsheets being not "user friendly," "requiring users to

master many complex and arbitrary operations," and requiring "users . . . to search

through complex menu systems to find appropriate commands to execute simple

computer tasks, which required users to memorize frequently needed commands,"

which was "burdensome and hindered a user's ability to find or access the many

commands and features available in prior art computer spreadsheets, undercutting

the effectiveness of the computer as a means to review and edit a spreadsheet." *Id.* at *5 (quotation omitted). All of these cases confirm the '077 patent's claims at issue are not abstract.

### 1. Presupposing Ineligibiliy, the District Court Failed to Perform a Proper Analysis to Determine Whether the Claims Are Directed to an Abstract Idea

"The abstract idea exception prevents patenting a result where 'it matters not by what process or machinery the result is accomplished.'" *McRO*, 837 F.3d at 1312 (quoting *O'Reilly v. Morse*, 56 U.S. 62, 113 (1854)). Consequently, "courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims." *Id.* at 1313 (quoting *In re TLI Communications LLC Patent Litigation*, 823 F.3d 607, 611 (Fed. Cir. 2016, and citing *Diehr*, 450 U.S. at 189 n.12.) Thus, "a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps," *id.*, and determine "whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *Id.* at 1314.

Accordingly, "'determin[ing] whether the claims at issue are directed to a patent ineligible concept'" is a "meaningful one, *i.e.*, that a substantial class of claims

are *not* directed to a patent-ineligible concept." *Enfish*, 822 F.3d at 1335 (quoting

*Alice*, 134 S. Ct. at 2355).

> The "directed to" inquiry, therefore, cannot simply ask whether the claims *involve* a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions *involves* a law of nature and/or natural phenomenon—after all, they take place in the physical world.  Rather, the "directed to" inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether their character as a whole is directed to excluded subject matter.

*Id.* at 1335 (quotations and citations omitted).  Additionally, "where the claim recites

specific structure or function for accomplishing the desired goal in a particular way,

the claim is more likely directed to a means than to the underlying abstract goal."

*Amdocs (Israel) Limited v. Openet Telecom, Inc.*, 841 F.3d 1288, 1310 (Fed. Cir.

2016).

Yet, nowhere in the District Court opinion is there a discussion analyzing the

claim language and the alleged abstract idea.  Noticeably absent is any analysis of

the multiple "wherein" clauses of the independent claims – the *exact* place where the

"how" occurs.  For example, claim 13 includes "communications control software"

that is required and enabled to do all of the following, among others:

- "utilize parameters from the master database file structure to synchronize the hospitality application information in real time between the master database, at least one wireless handheld computing device, at least one web server and at least one web page",

- "act as a real time interface between the elements of the system and any applicable communications protocol",

- "automatically and simultaneously configure the hospitality application information for display on both the wireless handheld computing device and the web page in conformity with a customized display layout unique to the wireless handheld computing device or the web page, wherein said customized display layout is compatible with the displayable size of the handheld computing device display screen or the web page", and

- "automatically format a programmed handheld configuration for display as cascaded sets of linked graphical user interface screens appropriate for a customized display layout of at least two different wireless handheld computing device display sizes in the same connected system."

'077 patent at 19:15-20:4.

Additionally, as shown above from the specification, the communications control software and its functionality to act as a real time interface between any applicable communications protocol as a layer that sits on top of the communications protocol improves the computer system, through its ability to allow the claimed hospitality system to work with new and varying communications protocols without

modifying the hospitality application, which solved the problem that existing in prior systems. *See Visual Memory*, 867 F.3d at 1259-60 (claims for an improved computer memory system that accommodated different types of processors without compromising performance, which was a problem of the prior art, were directed to a technological improvement and not abstract.).

The District Court's omission of these elements – none of which were present in the '850, '325 or '733 patent's claims and all of which are critical to achieve a synchronized system – from its analysis resulted in ignoring the specification as to how the claims improve computer functionality and a technological process of an information management and real time synchronous communications system for use with wireless handheld computing devices having varying display characteristics, such as screen sizes, and the internet with communications control software, to among other things, synchronize the hospitality application information in real time between the master database, at least one wireless handheld computing device, at least one web server and at least one web page, to automatically and simultaneously configure the hospitality application information for display on both the wireless handheld computing device and the web page in conformity with a customized display layout for the wireless handheld computing device or the web page, wherein the customized display layout is compatible with the displayable size of the handheld computing device display screen or the web page, and to automatically format a

programmed handheld configuration for display as cascaded sets of linked GUI
screens appropriate for a customized display layout of at least two different wireless
handheld computing device display sizes in the same connected system.

While only considering claim 1, the court made the same errors with respect
to claims 1 and 9. These claims include a system having "menu configuration
software" enabled to[4]:

- "generate a programmed handheld menu configuration from said
  master menu" "for display on a wireless handheld computing device,
  said programmed handheld menu configuration comprising at least
  menu categories, menu items and modifier",

- "generate said programmed handheld menu configuration by utilizing
  parameters from the master menu file structure", and

- "generate the programmed handheld menu configuration in conformity
  with a customized display layout unique to the wireless handheld
  computing device to facilitate user operations with and display of the
  programmed handheld menu configuration on the display screen of a
  handheld graphical user interface integral with the wireless handheld
  computing device, wherein said customized display layout is

---

[4] Differences exist between claim 1's and claim 9's "menu configuration software."
For purposes of the bullets herein, the common features are specified.

compatible with the displayable size of the handheld graphical user
interface."

*Id.* at 16:5-34, 17:53-18:12.

Claims 1 and 9 further recite details of a "programmed handheld menu
configuration" that "is configured by the menu configuration software for display"
and that is used for "real time synchronous communications to and from the wireless
handheld computing device." *Id.* at 16:30-49, 18:13-34.  Further, claims 1, 9 and 13
recite the additional particular limitation of "a cascaded set of linked graphical user
interface screens for a wireless handheld computing device in the system includes a
different number of user interface screens from at least one other wireless handheld
computing device in the system." *Id.* at 16:57-61, 18:43-47, 20:5-9.

By overlooking all of these terms and their integration as an ordered
combination, the District Court disregarded details regarding how the claims
improve computer functionality and a technological process.  Instead, the District
Court relied almost entirely on *Apple*, which concerned claims that did *not* contain
the specifics recited in the '077 patent's claims  Appx11.  The court ruled "the claims
of the '077 Patent include functionality in addition to the generation and transmission
of menus, but the inclusion of additional steps does not change the nature of the
underlying invention," Appx12, which "are not directed to improving the capabilities
of any particular computing device." *Id.*  In so doing, the court further evidenced its

error of over-generalizing the claim language, ignoring critical claim terms, like the "master menu" / "master database," "communications control software" and the "customized display layout," and which had no prior analog outside a system with computers and wireless handheld computing devices.

Further, the District Court entirely disregarded the factual record, which not only detailed the problems of the prior art and confirmed how the claimed inventions solved them, but also included accolades regarding the inventions.  *See Enfish*, 822 F.3d at 1337; *Data Engine Technologies*, 2018 WL 4868029, at *6, *6 n.2.

The District Court's own assertion as to what the claims are directed to, while vastly truncated, confirms that they are not directed to some kind of a preexisting manual/human process, rather they are directed to a technological improvement to computers:  "On their face, the claims are directed to a system for (1) configuring and transmitting hospitality information from a master menu/database to wireless handheld devices with different display screen sizes and (2) enabling real-time synchronous communications and formatting between the wireless handheld devices and the master database."  Appx10.

The notion that the District Court's overgeneralization and disregard of claim language is acceptable in the first step of the *Alice* analysis flies in the face of the Supreme Court's guidance that a court must "tread carefully in construing this exclusionary principle lest it swallow all of patent law."  *Alice*, 134 S. Ct. at 2354.

Given the evidence in the specification and intrinsic record detailing how the claims improve computer functionality, *see* '077 patent at 15:38-46; Appx1491; Appx1588-1589; Appx927-928; Appx1092, and the claims' specifics as to how to practice the claimed inventions, all of which the District Court ignored, it erred in finding the claims abstract.

In addition, Dr. Shamos' expert declaration of Dr. Shamos, Mr. Dedo's declaration, Mr. Harker's Memorandum for Record, and Mr. McNally's declaration all confirmed that the claimed inventions solved computerized problems and improved the functioning of computers.  Appx10266-10272 at ¶¶ 22-27; App11109-11114 at ¶¶ 4, 6-13; Appx1277-1278; Appx10339-10359 at ¶¶ 9-37.  The District Court made no mention of Ameranth's factual record, evidencing the court ignored it and instead found in favor of Pizza Hut's attorney argument and expert declaration. Even though Pizza Hut filed its own expert declaration, Appx6514-6593, to contest Ameranth's positions, Ameranth's expert, Dr. Shamos, refuted Domino's positions and the facts should have been viewed in the light most favorable to Ameranth.  The Ninth Circuit has held it is error for a district court to grant summary judgment when it "resolve[d an] issue in light of the disputed and conflicting evidence before it." *Pan Pac. Retail Props.*, 471 F.3d at 970; *see also Animal Legal Def. Fund*, 836 F.3d at 990.

## 2. The Claims of the '077 Patent Are Comparable to Other Claims Found to Not Cover Abstract Ideas.

The Supreme Court has not established a definitive rule to determine what constitutes an "abstract idea" sufficient to satisfy the first step of the *Mayo/Alice* inquiry. Rather, both this court and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases.

*Enfish*, 822 F.3d at 1334.

This Court clarified that a relevant inquiry at Step 1 is "to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea." *Id.* at 1335-36. It contrasted patent-eligible claims "directed to an improvement in the functioning of a computer" with claims "simply adding conventional computer components to well-known business practices," claims reciting "use of an abstract mathematical formula on any general purpose computer" or "a purely conventional computer implementation of a mathematical formula" or "generalized steps to be performed on a computer using conventional computer activity." *Id.* at 1338. Moreover, a claimed invention's ability to run on a general purpose computer does not "doom" the claims. *Id.*

The '077 patent's claims at issue are not directed to any business practice or mathematical formula. Instead, they are directed to technology for an improved system with PHMC's that can be displayed on different screen sizes of handheld devices and synchronized across nodes for consistency in real time through use of

"communications control software" (claim 13) or "menu configuration software"
(claims 1 and 9).

The District Court failed to perform any analysis on how or why the claims of
the '077 patent are comparable to other claims found to be abstract.  The court
decided – without any basis for doing so – to ignore the requirements of the
independent claims' "wherein" clauses that reflect the "how" of the claims by
summarily concluding that the claims "merely claim the resulting systems."  Appx11
(quoting *Apple*, 842 F.3d at 1241).  This is reversible error.

Instead of analyzing the claims, the District Court attempted to distinguish
*Core Wireless*, *Visual Memory* and *Local Intelligence, LLC v. HTC America, Inc.*,
Case No. 5:17-cv-06437-EJD, 2018 WL 1697127 (N.D. Cal. Apr. 6, 2018), via its
single, conclusory statement that Ameranth's claims are only directed to a result, and
cited to *Local Intelligence* and *Uniloc USA, Inc. v. HTC America, Inc.*, No. C17-
1558JLR, 2018 WL 3008870 (W.D. Wash. June 15, 2018), *appeal docketed*, No.
18-2185 (Fed. Cir. July 23, 2018), when asserting the "the inclusion of additional
steps does not change the nature of the underlying invention, which is 'directed to an
abstract idea.'"  Appx12.

In *Uniloc*, the district court invalidated claims directed to a result without
claiming "'capabilities'" that produce that result, 2018 WL 3008870, at *8; the claims
fell into the category of "generalized steps to be performed on a computer using

conventional computer activity," and are not analogous to the '077 patent claims. More specifically, the claims in *Uniloc* pertained to methods and systems describing generalized steps like "broadcasting a message, displaying something on a display device, using that device to issue a command, and then sending the command." *Id.* at *6-*7. In contrast, the '077 patent claims recite specific, non-generalized elements with new and non-conventional approaches for a system that improve computers and operates as part of an ordered combination for how to program and/or design the software and communications while maintaining the claimed synchronization.

The District Court was mistaken when attempting to distinguish *Core Wireless*, *Visual Memory* and *Local Intelligence*. The claims of the '077 patent *are* analogous to the claims in those cases found to be technological improvements and are not abstract.

Just like the '077 patent's claims, the claims examined in *Core Wireless* were directed to an improved user interface for computing devices with small screens which permitted users "to more quickly access desired data stored in, and functions of applications included in, the electronic devices" and which were an "improvement in the functioning of computers, particularly those with small screens." 880 F.3d at 1359, 1363. The claim limitations "disclose a specific manner of displaying a limited set of information to the user, rather than using conventional user interface methods to display a generic index on a computer." *Id.* at 1363.

In *Visual Memory*, the claims were directed to an improved computer memory system, as discussed above, and they "focus on a 'specific asserted improvement in computer capabilities'—the use of programmable operational characteristics that are configurable based on the type of processor—instead of 'on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool.'" 867 F.3d at 1259-60 (quoting *Enfish*, 822 F.3d at 1336). Here, the claims of the '077 patent solved the problem of having to individually program each handheld device running, for example, Palm, Windows CE, iOS, or Android, not only because of the different operating systems, but also because of the different non-standard PC display characteristics, such as display size and layout/orientation, of each handheld device type.

In *Local Intelligence*, the court relied on *Core Wireless* and ruled "the claims at issue do more than simply state a result (*i.e.*, display communication services according to current location); they also recite the way in which it is accomplished (*i.e.*, using location retrieved from the location server and functions stored in the datastore)" and solved the same technological problem as in *Core Wireless* of "limited display space on electronic devices with small screens." 2018 WL 3008870, at *7; *see also id.* at *8. The same is true regarding the '077 patent's claims.

The '077 patent discloses and claims specific improved information management and real time synchronous communications systems for use with

wireless handheld computing devices having different display sizes that are configured and programmed in a way to make the computer-based platforms on which they are installed perform better with full integration/synchronization and with any applicable communications protocol, all while overcoming the size, weight, cost, battery power, and memory constraints of the wireless devices known at the time.  *See, e.g.,* '077 patent at 15:38-46; Appx1588-1589.   The claims provide technical details, including the programming and design requirements of the advanced master menu/database and its file structure and the communications control software and menu configuration software.  The claimed inventions relate to GUIs and solved the technological problems of configuring a menu or hospitality application information for varying screen sizes on wireless handheld computing devices having different display sizes (which are small) while also being user-friendly. *See* '077 patent at 1:44-48; Appx1092.  Thus, the claimed inventions are a technological improvement to the design of information management and real time synchronous communications systems used with computers and different types of wireless handheld computing devices.  *See Core Wireless*, 880 F.3d at 1363 ("Like the improved systems claimed in *Enfish*, *Thales*, *Visual Memory*, and *Finjan*, these claims recite a specific improvement over prior systems, resulting in an improved user interface for electronic devices.").   They are not claims that merely use a computer as a tool.

The claims themselves do not describe generalized organizational activities that are run on conventional machines.  The claims do not describe general methods of collecting, classifying, separating and transmitting data that can be performed on any computer which the Court has previously found ineligible, *see Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343 (Fed. Cir. 2014); *In re TLI Communications LLC Patent Litigation*, 823 F.3d 607 (Fed. Cir. 2016), and instead provide specific arrangements of the "communications control software" (claim 13) and "menu configuration software (claims 1 and 9) that is enabled 1) for programmable handheld devices that utilized database parameters to ensure information received is synchronized between any device and the master database instantaneously so that all devices and the database have the same information, and 2) to create and use a "customized display layout" that allowed for the programming and design of menus for wireless handheld devices of varying physical display characteristics, such as different display sizes, varying fonts, etc. without the need to program/design for each device individually.  Hence, the claims are outside of the realm of abstractness because they clearly describe improved information management and real time synchronous communications systems, and are not generalized organizational activities.

Moreover, the three independent claims recite specialized requirements, including the programming and design requirements, for an improved information

management and communications system including customized display layouts and the requirement of differing number of screens between at least two different devices; yet, the Court ignored this functionality at both Steps 1 and 2. The claims' system architecture and programming/design requirements matter and cannot be disregarded because they specifically limit the breadth of the claims, enable the solutions and do not prevent persons from making an information management and communications system "by any means whatsoever" or carrying out a known process on a conventional computer. *See Morse*, 56 U.S. at 113; *see also Mayo*, 132 S. Ct. at 1301.

Accordingly, the District Court erred when holding that the claims are directed to an abstract idea and it should be reversed.

## D. Step 2: The Claims Recite Significantly More Than an Abstract Concept

*Alice* Step 2 assumes that the court has found the patent claims are directed to an abstract idea at Step 1. Here, the claims improve computer systems and are not directed to an abstract idea, and the Court need not continue to Step 2. But if the Court were to assume that the claims are directed to an abstract idea, the District Court's error becomes more evident, because it disregarded claim elements and the evidentiary record and did not look at the facts in the light most favorable to Ameranth when concluding "there is nothing in these elements, either individually or in combination that 'transform[s] the claimed abstract idea into a patent-eligible

application of the abstract idea.'" Appx15 (quoting *Apple*, 842 F.3d at 1242).

Further, the District Court extended its error by relying on *Apple* in Step 2.

The Step 2 inquiry considers whether the claim limitations "involve more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Berkheimer*, 881 F.3d at 1367 (quotations omitted). Whether the claim limitations – individually or in combination – are "well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that "must be proven by clear and convincing evidence." *Id.* at 1368; *see also Aatrix*, 882 F.3d at 1128. "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. As is the case here, an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016); *see also Berkheimer*, 881 F.3d at 1369 ("Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional." (citation omitted)).

Here, the parties' filed competing declarations, albeit Ameranth filed three declarations and cited to six declarations in the '077 patent's file history to Pizza Hut's one declaration. Ameranth's nine declarations provided evidence that the

claimed inventions improved the functioning of computers and were not routine or conventional activity, yet the Court ignored them all.   Appx10266-10272 at ¶¶ 22-27; Appx11109-11114 at ¶¶ 4, 6-13; Appx10339-10359 at ¶¶ 9-37; *see also* Appx7151 n. 5.   Pizza Hut's declaration, on the other hand, sought to argue the claims were routine and conventional by identifying individual claim elements and referring to different prior art references.   *See, e.g.,* Appx6549-6574 at ¶¶ 110-210. Pizza Hut's declaration looks like pseudo-obviousness arguments with conclusions such as, for example, "In my opinion, the claimed combination of elements in claim 1 of the '077 patent is well-understood, routine, and conventional to a person of skill in the art."   *Id.* at ¶ 210; *see also* Appx6585 at ¶ 271.   The Court rejected this type of pseudo-obviousness argument in *Bascom*:

> The district court's analysis in this case, however, looks similar to an obviousness analysis under 35 U.S.C. § 103, except lacking an explanation of a reason to combine the limitations as claimed.   The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art.   As is the case here, an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.

827 F.3d at 1350.   Further, where evidence, such as conflicting testimony, is genuinely disputed on a particular issue, such as whether the claims cover routine and conventional activity, that "issue is inappropriate for resolution on summary judgment."   *Direct Techs.*, 836 F.3d at 1067; *Pan Pac. Retail*, 471 F.3d at 970.

Ameranth argued against routineness and conventionality, *see* Appx10252-

10258, the Dr. Shamos' declaration rebutted Pizza Hut's arguments, Appx10264 at

¶ 12, Appx10266-10273 at ¶¶ 21-29; and so did Mr. McNally's declaration.

Appx10352-10353 at ¶ 29; *see also* Appx10235 (citing Appx10339-10359 at ¶¶ 9-

37).  Yet, the District Court incorrectly stated that Ameranth did not dispute that the

hardware or software elements were typical and conventional, or commonly known,

respectively.  Appx14.  This is yet another error and confirms the District Court did

not view the facts in the light most favorable to Ameranth.

Ameranth does not assert it invented the hardware or operating systems used

to implement the claims.  Indeed, the specification confirms as much.  The claims

specifically rely on the claimed master menu/database and the parameters of its file

structure, which the specification describes as advanced, as explained above, as well

as the communications control software, both of which the District Court

disregarded.  The specification's statement that the "discrete programming steps are

commonly known," '077 at 12:59-61; *see also id.* at 6:37-7:30, does not mean that

the unique *combination* of steps as claimed were commonly known nor that the

design of the architecture of the overall software system was commonly known.  For

example, when considering the claims as an ordered combination and as a whole,

the combinations of functions of the "communications control software," the "menu

configuration software," the "master menu" / "menu database" and the "customized

display layout," were not routine or conventional, but by having their functionality

specifically recited in the claims, one of ordinary skill in the art could write the code and design the system to perform these functions.  *See* Appx2325-2328; Appx2175-2182.  To assert otherwise is baseless and an over-reach.

Just as in *Berkheimer*, there is at least a genuine issue of material fact in light of the intrinsic record regarding whether the claimed technology performs in an inventive manner that improves aspects of the disclosed system, and the District Court erred in granting summary judgment.  881 F.3d at 1370 ("Whether claims 4–7 perform well-understood, routine, and conventional activities to a skilled artisan is a genuine issue of material fact making summary judgment inappropriate with respect to these claims.").

Further, the District Court's Step 2 analysis essentially excluded "master menu" / "master database" and its file structures, "customized display layout" functionality for varying screen sizes, and claim 13's "communications control software" and its ability to sync both handheld devices, no matter the protocol, and web pages simultaneously.  The court incorrectly asserted Ameranth did not rebut Domino's contention that the claim elements regarding "automatic formatting of the programmed handheld configuration for display as cascaded sets of linked graphical user interface screens" and the system's requiring "a different number of user interface screens from at least one other wireless handheld computing device in the system" were "commonplace."  Appx15.

In fact, the court erred by relying on what it believed was support from Domino's as to the "different number of user interface screens" limitation which had no evidentiary support and was merely a conclusory argument from their expert while disregarding Ameranth's own arguments and evidence, *see* Appx10264 at ¶ 12; Appx10266-10273 at ¶¶ 21-29; Appx10244-10249.

The District Court also misunderstood the claims.  The claims do not merely more quickly "automatically format[      ] the programmed handheld menu configuration in a particular way and for **more than one** handheld device" as the District Court mistakenly wrote.  Appx14-15 (emphasis added).  This misreads the claims as a system with simply one or more handhelds and the claims do not merely require "more than one"; rather, the claims require a system with at least two *differently* sized screens on at least two *different* handheld devices (*i.e.*, two handheld devices each with a *different* sized screen and with a *different* number of screens).  The claims ensured the different components of the system, such as the backend, multiple handset devices, and for some claims a web page, are in equilibrium.  '077 patent at 3:27-35 ("The menu generation approach of the present invention includes a desktop software application that enables the rapid creation and building of a menu and provides a means to instantly download the menu configuration onto, e.g., a handheld device or Web page and to seamlessly interface with standard point of sale ('POS') systems to enable automatic database updates and

communication exchanges when a change or input occurs in any of the other system elements."); Appx1589 ("The inventors' breakthrough was to leverage GUI-based information or data (*e.g.*, parameters defining modifiers/sub-modifiers and other parameters) from a master or central database for the synchronous generation and transmission to or from other components of the system, and which was displayable dependent on the particular display characteristics of each system node or device type. The result was overall consistency of data across all connected system nodes at any given time.").

The claimed innovation of wirelessly ensuring data was consistent across multiple system nodes with different types and sizes of handhelds is not what Windows CE® did. The minimal, built-in synchronization of Windows CE® identified in the specification, '077 patent at 12:14-19, did not permit *wireless* synchronization among *all* nodes of a network nor in "real time" as claimed. *See* Appx11109-11114 at ¶¶ 4-6, 8, 10, 12; *see also* Appx10237-10238; Appx10252-10254. Indeed, Microsoft, the creator of Windows CE®, "considered Ameranth's new systemic synchronization and integration technology to be innovative and ground-breaking in 1999-2000. As I myself [Dedo] stated at the time: 'Ameranth provides a total turnkey solution integrating Pocket PC's with wireless networks, and linking them to PC servers, and the internet.'" Appx11112 at ¶ 10. But the Court ignored this critical fact, the detailed declaration of Mr. Dedo, and its own

construction of "synchronize" and "synchronous": "made, or configured to make, consistent." Appx4787.

This systemic synchronization is vastly different from the one device at a time synchronization performed by Windows CE® – an operating system that required Windows CE® on the mobile device and Windows on a computer; Windows CE® could not synchronize with a non-Windows-based device, nor could it synchronize wirelessly or across multiple mobile devices at the same time. *See* Appx11113-11114 at ¶ 12 ("Ameranth's technology was new, pioneering, unconventional and provided functionality and features beyond what was otherwise available in Windows CE. This was one of the reasons driving Microsoft's decision to make a strategic multi-million investment into Ameranth in June 2000 in order to support and foster Ameranth's 21st Century Restaurant system technology and its integration with and use of Microsoft's Windows CE platform.")[5]; *id.* at ¶ 7 ("Microsoft believed that Ameranth's innovative software modules, which created the 'handheld user interfaces,' were novel and non-conventional both because they involved Ameranth's own software solutions that provided functionality and

---

[5] Ameranth's 21st Century Restaurant system technology incorporated the claimed inventions of the '077 patent. Appx00807 ("Ameranth won three major, best product/technology awards for its 21st Century Restaurant System (a product marketing name surrounding the core inventive concepts of the present application and claims), one award of which was personally nominated by Bill Gates, Chairman of Microsoft.); *see also* '077 patent at Fig. 9 (figure entitled "Ameranth's 21st Century Communications Integration.").

delivered results no one else was providing and because they integrated and used mobile operating platforms-like Microsoft's Windows CE-with other software and hardware components of the 21st Century Restaurant system to accomplish such unprecedented results.  Microsoft also recognized the value in the 21st Century Restaurant system's technology to work with different point of sale ('POS') systems and mobile computing devices.").

In *Mayo*, the Supreme Court not only reaffirmed *Diehr*, but applied it as a secondary check on Step 2.  Specifically, after first considering the three claim steps individually and concluding that none gave rise to an inventive concept on its own, the Court considered the claim as a whole, inquiring whether "the three steps as an ordered combination adds [something more] to the laws of nature that is not already present when the steps are considered separately."  *Mayo*, 132 S. Ct. at 1298.  Both *Mayo* and *Diehr* further explain that the "claims must be considered as a whole," such that "a new combination of steps in a process may be patentable even though all the constituents . . . were well known and in common use before the combination was made."  *Diehr*, 450 U.S. at 188.

Here, after incorrectly deciding claim 1 was representative, the District Court reduced the individual components of into only four elements from claim 1 across all 18 claims, individually declared each to be generic, and then, while excluding all of

Ameranth's factual evidence, concluded that all the claimed programmed functions were well-understood, routine, and conventional.  Appx13-15.

All systems, no matter how inventive, can be broken down into known elements, and a simple determination of that fact cannot destroy a patent right.  The District Court never considered the claimed systems as a whole – claims 1 and 9 have architectures and programming requirements, including the requirements for "menu configuration software," and claim 13 has an architecture and programming requirements, including the requirements for *both* handheld devices and web pages and "communications control software."  As described above, the claimed combinations result in improved information management and real time synchronous communications systems and are thus inventive.

The District Court erred and should be reversed.

### E. Claim 1 Is Not Representative

The District Court improperly held claim 1 as representative of all 18 claims without any kind of an analysis and in direct conflict with Ameranth's positions to the contrary.  Further, its own simplification of claim 1 into four elements and conclusion that they "are essentially the same [elements] as those set out in the other independent claims 9 and 13" was wrong.  Appx13 n.3.  The court's simplified four elements of claim 1 excluded elements/functions critical to the inventiveness of the other claims.  Yet Ameranth set forth differences and explained claim 1 is not

representative.  Appx10250-10251; Appx7255-7257 at ¶¶ 129-31.  For example, claims 1 and 13 differ in numerous material respects, such as claim 13's including more elements and different functionality and claim 13's not including "menus." Appx10251.

Claim 13 is not for configuring, transmitting and synchronizing <u>menus</u> and instead is for configuring, transmitting and configuring hospitality application information.  While claims 1 and 9 both recite "menu configuration software," claim 9 further includes "automatically generat[ing] a programmed handheld menu configuration from said master menu for display on a wireless handheld computing device."  Claim 1 is not representative of claim 13 since there is no "web server" or "web page" as in claim 13; nor is the requirement for "simultaneous" synchronization of **both** "handhelds" and "web pages" in independent claims 1 and 9.   Indeed, Ameranth had disclaimed "web pages" from claims 1-12 during prosecution. Appx1587.  Further, the specification confirms that configuring for and synchronizing with both a handheld and a web page, concurrently was a "first" – not routine and conventional – and it was error to have ignored this additional functionality in claims 13-18.  '077 patent at 4:63-5:2.

Similarly, claim 1 is not representative of the dependent claims.  Dependent claims contain numerous different limitations than the independent claims, such as those set forth in claim 8.  '077 patent at 17:24-34.

The District Court's ruling that these claims are all the same – and that claim 1 is representative – is flawed on its face. It exemplifies the greater error by the District Court of over-generalizing the claim language in order to connect technological improvements to an abstract concept, and then decide those improvements are ineligible under a small, judicially created exception to § 101.

### F. The District Court Invalidated Claims Upon Which It Had No Subject Matter Jurisdiction

Pizza Hut's opening brief in support of its motion for summary judgment identified the asserted claims as to it as claims 1, 6, 8, 13 and 17. Appx6398. On August 7, 2017, in compliance with the District Court's Order setting a five-claim maximum, Appx2192, Ameranth served Domino's its Amended Disclosure of Asserted Claims and Infringement Contentions, asserting claims 1, 6, 9, 13 and 17 of the '077 patent. Appx2196. Domino's sought to join Pizza Hut's (mooted) motion on August 28, 2018, Appx10204-10207, and it informed the District Court that claim 9 was asserted against Domino's, but not Pizza Hut. Appx10212 n.1.

The five asserted claims – claims 1, 6, 9, 13 and 17 – were brought to the District Court's attention in the parties' pretrial order filed July 27, 2018. Appx10198. Less than two months later, in its supplemental brief in District Court filed September 7, 2018, Ameranth pointed out that claims 2-5, 7, 10-12, 14-16 and 18 reflected additional and unique patentability, Appx10258-10259; *see also* Appx7235 at ¶ 97; Appx7172 n.29, and were not challenged in the summary

judgment motion.  Appx10258-10259.  Thus, the District Court indisputably had
actual notice of what claims were asserted and which ones were not.

A district court has no jurisdiction over unasserted claims and this Court has
vacated or reversed district court decisions invalidating unasserted claims.  *See, e.g.,*
*Fox Group, Inc. v. Cree, Inc.*, 700 F.3d 1300, 1308 (Fed. Cir. 2002) ("[U]unlike the
situation in *Scanner Technologies*, where all of the claims were at issue and were
never withdrawn or altered by either party, here, both parties were on notice that
only claims 1 and 19 were at issue, and they knew which claims were at issue before
the district court ruled on the parties' summary judgment motions.  There was no
case or controversy with respect to the unasserted claims at the time of the summary
judgment motions; therefore, the district court did not have jurisdiction over the
unasserted claims. Accordingly, we vacate the district court's declaration that the
entire '130 patent is invalid, but uphold the district court's finding of invalidity of
claims 1 and 19 under § 102(g)."  (quotation and citations omitted)); *Allergan, Inc.*
*v. Sandoz, Inc.*, 681 Fed. Appx. 955, 963-64 (Fed. Cir. 2017) (reversing district
court's invalidation of unasserted claims because court had no jurisdiction over
them); *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1357 n.3 (Fed. Cir. 2013)
("The district court also erred to the extent it invalidated the unasserted claims of the
'453 patent or to the extent the district court invalidated claims not at issue in the
motion before it.  Accordingly, to the extent the district court's final judgment

invalidates patent claims not at issue, that determination is vacated.").

Here, the District Court invalidated claims 1, 4-9, 11, 13-18 of the '077 patent, Appx1-2, even though the only claims asserted against Domino's were claims 1, 6, 9, 13 and 17.  This is error, and the order invalidating the claims beyond claims 1, 6, 9, 13 and 17 should be vacated for this reason alone.

## VIII.  CONCLUSION AND PRAYER

For the reasons stated herein, this Court should reverse.  The Court should hold that the '077 patent's claims at issue are eligible under § 101 and that the District Court did not have jurisdiction over any unasserted claims.

Dated:  December 27, 2018          Respectfully submitted,

*/s/ Richard C. Weinblatt*
Richard C. Weinblatt
STAMOULIS & WEINBLATT LLC
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
Telephone: (302) 999-1540
Facsimile: (302) 762-1688
Email: weinblatt@swdelaw.com

*Attorneys for Appellant*
*Ameranth, Inc.*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

*Page*

Judgement [Case No. 3:12-cv-733-DMS-WBG, Dkt. No. 66] ........................Appx1

Order Granting Motion for Summary Judgment
[Case No. 3:11-cv-1810-DMS-WVG, Dkt. No. 1395].....................................Appx3

U.S. Patent No. 8,146,077............................................................................Appx276



**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

AMERANTH, INC.,

Plaintiff,

vs.

DOMINO'S PIZZA, LLC, and
DOMINO'S PIZZA, INC.,

Defendants.

CASE NO. 12cv0733 DMS (WVG)

**JUDGMENT**

WHEREAS the Patent Trial and Appeal Board and/or the Federal Circuit Court of Appeals has held all claims of U.S. Patent No. 6,384,850 (the "'850 Patent"), all claims other than claim 14 of U.S. Patent No. 6,871,325 (the "'325 Patent"), and all claims of U.S. Patent No. 6,982,733 (the "'733 Patent") patent ineligible and/or invalid, and all appeals of those decisions have been exhausted;

WHEREAS the issue of patent eligibility of all asserted claims of U.S. Patent No. 8,146,077 (the "'077 Patent") under 35 U.S.C. §101 (hereinafter "Section 101") was brought before this Court on summary judgment by Domino's Pizza, LLC and Domino's Pizza, Inc. (collectively hereinafter "Domino's"), fully briefed, oral argument heard, and a decision rendered.

IT IS HEREBY ORDERED AND ADJUDGED:

Domino's motion for summary judgment of unpatentability under Section 101 (Doc. No. 1120 in Lead Case No. 11-cv-1810 DMS-WVG) is granted and all asserted claims of the '077 Patent (claims 1, 4-9, 11, 13-18) are patent ineligible under Section

**Appx1**

1   101 as set forth in the Court's Order Granting the Motion For Summary Judgment Of

2   Unpatentability (Doc. No. 1395 in Lead Case No. 11-cv-1810 DMS-WVG).

3         Other than counterclaims for patent ineligibility (on which judgment is hereby

4   entered), Domino's counterclaims are dismissed without prejudice.  All other pending

5   motions, save for any motions to file documents under seal, are denied as moot, and all

6   pending dates in this case are vacated.

7   DATED:  October 11, 2018

8   _____

9   HON. DANA M. SABRAW
    United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Appx2**

1
2
3
4
5
6
7
8               **UNITED STATES DISTRICT COURT**
9            **SOUTHERN DISTRICT OF CALIFORNIA**
10 IN RE: AMERANTH CASES,    |   CASE NO. 11cv1810 DMS (WVG)
11                    |   **ORDER GRANTING DEFENDANTS**
12                    |   **DOMINO'S PIZZA, LLC AND DOMINO'S**
                    **PIZZA, INC.'S MOTION FOR SUMMARY**
13                    **JUDGMENT OF UNPATENTABILITY**
14
15       This case comes before the Court on the motion for summary judgment of
16 unpatentability of the sole remaining patent in this case, United States Patent Number
17 8,146,077 ("the '077 Patent"). The motion was originally filed by Defendant Pizza Hut,
18 LLC. Ameranth filed an opposition to the motion, and Pizza Hut filed a reply. After
19 the motion was reset for hearing, Ameranth and Pizza Hut settled their case. Thereafter,
20 Domino's filed an *ex parte* motion to join Pizza Hut's motion and to again reset the
21 motion for hearing. The Court granted that *ex parte* motion, gave Ameranth leave to
22 file a surreply and reset the motion for hearing. The motion came on for hearing on
23 September 21, 2018. William Caldarelli appeared and argued for Ameranth and Frank
24 Angileri appeared and argued for Domino's. After thoroughly considering the parties'
25 briefs and the record on file herein, and after hearing oral argument from counsel, the
26 Court grants the motion.
27 / / /
28 / / /

**Appx3**

# I.

## BACKGROUND

The '077 Patent is entitled, "Information Management and Synchronous Communications System with Menu Generation, and Handwriting and Voice Modification of Orders." As indicated in the specification, there are four principal objects of the invention described and claimed in the '077 Patent: To provide an improved information management and synchronous communications system that (1) "facilitates user-friendly and efficient generation of computerized menus for restaurants and other applications that utilize equipment with non-PC-standard graphical formats, display sizes and/or applications[,]" (2) "provides for entry, management and communication of information from the operator as well as to and from another computer, Web page menu, remote digital device using a standard hardwired connection, the internet or a wireless link[,] (3) "is small, affordable and lightweight yet incorporates a user-friendly operator interface and displays menus in a readily comprehensible format[,]" and (4) "enables automatic updating of both wireless and internet menu systems when a new menu item is added, modified or deleted from any element of the system." ('077 Patent at 2:61-3:17.) There are eighteen claims in the '077 Patent, three independent and fifteen dependent. Claim 1 is representative, and provides:

> An information management and real time synchronous communications system for configuring and transmitting hospitality menus comprising:
>
> a.   a central processing unit,
>
> b.   a data storage device connected to said central processing unit,
>
> c.   an operating system including a first graphical user interface,
>
> d.   a master menu including at least menu categories, menu items and modifiers, wherein said master menu is capable of being stored on said data storage device pursuant to a master menu file structure and said master menu is capable of being configured for display to facilitate user operations in at least one window of said first graphical user interface as cascaded sets of linked graphical user interface screens, and

**Appx4**

e.  menu configuration software enabled to generate a programmed handheld menu configuration from said master menu for wireless transmission to and programmed for display on a wireless handheld computing device, said programmed handheld menu configuration comprising at least menu categories, menu items and modifiers and wherein the menu configuration software is enabled to generate said programmed handheld menu configuration by utilizing parameters from the master menu file structure defining at least the menu categories, menu items and modifiers of the master menu such that at least the menu categories, menu items and modifiers comprising the programmed handheld menu configuration are synchronized in real time with analogous information comprising the master menu,

wherein the menu configuration software is further enabled to generate the programmed handheld menu configuration in conformity with a customized display layout unique to the wireless handheld computing device to facilitate user operations with and display of the programmed handheld menu configuration on the display screen of a handheld graphical user interface integral with the wireless handheld computing device, wherein said customized display layout is compatible with the displayable size of the handheld graphical user interface wherein the programmed handheld menu configuration is configured by the menu configuration software for display as programmed cascaded sets of linked graphical user interface screens appropriate for the customized display layout of the wireless handheld computing device, wherein said programmed cascaded linked graphical user interface screens for display of the handheld menu configuration are configured differently from the cascaded sets of linked graphical user interface screens for display of the master menu on said first graphical user interface, and

wherein the system is enabled for real time synchronous communications to and from the wireless handheld computing device utilizing the programmed handheld menu configuration including the capability of real time synchronous transmission of the programmed handheld menu configuration to the wireless handheld computing device and real time synchronous transmissions of selections made from the handheld menu configuration on the wireless handheld computing device, and

wherein the system is further enabled to automatically format the programmed handheld menu configuration for display as cascaded sets of linked graphical user interface screens appropriate for a customized display layout of at least two different wireless handheld computing device display sizes in the same connected system, and

wherein a cascaded set of linked graphical user interface screens for a wireless handheld computing device in the system includes a different number of user interface screens from at least one other wireless handheld computing device in the system.

(*Id.* at 15:56-16:61.)

**Appx5**

1    The '077 Patent was filed on April 22, 2005, and is a continuation of United

2    States Patent Number 6,982,733 ("the '733 Patent"), which in turn is a continuation-in-

3    part of United States Patent Number 6,384,850 ("the '850 Patent).  United States Patent

4    Number 6,871,325 ("the '325 Patent") is also part of this patent family, and is a

5    continuation of the '850 Patent.  The specification of the '077 Patent is identical to that

6    of the '733 Patent, and it is "largely the same as [the '850 and '325 Patents], containing

7    two additional figures and some additional description." *Apple, Inc. v. Ameranth, Inc.*,

8    842 F.3d 1229, 1234 n.1 (Fed. Cir. 2016).[1]

9    These consolidated cases, when originally filed in 2011, alleged infringement of

10   the '850 and '325 Patents only.  The '733 and '077 Patents were added to the case in

11   subsequent pleadings.  In 2013, a majority of Defendants in these cases filed petitions

12   with the Patent Trial and Appeal Board ("PTAB") seeking review of the '850, '325 and

13   '733 Patents under the Transitional Program for Covered Business Method ("CBM")

14   Patents.  The PTAB instituted review on all three petitions, and it found certain claims

15   of these three patents unpatentable under 35 U.S.C. § 101.  On appeal, the Federal

16   Circuit affirmed the PTAB's determinations of unpatentability, and reversed the

17   PTAB's determinations that the other claims were patentable.  *Id.* at 1245.  Specifically,

18   the Federal Circuit found all instituted claims of the '850, '325 and '733 Patents

19   unpatentable under § 101.  *Id.*  In light of that decision, the '850, '325 and '733 Patents

20   are no longer at issue here.

21   Various Defendants in these cases also twice petitioned the PTAB for CBM

22   review of the '077 Patent.  The first of those petitions was filed in 2014, and was

23   denied.  (*See* Decl. of John Osborne in Supp. of Opp'n to Mot. ("Osborne Decl."), Ex.

24   9.)  The second petition was filed in 2017, after the Supreme Court's decision in *Alice*

25   ///

26

27

28       [1] Exhibit A to the Declaration of Melissa Smith in support of Pizza Hut's motion
     is a version of the '077 Patent that highlights those portions of the specification that
     were not included in the specification of the '850 Patent.  (*See* ECF No. 1120-3.)

**Appx6**

Case 3:12-cv-00733-DMS-WVG   Document 16   Page 78   Filed: 12/27/2018   Page 88 of
121
Case 3:11-cv-01810-DMS-WVG   Document 1395   Filed 09/25/18   PageID.82424   Page 5 of 14

1   *Corp. Pty Ltd. v. CLS Bank Int'l*, ___ U.S. ___, 138 S.Ct. 2347 (2014), and the Federal

2   Circuit's decision in *Apple*. That petition was also denied. (*See* Osborne Decl., Ex. 5.)

## II.

## DISCUSSION

5   Domino's moves for summary judgment that the '077 Patent is unpatentable

6   under § 101. Specifically, Domino's argues the claims of the '077 Patent are directed

7   to an abstract idea, and the claim elements, considered individually and in combination,

8   fail to transform that abstract idea into a patent-eligible invention.

9   Section 101 of the Patent Act provides, "Whoever invents or discovers any new

10  and useful process, machine, manufacture, or composition of matter, or any new and

11  useful improvement thereof, may obtain a patent therefor, subject to the conditions and

12  requirements of this title." 35 U.S.C. § 101. The Supreme Court has "'long held that

13  this provision contains an important implicit exception: Laws of nature, natural

14  phenomena, and abstract ideas are not patentable.'" *Alice*, 134 S.Ct. at 2354 (quoting

15  *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. ___, 133 S.Ct. 2107,

16  2116 (2013)). The reason for this exception is "pre-emption. [citation omitted] Laws

17  of nature, natural phenomena, and abstract ideas are 'the basic tools of scientific and

18  technological work.'" *Id.* (quoting *Myriad*, 133 S.Ct. at 2116) (internal quotation marks

19  omitted). "'[M]onopolization of those tools through the grant of a patent might tend to

20  impede innovation more than it would tend to promote it,' thereby thwarting the

21  primary object of the patent laws." *Id.* (quoting *Mayo Collaborative Services v.

22  Prometheus Labs., Inc.*, 566 U.S. ___, 132 S.Ct. 1289, 1293 (2012)). The Supreme

23  Court has also stated, however, that courts must "tread carefully in construing this

24  exclusionary principle lest it swallow all of patent law." *Id.* (citing *Mayo*, 132 S.Ct. at

25  1293-94). As stated in *Alice*, courts "must distinguish between patents that claim the

26  'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks

27  into something more, thereby 'transform[ing]' them into a patent-eligible invention[.]"

28  *Id.* (quoting *Mayo*, 132 S.Ct. at 1294, 1303).

**Appx7**

1    The test for determining patent-eligibility is two-pronged. "First, we determine

2    whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.*

3    at 2355. This "'directed to' inquiry applies a stage-one filter to claims, considered in

4    light of the specification, based on whether 'their character as a whole is directed to

5    excluded subject matter.'" *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed.

6    Cir. 2016) (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346

7    (Fed. Cir. 2015)). At stage one, courts "look to whether the claims in the patent focus

8    on a specific means or method, or are instead directed to a result or effect that itself is

9    the abstract idea and merely invokes generic processes and machinery." *Two-Way

10   Media Ltd. v. Comcast Cable Communications, LLC*, 874 F.3d 1329, 1337 (Fed. Cir.

11   2017), *pet. for cert. filed*, (U.S. July 27, 2018) (No. 18-124), (citing *McRO, Inc. v.

12   Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)).

13   If the claims are directed to an abstract idea, courts then proceed to the second

14   step, which asks "'[w]hat else is there in the claims before us?'" *Alice*, 132 S.Ct. at

15   2355 (quoting *Mayo*, 132 S.Ct. at 1296-97). "To answer that question, we consider the

16   elements of each claim both individually and 'as an ordered combination' to determine

17   whether the additional elements 'transform the nature of the claim' into a patent-eligible

18   application." *Id.* (quoting *Mayo*, 132 S.Ct. at 1298, 1297). The Supreme Court

19   "described step two of this analysis as a search for an 'inventive concept'–i.e, an

20   element or combination of elements that is 'sufficient to ensure that the patent in

21   practice amounts to significantly more than a patent upon the [ineligible concept]

22   itself.'" *Id.* (quoting *Mayo*, 132 S.Ct. at 1294) (quotation marks omitted).

23   "Patent eligibility under § 101 presents an issue of law that [the Federal Circuit]

24   review[s] de novo." *Accenture Global Servs., GmbH v. Guideware Software, Inc.*, 728

25   F.3d 1336, 1340-41 (Fed. Cir. 2013) (citing *Bancorp Servs., LLC v. SunLife Assurance

26   Co. of Can.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012)). "This legal conclusion may contain

27   underlying factual issues." *Id.* at 1341 (citing *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d

28   1335, 1339 (Fed. Cir. 2013)). However, "it is also possible, as numerous cases have

**Appx8**

1    recognized, that a § 101 analysis may sometimes be undertaken without resolving

2    factual issues." *Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*, 811 F.3d

3    1314, 1325 (Fed. Cir. 2016).    In that circumstance, "the § 101 inquiry may

4    appropriately be resolved on a motion for summary judgment." *Id.*

5    **A.    Step One - Abstract Idea**

6        "The 'abstract ideas' category embodies 'the longstanding rule that [a]n idea of

7    itself is not patentable.'" *Alice*, 134 S.Ct. at 2355 (quoting *Gottschalk v. Benson*, 409

8    U.S. 63, 67 (1972)).   The Federal Circuit has recognized that "'[i]nformation as such

9    is an intangible' and that collecting, analyzing, and displaying that information, without

10   more, is an abstract idea." *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1344

11   (Fed. Cir. 2018) (citing *Elec. Power Grp., LLC v. Alstom*, 830 F.3d 1350, 1353-54 (Fed.

12   Cir. 2016)).   *See also Intellectual Ventures I LLC v. Capital One Financial Corp.*

13   ("*Intellectual Ventures III*"), 850 F.3d 1332, 1340 (Fed. Cir. 2017) (stating collecting,

14   displaying and manipulating data is abstract idea).  It has also stated, "[t]he category of

15   abstract ideas embraces 'fundamental economic practice[s] long prevalent in our system

16   of commerce,' including 'longstanding commercial practice[s]' and 'methods of

17   organizing human activity[.]'" *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d

18   1307, 1313 (Fed. Cir. 2016) (quoting *Alice*, 134 S.Ct. at 2356).  This is so even if the

19   practices or methods are "performed on a computer[,]" *Enfish*, 822 F.3d at 1334, or are

20   limited "to a particular field of use or technological environment, such as the Internet."

21   *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir.

22   2015).  At *Alice* step one, the key consideration is "'whether the claims ... focus on a

23   specific means or method that improves the relevant technology or are instead directed

24   to a result or effect that itself is the abstract idea and merely invoke generic processes

25   and machinery.'" *Smart Systems Innovations, LLC v. Chicago Transit Authority*, 873

26   F.3d 1364, 1371 (Fed. Cir. 2017) (quoting *McRO*, 837 F.3d at 1313).  "The Federal

27   Circuit has recognized that this process sometimes involves 'close calls about how to

28   characterize what the claims are directed to.'" *Local Intelligence, LLC v. HTC America,*

**Appx9**

1  *Inc.*, No. 5:17-cv-06437-EJD, 2018 WL 1697127, at *4 (N.D. Cal. Apr. 6, 2018)

2  (quoting *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341,

3  1348 (Fed. Cir. 2016)).  It has also "acknowledged that 'precision has been elusive in

4  defining an all-purpose boundary between the abstract and the concrete.'" *Affinity Labs*

5  *of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016), *cert. denied*,

6  ___ U.S. ___, 137 S.Ct. 1596 (2017), (quoting *Internet Patents*, 790 F.3d at 1345).

7       Here, the parties dispute what the claims of the '077 Patent are directed to.

8  Domino's argues the claims are directed to the abstract idea of configuring and

9  transmitting menu information.  Ameranth is less clear in what the claims are directed

10  to.  In its initial opposition to the motion, it asserted "[t]he invention was, inter alia, in

11  the software which configured the hardware to perform the inventive functions[,]" and

12  that the claims were "directed to specific implementations of 'master menus' whereby

13  they are, inter alia, used to configure 'programmed handheld menu configurations'

14  ('PHMC') by using the master menu 'file structure' and are synchronized with the

15  handheld PHMC."  (Opp'n at 11.)  In the supplemental opposition, Ameranth has

16  retreated from its position that the invention is in the software, and is now explaining

17  the claims by reference to the problem allegedly being solved, which Ameranth

18  describes as "the challenges of synchronizing and automatically reformatting hospitality

19  information contained in a master menu/master database with different wireless

20  handheld devices with varying display screen sizes and characteristics[.]" (Supp. Opp'n

21  at 2-3.)  This reference to the problem, however, is not a complete or concise

22  explanation of what the claims are directed to.  On their face, the claims are directed to

23  a system for (1) configuring and transmitting hospitality information from a master

24  menu/database to wireless handheld devices with different display screen sizes and (2)

25  enabling real-time synchronous communications and formatting between the wireless

26  handheld devices and the master database.

27  / / /

28

**Appx10**

1    In *Apple*, the Federal Circuit found the claims of the '850, '325 and '733 Patents

2    were directed to an abstract idea. 842 F.3d at 1241. The claims there were directed to

3    "systems including menus with particular features." *Id.* Here, the claims include

4    additional limitations, namely, wireless handheld devices with different display screen

5    sizes, and enabling real-time synchronous communications and formatting between the

6    devices in the system. However, none of those limitations fills the void set out by the

7    Federal Circuit in *Apple*. In other words, despite the additional limitations, the claims

8    here, like those in the related patents, "do not claim a particular way of programming

9    or designing the software to create menus that have these features, but instead merely

10   claim the resulting systems." *Id.*

11   Ameranth attempts to avoid this result by relying on the two PTAB decisions

12   denying the requests to institute CBM review of the '077 Patent. The first of those

13   decisions, however, was issued before the Federal Circuit's decision in *Apple*. That

14   decision also relies on *Ultramercial*, 722 F.3d 1335, which was subsequently vacated

15   by the Supreme Court.[2] (*See* Osborne Decl., Ex. 9 at 34.) And the second decision does

16   little more than explain why the first decision was correct. (*See* Osborne Decl., Ex. 5.)

17   This Court is not particularly persuaded by the reasoning of those decisions, and in any

18   event, those decisions are not binding on this Court.

19   Ameranth also relies on three cases: *Core Wireless Licensing S.A.R.L. v. LG-*

20   *Electronics, Inc.*, 880 F.3d 1356 (Fed. Cir. 2018), *Visual Memory LLC v. NVIDIA*

21   *Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017), and *Local Intelligence*, 2018 WL

22   1697127. But each of those cases is distinguishable.

23   In *Core Wireless* and *Local Intelligence*, the patents at issue "disclose[d]

24   improved display interfaces, particularly for electronic devices with small screens like

25   mobile telephones." 880 F.3d at 1359. *See also Local Intelligence*, 2018 WL 1697127,

26   at *8 (finding claims at issue indistinguishable from claims at issue in *Core Wireless*).

27

28   _____

[2] In a revised decision, the Federal Circuit found the claims in *Ultramercial* were "patent-ineligible under § 101." *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1048 (Fed. Cir. 2017).

Case 3:12-cv-00733-DMS-WVG   Document 16-1   Page 83   Filed: 12/27/2018
Case: 10-1141   Document: 161-12   Filed: 02/13/20   Page 93 of 121   Page 93 of 121
Case 3:11-cv-01810-DMS-WVG   Document 1395   Filed 09/25/18   PageID.82429   Page 10 of 14

Similarly, in *Visual Memory*, the asserted claims were "directed to a technological improvement: an enhanced computer memory system." 867 F.3d at 1259. In essence, the claims in both cases were "directed to a specific improvement in the capabilities of computing devices[.]" *Core Wireless*, 880 F.3d at 1361-62.

Unlike the claims in those cases, the claims of the '077 Patent are not directed to improving the capabilities of any particular computing device. Rather, the '077 Patent is directed to "computerization" of "paper-based ordering, waitlist and reservations management ... in the hospitality industry." ('077 Patent at 2:45-57.") (*See also* Rep. Tr. (Draft) at 4, Sept. 21, 2018 (describing problem being solved as "taking the large-scale paper menus that we have all seen and trying to get them down into a blackberry screen in a way that was usable and readable.")) And the claims themselves are directed to the resulting system wherein hospitality information is configured and transmitted to wireless devices with different display screen sizes, and those devices are able to engage in real-time synchronous communication with other devices in the system. Like the claims of the '850, 325 and '733 Patents, which the Federal Circuit found to be patent-ineligible, the claims of the '077 Patent:

> do not claim a particular way of programming or designing the software to create menus that have [the claimed] features, but instead merely claim the resulting systems. [citation omitted] Essentially, the claims are directed to certain functionality–here, the ability to generate menus with certain features. Alternatively, the claims are not directed to a specific improvement in the way computers operate.

*Apple*, 842 F.3d at 1241 (citation omitted). To be sure, the claims of the '077 Patent include functionality in addition to the generation and transmission of menus, but the inclusion of additional steps does not change the nature of the underlying invention, which is "directed to an abstract idea." *Id.* *See also Interval Licensing*, 896 F.3d at 1344-45 (finding claims "directed to an abstract idea because they consist of generic and conventional information acquisition and organization steps that are connected to, but do not convert, the abstract idea–displaying a second set of data without interfering with a first set of data–into a particular conception of how to carry out that concept.");

1 *Uniloc USA, Inc. v. HTC America, Inc.*, No. C17-1558JLR, 2018 WL 30008870, at *7
2 (W.D. Wash. June 15, 2018), *appeal docketed*, No. 18-2185 (Fed. Cir. July 23, 2018),
3 (finding claims directed to abstract idea where they  were "directed to a result, not a
4 specific means or method" and were "not technological improvements[.]") Thus, the
5 Court proceeds to step two of the § 101 inquiry.

6 **B.   Step Two - Inventive Concept**

7 The second step of the § 101 inquiry "is the search for an inventive concept,
8 which is something sufficient to ensure that the claim amounts to significantly more
9 than the abstract idea itself." *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873
10 F.3d 905, 911 (Fed. Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S.Ct. 2000 (May 14,
11 2018), (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d
12 1343, 1347 (Fed. Cir. 2014)).  Here, "we 'look with more specificity at what the claim
13 elements add, in order to determine whether they identify an inventive concept in the
14 application of the ineligible subject matter to which the claim is directed." *Intellectual*
15 *Ventures III*, 850 F.3d at 1338 (quoting *Affinity Labs*, 838 F.3d at 1258).  "To save a
16 patent at step two, an inventive concept must be evident in the claims." *Two-Way*, 874
17 F.3d at 1338 (citing *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir.
18 2017)).

19 Here, claim 1 sets out a number of elements in the patented system, including:
20 (1) Computer hardware ("a central processing unit[,]" etc.), (2) computer software ("an
21 operating system[,]" "menu configuration software"), (3) "real-time synchronous
22 communication" to and from the wireless handheld computing devices, and (4)
23 "automatically format[ting] the programmed handheld menu configuration" for "at least
24 two different wireless handheld computing device display sizes[.]"[3]  Domino's goes
25 through these elements individually and in combination, and explains why they do not
26 transform the abstract idea discussed above into an inventive concept.

27

28

---

[3]   These elements are essentially the same as those set out in the other
independent claims, 9 and 13.

1      As to the hardware elements, Domino's asserts those elements are typical and

2  conventional, and Ameranth does not dispute that assertion.

3      As to the software elements, Domino's argues those are "commonly known."

4  Ameranth does not dispute that argument either, nor could it in light of the

5  specification. (*See* '077 Patent at 12:57-61 ("The software applications for performing

6  the functions falling within the described invention can be written in any commonly

7  used computer language.  The discrete programming steps are commonly known and

8  thus programming details are not necessary to a full description of the invention."))

9      On the element of synchronization, Domino's contends that was "insignificant

10  post-solution activity," as found by the Federal Circuit in *Apple*.  842 F.3d at 1242.

11  Ameranth does not dispute this argument, but instead argues the synchronization

12  element was "non-conventional." (*See* Supp. Opp'n at 18-23.)  Ameranth's argument,

13  however, fails to acknowledge the Federal Circuit's decision in *Apple*, much less refute

14  the  court's statement that "[t]he invention merely claims the addition of conventional

15  computer components to well-known business practices."  842 F.3d at 1242.

16  Ameranth's argument also fails to address the specification, which describes one of the

17  benefits of the Windows CE® operating system as "built-in synchronization between

18  handheld devices, internet and desktop infrastructure[.]" ('077 Patent at 12:14-17.)

19      Domino's did not address the concept of "real-time" separately from the concept

20  of "synchronization," but that element, too, fails to demonstrate an inventive concept.

21  As stated by this Court in a previous case, "[r]eal-time execution is essentially adding

22  a 'but faster' step to the claim." *Clarilogic, Inc. v. Formfree Holdings Corp.*, No. 15-

23  cv-41 DMS (NLS), 2016 WL 3247890, at *2 (S.D. Cal. Mar. 4, 2016).  And the simple

24  inclusion of a "real-time" feature through the use of "entirely conventional, generic

25  technology[,]" which is what the claims of the '077 Patent recite, does not provide an

26  inventive concept. *Elec. Power Grp.*, 830 F.3d at 1356.  *See also Two-Way Media*, 874

27  F.3d at 1340-41 (finding no inventive concept in claim requiring "receiving and

28  / / /

1   transmitting a real-time media stream" through "anything other than conventional

2   computer and network components according to their ordinary functions.")

3        The only other two elements set out in the claims are the automatic formatting

4   of the programmed handheld menu configuration for display as cascaded sets of linked

5   graphical user interface screens, and the requirement that the system include "a different

6   number of user interface screens from at least one other wireless handheld computing

7   device in the system."   On these two elements, Domino's again says they were

8   "commonplace," and Ameranth again does not dispute that assertion.   Instead, it reverts

9   to its unconventionality argument.   That argument, however, is little more than *ipse*

10  *dixit*.   And automatically formatting the programmed handheld menu configuration in

11  a particular way and for more than one handheld device adds little, if anything, to the

12  invention beyond the concept of synchronization discussed above.   That Ameranth has

13  described the concept in different terms does not make it any more inventive.   *See*

14  *Intellectual Ventures III*, 850 F.3d at 1342 ("The mere fact that the inventor applied

15  coined labels to conventional structures does not make the underlying concept

16  inventive.")

17       As with the related patents, there is nothing in these elements, either individually

18  or in combination that "transform[s] the claimed abstract idea into a patent-eligible

19  application of the abstract idea."   *Apple*, 842 F.3d at 1242.   Accordingly, the asserted

20  claims of the '077 Patent are unpatentable under § 101.

21                                      **III.**

22                                  **CONCLUSION**

23       For these reasons, the Court grants Domino's motion for summary judgment of

24  unpatentability, and vacates all dates currently set in these cases.   The parties shall meet

25  and confer on the form of judgment, *i.e.*, whether judgment should be entered in the

26  / / /

27  / / /

28  / / /

1    lead case on all claims or whether judgment should be entered in each individual case,

2    and submit either a joint proposed judgment/judgments or a joint status report on or

3    before **October 2, 2018**.

4        **IT IS SO ORDERED**.

5    DATED:  September 25, 2018

6

7        HON. DANA M. SABRAW
         United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Appx16**

US008146077B2

(12) **United States Patent**
McNally et al.

(10) **Patent No.:** **US 8,146,077 B2**
(45) **Date of Patent:** **Mar. 27, 2012**

(54) **INFORMATION MANAGEMENT AND SYNCHRONOUS COMMUNICATIONS SYSTEM WITH MENU GENERATION, AND HANDWRITING AND VOICE MODIFICATION OF ORDERS**

(75) Inventors: **Keith R. McNally**, San Diego, CA (US); **William H. Roof**, San Diego, CA (US); **Richard Bergfeld**, Chatsworth, CA (US)

(73) Assignee: **Ameranth, Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1535 days.

(21) Appl. No.: **11/112,990**

(22) Filed: **Apr. 22, 2005**

(65) **Prior Publication Data**
US 2005/0204308 A1    Sep. 15, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 10/016,517, filed on Nov. 1, 2001, now Pat. No. 6,982,733, which is a continuation-in-part of application No. 09/400,413, filed on Sep. 21, 1999, now Pat. No. 6,384,850.

(51) **Int. Cl.**
*G06F 9/445* (2006.01)

(52) **U.S. Cl.** ...... **717/177**; 717/102; 717/109; 717/111; 717/168; 717/174; 715/810; 715/828

(58) **Field of Classification Search** .......... 715/810–845
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,415,065 A | * | 11/1983 | Sandstedt | ....................... | 705/34 |
| 4,530,067 A | | 7/1985 | Dorr | | |
| 4,547,851 A | * | 10/1985 | Kurland | ........................... | 705/15 |
| 4,553,222 A | * | 11/1985 | Kurland et al. | ................. | 705/15 |
| 4,638,312 A | * | 1/1987 | Quinn et al. | ................... | 340/5.9 |
| 5,003,472 A | | 3/1991 | Perrill et al. | | |
| 5,023,438 A | * | 6/1991 | Wakatsuki et al. | ...... | 235/462.46 |
| 5,189,411 A | * | 2/1993 | Collar et al. | ............. | 340/825.2 |
| 5,235,509 A | * | 8/1993 | Mueller et al. | ................. | 705/15 |
| 5,367,557 A | * | 11/1994 | Ozenbaugh, II | ......... | 455/405 |
| 5,510,979 A | | 4/1996 | Moderi et al. | | |
| 5,724,069 A | * | 3/1998 | Chen | .......................... | 345/172 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0779759 A2 | 6/1997 | |

(Continued)

OTHER PUBLICATIONS

Micros Systems Inc. "Preliminary Information Packet for the Micros Hand-Held Touchscreen" Sep. 2, 1992.*

(Continued)

*Primary Examiner* — Lewis A Bullock, Jr.
*Assistant Examiner* — Matthew Brophy
(74) *Attorney, Agent, or Firm* — Fabiano Law Firm, P.C.; Michael D. Fabiano

(57) **ABSTRACT**

An information management and synchronous communications system and method facilitates database equilibrium and synchronization with wired, wireless and Web-based systems, user-friendly and efficient generation of computerized menus and reservations with handwritten/voice modifications for restaurants and other applications that utilize equipment with nonstandard graphical formats, display sizes and/or applications for use in remote data entry, information management and communication with host computer, digital input device or remote pager via standard hardwired connection, the internet, a wireless link, printer or the like.

**18 Claims, 8 Drawing Sheets**

Ameranth 21ˢᵗ Century Communications Integration



**US 8,146,077 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,781,189 A | * | 7/1998 | Holleran et al. ............... 715/826 |
| 5,802,526 A | | 9/1998 | Fawcett et al. |
| 5,845,263 A | | 12/1998 | Camaisa et al. |
| 5,850,214 A | * | 12/1998 | McNally et al. ............... 345/173 |
| 5,912,743 A | * | 6/1999 | Kinebuchi et al. ............. 358/442 |
| 5,937,041 A | * | 8/1999 | Cardillo et al. ............ 379/93.25 |
| 5,969,968 A | | 10/1999 | Pentel |
| 5,974,238 A | * | 10/1999 | Chase, Jr. ...................... 709/248 |
| 5,991,739 A | * | 11/1999 | Cupps et al. ..................... 705/26 |
| 6,023,714 A | * | 2/2000 | Hill et al. ....................... 715/235 |
| 6,034,621 A | * | 3/2000 | Kaufman ...................... 340/7.21 |
| 6,038,545 A | * | 3/2000 | Mandeberg et al. ............. 705/15 |
| 6,107,944 A | | 8/2000 | Behr |
| 6,125,356 A | * | 9/2000 | Brockman et al. .............. 705/37 |
| 6,167,255 A | | 12/2000 | Kennedy, III et al. |
| 6,208,976 B1 | | 3/2001 | Kinebuchi et al. |
| 6,219,696 B1 | | 4/2001 | Wynblatt et al. |
| 6,300,947 B1 | * | 10/2001 | Kanevsky ..................... 715/866 |
| 6,301,564 B1 | * | 10/2001 | Halverson ...................... 705/15 |
| 6,341,316 B1 | | 1/2002 | Kloba et al. |
| 6,421,717 B1 | | 7/2002 | Kloba et al. |
| 6,425,524 B2 | | 7/2002 | Pentel |
| 6,435,406 B1 | | 8/2002 | Pentel |
| 6,473,739 B1 | * | 10/2002 | Showghi et al. ................. 705/26 |
| 6,553,412 B1 | | 4/2003 | Kloba et al. |
| 6,779,042 B1 | | 8/2004 | Kloba et al. |
| 6,839,744 B1 | | 1/2005 | Kloba et al. |
| 6,865,261 B1 | | 3/2005 | Rao et al. |
| 6,880,750 B2 | | 4/2005 | Pentel |
| 6,920,431 B2 | * | 7/2005 | Showghi et al. ................. 705/26 |
| 6,973,437 B1 | * | 12/2005 | Olewicz et al. ................. 705/15 |
| 6,996,777 B2 | * | 2/2006 | Hiipakka ...................... 715/727 |
| 7,000,032 B2 | | 2/2006 | Kloba et al. |
| 7,174,308 B2 | * | 2/2007 | Bergman et al. ................. 705/26 |
| 7,234,640 B2 | | 6/2007 | Pentel |
| 2001/0047302 A1 | | 11/2001 | Yoshinaga et al. |
| 2002/0059405 A1 | * | 5/2002 | Angwin et al. ............... 709/223 |
| 2003/0067494 A1 | * | 4/2003 | Burns ........................... 345/810 |
| 2003/0107588 A1 | | 6/2003 | Elsbree et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | GB2196766 A | 5/1988 |
| WO | WO9820434 | 5/1998 |
| WO | WO9841936 | 9/1998 |

## OTHER PUBLICATIONS

"Graphic User Interface Builder Menu Construction Using a Tree-View Container" IBM Technical Disclosure Bulletin, vol. 38, No. 9, Sep. 1995.

"Entertainment Industry Leader Rich Rank Takes Helm At Cybermeals, World's Largest Online Meal Ordering System", Sep. 15, 1998, <URL:http://www.food.com/food.sph/saisp...s/aboutus/pressrelease.jsp?id=228>, printed on Apr. 20, 2001.

"W3C Putting Compact HTML, HDML to Test for Net Access—Mobile Markup Languages Face Off", Yoshiko Hara, Apr. 6, 1998, <URL:http://www.techweb.com/se/directlink. cgi?eet19980406s0089>, printed on Sep. 2, 1999.

Complaint for Patent Infringement, Jun. 28, 2007, *Ameranth, Inc.* v. *Menusoft Systems Corporation and Cash Register Sales & Service of Houston, Inc.* (*dba CRS Texas*), 2-07-CV-271, (E.D. Tex.).

Defendants Menusoft Systems Corporation and Cash Register Sales & Service of Houston, Inc.'s Original Answer, Defenses, and Counterclaims, Sep. 4, 2007, *Ameranth, Inc.* v. *Menusoft Systems Corporation and Cash Register Sales & Service of Houston, Inc.* (*dba CRS Texas*), 2-07-CV-271, (E.D. Tex.).

Plaintiff Ameranth, Inc.'s Reply to Defendants Menusoft Systems Corporation and Cash Register Sales & Service of Houston, Inc.'s Counterclaims, Sep. 24, 2007, *Ameranth, Inc.* v. *Menusoft Systems Corporation and Cash Register Sales & Service of Houston, Inc.* (*dba CRS Texas*), 2-07-CV-271, (E.D. Tex.).

Complaint for Declaratory Judgment of Patent Non-Infringement and Invalidity, Jul. 17, 2007, *Radiant Systems, Inc.* v. *Ameranth, Inc.*, 1-07-CV-1641, (N.D. Ga.).

Defendant and Counterclaim Plaintiff Ameranth, Inc.'s Answer and Counterclaims for Patent Infringement, Aug. 10, 2007, *Radiant Systems, Inc.* v. *Ameranth, Inc.*, 1-07-CV-1641, (N.D. Ga.).

Reply to Counterclaims, Sep. 4, 2007, *Radiant Systems, Inc.* v. *Ameranth, Inc.*, 1-07-CV-1641, (N.D. Ga.).

Radiant Systems, Inc.'s Motion for Leave to File a First Amended Complaint for Declaratory Judgment of Patent Non-Infringement, Invalidity and Inequitable Conduct, Oct. 5, 2007, *Radiant Systems, Inc.* v. *Ameranth, Inc.*, 1-07-CV-1641, (N.D. Ga.).

Radiant Systems, Inc.'s Memorandum in Support of Its Motion for Leave to File a First Amended Complaint for Declaratory Judgment of Patent Non-Infringement, Invalidity and Inequitable Conduct, Oct. 5, 2007, *Radiant Systems, Inc.* v. *Ameranth, Inc.*, 1-07-Cv-1641, (N.D. Ga.).

Exhibit A to Radiant Systems, Inc.'s Motion for Leave—First Amended Complaint for Declaratory Judgment of Patent Non-Infringement, Invalidity and Inequitable Conduct, Oct. 5, 2007, *Radiant Systems, Inc.* v. *Ameranth, Inc.*, 1-07-CV-1641, (N.D. Ga.).

Exhibit B to Radiant Systems, Inc.'s Motion for Leave—FSTEC, Show Directory, Oct. 1996.

Exhibit C to Radiant Systems, Inc.'s Motion for Leave—Declaration and Power of Attorney for U.S. Appl. No. 09/400,413, now U.S. Patent No. 6,384,850, Oct. 25, 1999.

Exhibit D to Radiant Systems, Inc.'s Motion for Leave—FSTEC, Show Directory, Nov. 1997.

Exhibit E to Radiant Systems, Inc.'s Motion for Leave—FSTEC, Show Directory, Nov. 1998.

Exhibit F to Radiant Systems, Inc.'s Motion for Leave—Ameranth webpage, 1998.

Exhibit G to Radiant Systems, Inc.'s Motion for Leave—Office Action, Nov. 29, 2000, for U.S. Appl. No. 09/400,413, now U.S. Patent No. 6,384,850.

Exhibit H to Radiant Systems, Inc.'s Motion for Leave—Marked-up claims of U.S. Appl. No. 09/400,413, now U.S. Patent No. 6,384,850.

Exhibit I to Radiant Systems, Inc.'s Motion for Leave—Amendment & Response to Nov. 29, 2000 Office Action, Feb. 26, 2001, for U.S. Appl. No. 09/400,413, now U.S. Patent No. 6,384,850.

Exhibit J to Radiant Systems, Inc.'s Motion for Leave—Notice of Allowability, Nov. 24, 2004, for U.S. Appl. No. 10/015,729, now U.S. Patent No. 6,871,325.

Ameranth's Opposition to Radiant's Motion for Leave to File a First Amended Complaint, Oct. 22, 2007, *Radiant Systems, Inc.* v. *Ameranth, Inc.*, 1-07-CV-1641, (N.D. Ga.).

Exhibit 1 to Ameranth's Opposition—International Search Report, Nov. 21, 2000, for PCT/US00/25863.

Exhibit 2 to Ameranth's Opposition—International Search Report, May 17, 2005, for PCT/USO4/13206.

Exhibit 3 to Ameranth's Opposition—Written Opinion of the International Searching Authority, May 20, 2005, for PCT/US04/13206.

Exhibit 4 to Ameranth's Opposition—International Search Report, Mar. 1, 2001, for PCT/US00/31510.

Exhibit 5 to Ameranth's Opposition—International Preliminary Examination Report, Jun. 20, 2001, for PCT/US04/13206.

Exhibit 6 to Ameranth's Opposition—International Search Report, Jul. 4, 2003, for PCT/US03/08050.

Exhibit 7 to Ameranth's Opposition—Notice of Allowability, Mar. 18, 2005, U.S. Appl. No. 10/136,873, now U.S. Patent No. 7,028,264.

Exhibit 8 to Ameranth's Opposition—Allowed Claims of U.S. Appl. No. 10/136,873, now U.S. Patent No. 7,028,264.

Exhibit 9 to Ameranth's Opposition—Specification of U.S. Appl. No. 10/136,873, now U.S. Patent No. 7,028,264.

Exhibit 10 to Ameranth's Opposition—Statement Regarding Notice of Allowance, Apr. 12, 2005, U.S. Appl. No. 10/136,873, now U.S. Patent No. 7,028,264.

Exhibit 11 to Ameranth's Opposition—Notice of Allowability, Oct. 15, 2004, U.S. Appl. No. 10/079,739, now U.S. Patent No. 6,857,105.

Radiant Systems, Inc.'s Reply Brief in Further Support of Its Motion for Leave to File a First Amended Complaint, Oct. 29, 2007, *Radiant Systems, Inc.* v. *Ameranth, Inc.*, 1-07-CV-1641, (N.D. Ga.).

Exhibit A to Radiant Systems, Inc.'s Reply Brief in Further Support of Its Motion for Leave to File a First Amended Complaint—U.S. Patent No. 5,580,214.

US 8,146,077 B2

Page 3

Hamilton, Martha M., "Computers on the Menu," Washington Business, Dec. 18, 1995.

Letter from Ronald D. Coleman, President & CEO of MarCole Interactive Systems to George L. Kanabe, Fish & Richardson P.C., Oct. 2, 2007.

MarCole Enterprises, Inc. Catalog, Tabletop Merchandising and Gift Registry System Flow, 1993.

MarCole Press Release, *MarCole Introduces New Gift Registry System Products at Retail Systems '96*, May 20, 1996.

MarCole Press Release, *MarCole Enterprises Wins ISA 's Coveted Interactive Marketing Best Multimedia Application Award*, Jul. 23, 1996.

MarCole Press Release, *MarCole's Interactive Shopping and Gift Registry System to Rollout to all Reading China & More! Stores*, Sep. 30, 1996.

MarCole Press Release, *MarCole's Interactive Shopping System to Offer NFL Team Home Products at Super Bowl XXXI*, Jan. 15, 1997.

Rubinstein, Ed, *Wish Lists, Is Gift Registry the Most Profitable Kiosk of All?*, Kiosk Business, Jan./Feb. 2002.

MarCole Draft New Release, *MarCole Enterprises Named NCR Retail Solution Partner*, Aug. 19, 1998.

Brookins, Laurie, *State of the Heart, Crafting a High-Tech Registry for the New Bride and Groom*, The Gourmet Retailer, Nov. 1999.

Tableware Today, *MarCole Gift Registry Works v.5.0*, Jun./Jul. 2002. Kiosk, *The Gift Registry Kiosk*, 2002.

Killam, Jim, *Interactive Kiosks Score In-Store*, Sales and Marketing Strategies & News, Feb. 199!.

OfficeWorld News, Interactive Multimedia Systems Transform Superstore Shopping, Feb. 1996.

Jankowski, Wanda, *Electronic Kiosks: Boon for Retailers?*, Gifts & Decorative Accessories, Oct. 1995.

Hawk, Amanda Kate, *Kiosks! The Good, The Bad, and the Best*, RIS News, Sep. 1996.

Porter, Thyra, *MarCole Signs New Tabletop Manufacturers*, Kitchenware News, Mar. 1996.

Promotion Audit, *Office Depot Installs Interactive Shopping System*, Apr. 1996.

Kehoe, Ann-Margaret, *Wooing Brides with Technology*, Home Furnishings Daily, Oct. 11, 1993.

Brandweek, *Dayton Hudson Grows Kiosk Test*, Elaine Underwood, May 8, 1995.

Gift & Stationary Business, *Pull in a China Shop*, Jun. 1993.

Kehoe, Ann-Margaret, *Technology Comes to Tabletop*, Home Furnishings Daily, May 24, 1993.

Integrated Restaurant Software, "Dining Out: Baltimore—D.C." video, Nov. 4, 1994.

CompuWave Media Publication in Virtual, Pre-Sep. 21, 1999!!.

Squirrel Companies Inc., Squirrel Restaurant Management System Brochure, Pre-Sep. 21, 1999.

Squirrel Systems, company information web page, http://web.archive.org/web/19990508153731/www.squirrelsystems.com/about/company.html, May 8, 1999.

Squirrel Systems, products web page, http://web.archive.org/web/1999050875824/www.squirrelsystems.com/products/newsq.html, May 8, 1999.

Robin Berger, "POS Positions Spago for Growth,"http://web.archive.org/web/19991009105324/www.squirrelsystems.com/media/articles/spago.html, http://web.archive.org/web/19991112165756/www.squirrelsystems.com/media/articles.html, Hospitality Technology, Apr./May 1997.

Squirrel Companies Inc., System Setup Version 3.0x, Copyright 1989.

Squirrel Companies Inc., Squirrel Restaurant Management System Brochure, Pre-Sep. 21, 1999!!.

Squirrel Systems, "SQUiRREL® Companies Inc. wins the California Restaurant Association's 1998 EXPO Innovator Award in the Technology category", http://web.archive.org/web/19991013045515/squirrelsystems.com/media/pr/aug2098.html, Aug. 20, 1998.

Business Wire, Fujitsu and Sulcus Hospitality Group partner to develop first wireless computer for restaurant industry, Business Wire, Aug. 30, 1993.

Business Wire, "Sulcus's Squirrel and cybermeals Ink Technology Alliance; cybermeals New Menucaster Software to be Bundled into Squirrel's Touch Tomorrow Point of Sale Package," http://findarticles.com/p/articles/mi_m0EIN/is_1998_Feb_24/ai_203163397?tag=content;coll, Business Wire, Feb. 24, 1998.

Business Wire, "Accel Partners Invest $10 Million in cybermeals", http://www.allbusiness.com/banking-finance/financial-markets-investing/6840069-1.html, Business Wire, May 28, 1998.

Revshare.com, cybermeal revenue sharing program, http://web.archive.org/web/19980124080645/http://www.revshare.com/, Jan. 24, 1998.

Squirrel Systems, SQ Classic product webpage, http://web.archive.org/web/19991010022213/www.squirrelsystems.com/products/sq_classic.html, Oct. 10, 1999.

Squirrel Systems, "Brew Moon Management Toasts SQUiRREL's 'Seamless Solution", http://web.archive.org/web/19990508170309/www.squirrelsystems.com/media/articles/brewmoon.html, Nov. 1998.

Squirrel Systems, "Squirrel Customer Profile: Chevy's Fresh Mex", http://www.squirrelsystems.com/news/articles/9808.html, Aug. 1998.

Micros Systems, Inc., "8700 HMS Version 2.10 User's Manual", http://web.archive.org/web/19961111034156/www.micros.com/frames/servdine.htm, Copyright 1997.

Micros Systems, Inc., core products web page, http://web.archive.org/web/19961111034156/www.micros.com/frames/servdine.htm, Nov. 11, 1996.

Micros Systems, Inc., new products web page, http://web.archive.org/web/19961111103410/www.micros.com/frames/innovats.htm, Nov. 11, 1996.

Micros Systems, Inc., quick service products web page, http://web.archive.org/web/19961111034149/www.micros.com/frames/quikserv.htm, Nov. 11, 1996.

Micros Systems, Inc., company information web page, http://web.archive.org/web/19961111034029/www.micros.com/frames/about.htm, Nov. 11, 1996.

Micros Systems, Inc., 8700 HMS Product Overview, http://web.archive.org/web/19990508144340/www.micros.com/mktg/html/8700over.htm, May 8, 1999.

Micros Hospitality Information Systems, "Preliminary Information Packet for the: Micros Hand-Held Touchscreen," Pre-Sep. 21, 1999??.

Micros Systems, Inc., "The MICROS 2700 HTS Touchscreen", Pre Sep. 21, 1999??.

Integrated Restaurant Software, RMS Touch—Touch Screen Restaurant Management System product description, http://web.archive.org/web/19970215025823/www.rmstouch.com/pos.htm, Feb. 15, 1997.

Integrated Restaurant Software, company profile web page, http://web.archive.org/web/19970215025858/www.rmstouch.com/profile.htm, Feb. 15, 1997.

Compuwave Technologies, Inc., Elite32 Palm System brochure, Pre-Sep. 21, 1999??.

Compuwave Technologies, Inc., POSInfrared Restaurant System brochure, Pre-Sep. 21, 1999??.

Compuwave Technologies, Inc., Wireless POS Drive-Thru System brochure, Pre-Sep. 21, 1999??.

Compuwave Technologies, Inc., "Compuwave Technologies Approved as Supplier to McDonald's Canada", Compuwave Press Release, Sep. 14, 2000.

Compuwave Technologies, Inc., Revolutionary Wireless Restaurant System brochure, Pre-Sep. 21, 1999??.

Menusoft Systems Corporation, "Winning with Windows Digital Dining. Austin.97", Austin, Texas Digital Dining Users' Conference, Feb. 20, 1997.

Menusoft Systems Corporation, "Digital Dining for Windows User Manual", Copyright 1997.

Menusoft Systems Corporation, "Digital Dining for Windows v7.0 User Manual", Copyright 1997.

Menusoft Systems Corporation, "Digital Dining for Windows v7.0 setup manual", Copyright 1997.

Micros Systems, Inc., "POS Configuration User's Guide: 3700 POS", Copyright 1998.

# US 8,146,077 B2

Page 4

Ibertech, Inc., "Ibertech, cybermeals Announce Technology Partnership", http://findarticles.com/p/articles/mi__m0EIN/is__1998__Feb__2/ai__20205914/print?tag=artBody;coll, Business Wire. Feb. 2, 1998.

Ed Rubenstein, "Future Food for Thought", http://findarticles.com/p/articles/mi__m3190/is__/ai__20462276, Nation's Restaurant News, Mar. 30, 1998.

Ameranth Technology Systems, Inc., company home page http://web.archive.org/web/19981202001436/http://www.ameranth.com/, Dec. 2, 1998.

Compuwave Technologies, Inc., company information web page, http://web.archive.org/web/20010207174316/www.compuwave.net/about.htm. Feb. 7, 2001.

Collins & Malik, "Hospitality Information Technology", pp. 214-376, Kendall/Hunt Pub. Co., 3d Ed., 1998.

Hospitality Technology, pp. 14,26,34, Jan. 1997.

"Wireless Technologies and the National Information Infrastructure", OTA-ITC-622 GPO stock #052-003-01421-1, pp. 99-131, Sep. 1995.

Judgment on Jury Verdict, Sept 21, 2010, *Ameranth, Inc.* v. *Monusoft Systems Corp. and Cash Register Sales & Service of Houston, Inc.*, Case No. 2:07-CV-271-CE (E.D. Tex.).

Plaintiffs Final Trial Exhibit List, *Ameranth, Inc.* v. *Menusoft Systems Corp. and Cash Register Sales & Service of Houston Inc.*, Case No. 2:07-CV-271-CE (E.D. Tex.).

Defendants' Final Trial Exhibit List, *Ameranth, Inc.* v. *Menusoft Systems Corp. and Cash Register Sales & Service of Houston, Inc.*, Case No. 2:07-CV-271-CE (E.D. Tex.).

* cited by examiner

U.S. Patent          Mar. 27, 2012          Sheet 1 of 8          US 8,146,077 B2



FIG. 1

FIG.2



FIG.3



FIG.4



FIG.5



**FIG.6**

Case 3:12-cv-00733-DMS-WVG   Document 104-12   Filed 02/15/20   PageID.4296   Page 107 of 121



**FIG.7**



This is an example of the ordering "Literal Screen".

FIG. 8



Ameranth 21st Century Communications Integration
WAN Wireless Growth in 2000+
POS Interface 15+ POS Partners
Ethernet
•On-line ordering
•On-line reservations
•On-line waitlisting
•On-line Frequent customer
•On-line reports/ coordination
Web Links
Ameranth Middleware Communications Controller
Linked Databases
• Com setup
• Wait list
• Frequent Customers
• Reservations
Web Hub
Wireless Hub
318 MHz
PadLink Table Status
Ethernet
Other PC-based systems
Jtech Paging
318 MHz
27MHz
Spectrum24
Spectrum24
Spectrum24
2700 for hostess station
2700 for wireless POS
2700 for Manager Inventory Scanning
2700 for valet parking
Fixed POS stations with Spectrum24 card
AMERANTH™
WIRELESS SYSTEMS SOLUTIONS

FIG. 9

US 8,146,077 B2

**1**

## INFORMATION MANAGEMENT AND SYNCHRONOUS COMMUNICATIONS SYSTEM WITH MENU GENERATION, AND HANDWRITING AND VOICE MODIFICATION OF ORDERS

The present application is a continuation of application Ser. No. 10/016,517, filed Nov. 1, 2001 now U.S. Pat. No. 6,982, 733, which is a continuation-in-part of application Ser. No. 09/400,413, filed Sep. 21, 1999 (now U.S. Pat. No. 6,384, 850). The contents of application Ser. No. 10/016,517 and application Ser. No. 09/400,413 are incorporated herein by reference.

### FIELD OF THE INVENTION

This invention relates to an information management and synchronous communications system and method for generation of computerized menus for restaurants and other applications with specialized display and synchronous communications requirements related to, for example, the use of equipment or software with non-PC-standard graphical formats, display sizes and/or applications for use in remote data entry, information management and synchronous communication between host computer, digital input device or remote pager via standard hardwired connection, the internet, a wireless link, smart phone or the like.

### BACKGROUND OF THE INVENTION

While computers have dramatically altered many aspects of modern life, pen and paper have prevailed in the hospitality industry, e.g., for restaurant ordering, reservations and wait-list management, because of their simplicity, ease of training and operational speed. For example, ordering prepared foods has historically been done verbally, either directly to a waiter or over the telephone, whereupon the placed order is recorded on paper by the recipient or instantly filled.

Although not previously adapted for wide-scale use in the hospitality industry, various forms of digital wireless communication devices are in common use, e.g., digital wireless messengers and pagers. Also in common use are portable laptop and handheld devices. However, user-friendly information management and communication capability not requiring extensive computer expertise has not heretofore been available for use in everyday life such as for restaurant ordering, reservations and wait-list management. Hundreds of millions of dollars have been spent on personal digital assistant ("PDA") development seeking to produce a small, light-weight and inexpensive device that could be adapted to such uses; yet none have yielded a satisfactory solution.

One of the inherent shortcomings of PDA type devices is that, as they strive for small size, low weight and low cost, they must compromise the size and clarity of the operator display medium interface itself, which in most cases is one of a variety of LCD (liquid crystal display) type devices. As the size of the display shrinks, the amount of information that may be displayed at any one point or time is commensurately decreased, typically requiring multiple screens and displays to display information to the operator. This reduces the overall utility of the device. Additionally, the smaller display and keyboard results in a non-optimal operator interface, which slows down operation and is thus unacceptable for the time criticality of ordering, reservation and wait-list management and other similar applications. This necessitates many design

**2**

compromises which in the aggregate have resulted in limited acceptance of PDA type devices in the restaurant and hospitality fields.

Many of the negatives prevalent in earlier devices have been eliminated, but, to date, there is still no integrated solution to the ordering/waitlist/reservation problem discussed above. With the advent of the Palm® and other handheld wireless devices, however, the efforts to make such devices ubiquitous have begun to bear fruit at least in some areas, e.g., personal calendars. However, substantial use of such devices in the restaurant and hospitality context has not occurred to date. As discussed above, at least one of the reasons PDAs have not been quickly assimilated into the restaurant and hospitality industries is that their small display sizes are not readily amenable to display of menus as they are commonly printed on paper or displayed on, e.g., large, color desktop computer screens. Another reason is that software for fully realizing the potential for wireless handheld computing devices has not previously been available. Such features would include fast and automatic synchronization between a central database and multiple handheld devices, synchronization and communication between a World Wide Web ("Web") server and multiple handheld devices, a well-defined application program interface ("API") that enables third parties such as point of sale ("POS") companies, affinity program companies and internet content providers to fully integrate with computerized hospitality applications, real-time communication over the internet with direct connections or regular modem dialup connections and support for batch processing that can be done periodically throughout the day to keep multiple sites in synch with the central database. A single point of entry for all hospitality applications to communicate with one another wirelessly has also previously been unavailable. Such a single point of entry would work to keep all wireless handheld devices and linked Web sites in synch with the backoffice server (central database) so that the different components are in equilibrium at any given time and an overall consistency is achieved. For example, a reservation made online would be automatically communicated to the backoffice server and then synchronized with all the wireless handheld devices wirelessly. Similarly, changes made on any of the wireless handheld devices would be reflected instantaneously on the backoffice server, Web pages and the other handheld devices.

For the foregoing reasons, paper-based ordering, waitlist and reservations management have persisted in the face of widespread computerization in practically all areas of commerce. At most, computerization of these functions has been largely limited to fixed computer solutions, i.e., desktop or mainframe, because of the problems heretofore faced in configuring wireless handheld devices and maintaining database synchronization for such applications. Specifically, the unavailability of any simple technique for creating restaurant menus and the like for use in a limited display area wireless handheld device or that is compatible with ordering over the internet has prevented widespread adoption of computerization in the hospitality industry. Without a viable solution for this problem, organizations have not made the efforts or investments to establish automated interfaces to handheld and Web site menus and ordering options.

A principal object of the present invention is to provide an improved information management and synchronous communications system and method which facilitates user-friendly and efficient generation of computerized menus for restaurants and other applications that utilize equipment with non-PC-standard graphical formats, display sizes and/or applications.

US 8,146,077 B2

3

4

A further object of the present invention is to provide an improved information management and synchronous communications system and method which provides for entry, management and communication of information from the operator as well as to and from another computer, Web page menu, remote digital device using a standard hardwired connection, the internet or a wireless link.

A further object of the present invention is to provide an improved information management and synchronous communications system which is small, affordable and light-weight yet incorporates a user-friendly operator interface and displays menus in a readily comprehensible format.

A further object of the present invention is to provide a synchronous information management and communications system which enables automatic updating of both wireless and internet menu systems when a new menu item is added, modified or deleted from any element of the system.

SUMMARY OF THE INVENTION

The foregoing and other objects of the present invention are provided by a synchronous information management and communications system and method optimized for simplicity of operation which incorporates menu generation for creation of menus to be used with wireless remote handheld computer and PDA devices, the internet or any application where simple and efficient generation of menus is appropriate. The menu generation approach of the present invention includes a desktop software application that enables the rapid creation and building of a menu and provides a means to instantly download the menu configuration onto, e.g., a handheld device or Web page and to seamlessly interface with standard point of sale ("POS") systems to enable automatic database updates and communication exchanges when a change or input occurs in any of the other system elements. To solve the above and other related problems, an information management and communications system is provided which results in a dramatic reduction in the amount of time, and hence cost, to generate and maintain computerized menus for, e.g., restaurants and other related applications that utilize non-PC-standard graphical formats, display sizes or applications.

The menu generation approach of the present invention has many advantages over previous approaches in solving the problem of converting paper-based menus or Windows® PC-based menu screens to small PDA-sized displays and Web pages. In one embodiment, the present invention is a software tool for building a menu, optimizing the process of how the menu can be downloaded to either a handheld device or Web page, and making manual or automatic modifications to the menu after initial creation.

Manual modifications to the generated menus include handwritten screen captures and/or voice recorded message captures coupled with the standard menus and modifiers generated according to standard choices. Such manual modifications enable an extremely rapid and intuitive interface to enhance operations and further optimize the overall operator interface. This approach solves a long-standing, operational issue in restaurant/hotel/casino food/drink ordering when customers want something unusual and not anticipated and available through normal computerized selections. As seen in FIG. 8, the operator screen on the hand-held can capture handwritten information specific to a customers requests directly on the touch-sensitive screen of the wireless computing device. This additional information can then be coupled with the fixed menu and modifier information generated automatically from the hospitality application software and the combined message can be sent to a restaurant point of sale

(POS) system, printer or/or display system. This unique operator interface enables universal languages and an unlimited set of information to be manually communicated and exchanged. The resultant combined message of one or more fixed indications selected from a menu of a device such as a hand-held, and dynamic handwritten messages and/or data provides an even more powerful tool than either modality used independently.

For example a restaurant server taking a drink order could select from a menu of her hand-held device's screen "Iced Tea", and then manually write in the literal screen of her hand-held "with lemon" as shown in FIG. 8. The manually-written information could, for example, be printed or displayed in front of a bartender preparing the drink order. The indication "Iced Tea" as selected from a menu of the hand-held would also be presented to the bartender, perhaps by printing and/or screen display. The server can also select any printer from within the hospitality establishment directly from the operator interface on the screen of the hand-held and have either the order or the receipt printed out where it is most convenient and efficient.

Similarly, a server taking a drink order could select from a menu of her hand-held device's screen "Iced Tea", and then record the voice message "with lemon" using her hand-held device integral microphone. The recorded information could, for example, be played on a speaker attached to a computer, POS system, or the like located near the bartender or chef preparing the order. The indication "Iced Tea" as selected from a menu of the hand-held would also be presented to the bartender/chef, perhaps by printing and/or screen display. Both the literal screen capture method and the voice recorded message method combine the power of automatic fixed menu generation with the expanded flexibility to resolve operational issues that exist throughout the hospitality market without this innovative solution. Additionally, in certain embodiments, hand-writing and voice recognition technologies can be utilized to convert the manual operator inputs into appropriate text messages which can be combined with the computer generated menu options to convey the combined information to, for example, a bartender or chef.

Similarly, hand-held devices can link the above innovations to individual customers at specific tables through a graphical user interface on the hand-held screen that assigns each customer a number within a table. For example, table 20 might have 6 customers (1-6) and each customer has a different order, By enabling the linkage of the orders to specific customer positions within the table and accessible from the hand-held screen, the servers can easily track and link the specific orders to the specific customers.

The use of wireless handheld devices in the restaurant and hospitality industry is becoming increasingly pervasive as restaurant owners and managers become more aware of the benefits. With the proper wireless handheld system in place, restaurants can experience increased table turns from improved server productivity and shorter order taking and check paying times. Restaurants and POS companies seeking to provide a wireless handheld interface to their desktop-based POS systems or a Web page equivalent face several challenges. These challenges include building a menu using their existing database and transferring the menu onto hand-held devices or Web pages that will interface with servers wirelessly or to restaurants/customers over the internet. The menu generation approach of the present invention is the first coherent solution available to accomplish these objectives easily and allows one development effort to produce both the handheld and Web page formats, link them with the existing

US 8,146,077 B2

**5**

POS systems, and thus provides a way to turn a complicated, time-consuming task into a simple process.

The information management and synchronous communications system of the present invention features include fast synchronization between a central database and multiple handheld devices, synchronization and communication between a Web server and multiple handheld devices, a well-defined API that enables third parties such as POS companies, affinity program companies and internet content providers to fully integrate with computerized hospitality applications, real-time communication over the internet with direct connections or regular modem dialup connections and support for batch processing that can be done periodically throughout the day to keep multiple sites in synch with the central database.

The communication module also provides a single point of entry for all hospitality applications, e.g., reservations, frequent customer ticketing, wait lists, etc. to communicate with one another wirelessly and over the Web. This communication module is a layer that sits on top of any communication protocol and as an interface between hospitality applications and the communication protocol and can be easily updated to work with a new communication protocol without modifying the core hospitality applications. An exemplary system diagram of such a communications systemic relationship is shown in FIG. **9** and serves as an example of the power of the synchronization element of the invention through a common, linked solution. A single point of entry works to keep all wireless handheld devices and linked web sites in synch with the backoffice server applications so that the different components are in equilibrium at any given time and an overall consistency is achieved. For example, a reservation made online can be automatically communicated to the back-office server and then synchronized with all the wireless handheld devices wirelessly. Similarly, changes made on any of the wireless handheld devices are reflected instantaneously on the backoffice server Web pages and the other handheld devices.

BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing features and advantages of the present invention can be appreciated more fully from the following description, with references to the accompanying drawings in which:

FIG. **1** is a schematic representation of a window displayed on a computer display screen which shows a hierarchical tree menu, modifier window and sub-modifier window in conformity with a preferred embodiment of the present invention.

FIG. **2** is a schematic representation of a modifier dialog box in conformity with a preferred embodiment of the present invention.

FIG. **3** is a schematic representation of a menu category dialog box in conformity with a preferred embodiment of the present invention.

FIG. **4** is a schematic representation of a menu item dialog box in conformity with a preferred embodiment of the present invention.

FIG. **5** is a schematic representation of a display customization dialog box in conformity with a preferred embodiment of the present invention.

FIG. **6** is a schematic representation of a communications control window in conformity with a preferred embodiment of the present invention.

**6**

FIG. **7** is a schematic representation of a point of sale interface on a wireless handheld device for use in displaying page menus created in conformity with a preferred embodiment of the present invention.

FIG. **8** is an example of a literal, hand-written screen according to embodiments of the present invention.

FIG. **9** is an exemplary system diagram relating to embodiments of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

Most personal computers today run under an operating system that provides a graphical user interface ("GUI") for accessing user applications. A GUI is used in the preferred embodiment of the present invention. Through an interface of windows, pull-down menus, and toolbars, GUI operating systems have simplified PCs and have rendered computer technology more user friendly by eliminating the need to memorize keyboard entry sequences. In addition, GUIs allow users to manipulate their data as they would physical entities. For example, a window can represent a file and the contents of the window can represent the records of the file. The window can be opened, closed, or set aside on a desktop as if it were an actual object. The records of the file can be created, deleted, modified and arranged in a drag-and-drop fashion as if they also were physical objects. The most common GUI operating systems that provide this "object-oriented" environment for personal computers are Microsoft Windows® systems, including Windows CE® for handheld wireless devices and the like. Generally, a particular application program presents information to a user through a window of a GUI by drawing images, graphics or text within the window region. The user, in turn, communicates with the application by "pointing" at graphical objects in the window with a pointer that is controlled by a hand-operated pointing device, such as a mouse, or by pressing keys on a keyboard.

The use of menus is conventional in GUIs for software applications. Menus are typically utilized to provide end users of applications with available choices or processing options while using the applications. For example, in a typical desktop or interactive application, selection of a "file" from a menu bar may cause display of a context menu which provides "file" options. File options can have additional subordinate or child options associated with them. If a file option having subordinate options is selected, the child options are displayed in context in a child menu or submenu proximate to the selected parent option. One or more of the child options provided in the child menu may have further subordinate options. Thus, such a menu system comprises cascading sets of menus which are displayable in context to show the parent/child relationships between options of the context menu. A menu system of this type is incorporated into the preferred embodiment of the invention.

The preferred embodiment of the present invention uses typical hardware elements in the form of a computer workstation, operating system and application software elements which configure the hardware elements for operation in accordance with the present invention. A typical workstation platform includes hardware such as a central processing unit ("CPU"), e.g., a Pentium® microprocessor, RAM, ROM, hard drive storage in which are stored various system and application programs and data used within the workstation, modem, display screen, keyboard, mouse and optional removable storage devices such as floppy drive or a CD ROM drive. The workstation hardware is configured by software including an operating system, e.g., Windows® 95, 98, NT or CE, networking software (including internet browsing soft-

US 8,146,077 B2

**7**

ware) and application software components. The preferred embodiment also encompasses a typical file server platform including hardware such as a CPU, e.g., Pentium® microprocessor, RAM, ROM, hard drive, modem, and optional removable storage devices, e.g., floppy or CD ROM drive. The server hardware is configured by software including an operating system, e.g., Windows® 95, 98, NT or CE, networking software (including Web server software) and database software.

A computer workstation for use in the preferred embodiment also includes a GUI. As is conventional, the GUI is configured to present a graphical display on the display screen arranged to resemble a single desktop. Execution of an application program involves one or more user interface objects represented by windows and icons. Typically, there may be several windows and icons simultaneously present on the desktop and displaying information that is generated by different applications.

The window environment is generally part of the operating system software that includes a collection of utility programs for controlling the operation of the computer system. The computer system, in turn, interacts with application programs to provide higher level functionality, including a direct interface with the user. Specifically, the application programs make use of operating system functions by issuing task commands to the operating system which then performs the requested task. For example, an application program may request that the operating system display certain information on a window for presentation to the user.

An aspect of the preferred embodiment of the information management and communications system of the invention is shown in FIG. **1**. FIG. **1** shows an example of the GUI provided by the operating system of the preferred embodiment of the present invention. With reference to FIG. **1**, the preferred embodiment includes an intuitive GUI **1** from which to build a menu on a desktop or other computer. A hierarchical tree structure **2** is used to show the different relationships between the menu categories **3** (e.g., soups, salads, appetizers, entrees, deserts, etc.), menu items **4** (e.g., green salad, chicken caesar salad, etc.), menu modifiers **5** (e.g., dressing, meat temperature, condiments, etc.) and menu sub-modifiers **6** (e.g., Italian, French, ranch, bleu cheese, etc.).

The procedure followed in configuring a menu on the desktop PC and then downloading the menu configuration onto the POS interface on the handheld device in conformance with the preferred embodiment is as follows.

The menu configuration application is launched by clicking on the appropriate icon on the desktop display screen. FIG. **1** will then be displayed. There are three windows on the screen shown in FIG. **1**. The left window is the menu tree **7**, also called the tree view. The top right window is the Modifiers window **8** and the bottom right window is the Sub-Modifiers window **9**. The Sub-Modifiers window lists the sub-modifiers that correspond to the modifier that is selected. The views on the right are referred to as list views. There are several ways of invoking a command, including using the menu options; using the context menu (right mouse click); using the keyboard or using the toolbar icons. For example, if it is desired to add a category to the menu, the following four options are available: (1) clicking on Edit, Add Category; (2) right mouse clicking on Menu, then clicking on Add Category; (3) highlighting Menu, then typing Ctrl+T or (4) clicking on the Add Category icon on the toolbar. To add an item to a category, the following options are available: (1) highlighting the category to which it is desired to add an item and then clicking on Edit>Add Item; (2) right mouse clicking on the

**8**

desired category and then clicking on Add Item; (3) highlighting the desired category, then typing Ctrl+N or (4) clicking on the Add icon on the toolbar.

When building a menu, it should be kept in mind that the menu items are stored using a tree metaphor similar to how files are stored on a PC with folders and subfolders. The menu structure is similar to the Windows® File Explorer in the way the items are organized hierarchically. Below is an example of how an item may be configured:



In the above example, Menu is the root. Entrees is a menu category. Red Meat is an Entree category. NY Strip is a modifier. Vegetable is a modifier. Meat Temperature is a modifier. Medium Rare is a sub-modifier of Meat Temperature.

The steps taken in building a menu are as follows:
1. Add Modifiers;
2. Add Sub-Modifiers and link them to the Modifiers;
3. Create Menu categories;
4. Add menu items to the categories;
5. Assign Modifiers to the menu items;
6. Preview the menu on the POS emulator on the desktop PC;
7. Download the menu database to the handheld device.

To add modifiers, a user clicks on the inside of the Modifiers window, then (1) clicks on Edit>Add Modifier; (2) Presses Ctrl+N; (3) right mouse clicks in the Modifiers window, then clicks on Add Modifiers or (4) clicks on the Add icon from the toolbar. If a menu is being built from scratch, the procedure is to enter the Long Name, Short Name, Code and Price in the Modifier dialog box **10** shown in FIG. **2**. The Long Name is the full descriptive name of the item. The Short Name is the abbreviated name that will be displayed on the handheld device. The Code is the numeric or alphanumeric code for the item. If there is an existing database, the existing database can be browsed and menu items retrieved from the database. Clicking on the Browse button will bring up the existing database of menu items. The item to be added is then selected and "OK" is clicked. The fields will then be filled with the information from the database. Clicking on OK again will add the item as a modifier. To delete a modifier, the modifier is selected and the Delete key pressed on the keyboard. To edit a modifier, either the modifier is double clicked or the Enter key is pressed.

Sub-modifiers represent the last level of modifiers that can be assigned to a menu tree. To add sub-modifiers, the modifier to which sub-modifiers are to be assigned is selected. Then, the focus is set on the sub-modifier window by clicking inside the Sub-Modifier window as follows: (1) clicking on Edit>Add Sub-Modifier; (2) pressing Ctrl+N; (3) right mouse clicking in the Sub-Modifiers window, then clicking on Add Sub-Modifiers or (4) clicking on the Add icon from the toolbar. If a menu is being built from scratch, the procedure is to enter the Long Name, Short Name, Code and Price in a Sub-Modifier dialog box similar to the Modifier dialog box

Case 3:12-cv-06733-DMS-WVG   Document 16-12  Page: 104   Filed: 12/27/2018   Page 114 of
121
Case 3:12-cv-06733-DMS-WVG   Document 164-12 Filed 02/13/20   PageID.4383   Page 114 of
121

US 8,146,077 B2

9

10

shown in FIG. 2. As with modifiers, the Long Name is the full descriptive name of the item. The Short Name is the abbreviated name that will be displayed on the handheld device. The Code is the numeric or alphanumeric code for the item. As before, if there is an existing database, the existing database can be browsed and menu items retrieved from the database. Clicking on the Browse button will bring up the existing database of menu items. The item to be added is then selected and OK clicked. The fields will then be filled with the information from the database. Clicking on OK again will add the item as a sub-modifier. To delete a sub-modifier, the sub-modifier is selected and the Delete key depressed on the keyboard. To edit a sub-modifier, either the sub-modifier is double clicked or the Enter key is pressed.

Menu categories are created from the root. Some examples of categories are Appetizers, Soups, Salads, Entrees, Desserts, etc. The first step is to click on Menu in the menu tree window. Categories are added by (1) clicking on the Add Category icon from the toolbar; (2) clicking on Edit>Add Category or (3) pressing Ctrl+T. As shown in FIG. 3, Menu Category dialog box 11 then appears in which to enter the Long and Short names for the menu category.

To add menu items to categories, the menu category which is being built is clicked. For example, if items are being added to Appetizers, the Appetizers branch is clicked on. Then the Edit>Add Item is clicked on or Ctrl+N pressed. As before, if a menu is being built from scratch, the procedure is to enter the Long Name, Short Name, Code, Prep Time, Recipe and Price into the Menu Item dialog box 12 shown in FIG. 4. The Long Name is the full descriptive name of the item. The Short Name is the abbreviated name that will be displayed on the handheld device. The Code is the numeric or alphanumeric code for the item. Prep Time is the time it takes to prepare the meal and Recipe would include preparation methods and ingredients that are used in the preparation of the item. If there is an existing database, the existing database can be browsed and menu items retrieved from the database. Clicking on the Browse button will bring up the existing database of menu items. The item to be added is then selected and OK is clicked. The fields will then be filled with the information from the database. Clicking on OK again will add the item to the category.

Once the menu items have been entered, it may be desired to assign some modifiers to the menu items. For example, it may be desired to assign meat temperature to a steak order. To accomplish this, first the modifier to be assigned is selected, then the menu item on the tree view that is to be assigned the modifier is clicked on and then Edit>Assign Modifier is clicked on. Or, the modifier can simply be dragged and dropped onto the menu item to link them. A dialog box is then displayed asking if this modifier is a required modifier. If it is a required modifier, the display icon will be red but if it is a non-required modifier the display icon will be green. As many modifiers as are applicable can be assigned. If any changes are made to the modifiers, those changes will be automatically reflected throughout the menu tree.

Once the modifiers have been entered, it may be desired to assign sub-modifiers to the modifiers items. For example, it may be desired to add Honey Mustard as a sub-modifier to Dressing. To accomplish this, first the modifier to be assigned a sub-modifier is selected, then the sub-modifier window is clicked on, then Edit>Add Sub Modifier is clicked on, Ctrl+N entered or the Add icon from the toolbar is clicked on. Or, the sub-modifier can simply be dragged and dropped onto the modifier to link them.

When the menu has been completely configured, it can be previewed on a POS emulator on the desktop to verify that the menu is correctly configured before downloading it to the handheld device. To preview, File>Preview Database is clicked on or the Preview Database icon from the toolbar is clicked on. The handheld POS emulator on the desktop can then be run. If the configuration is deemed acceptable, the handheld device is connected to the desktop PC to ensure that a connection has been established; the POS application on the handheld device is exited and File>Download Database is clicked on or the Download Database icon from the toolbar is clicked on. If there is an existing menu database on the handheld device, the system will ask if the existing database should be replaced. Yes is clicked if existing database replacement is desired.

A database function enables the creation of, e.g., a breakfast menu, lunch menu and dinner menu and downloading them to a handheld device. Functions available are (1) creating a new database; (2) opening an existing database; (3) saving a database under a different name. To access these functions, File is clicked on the menu bar.

The preferred embodiment encompasses customized layout, views and fonts. To set the focus on the view it is desired to change, click inside the desired window. The main customizing dialog box is accessed by clicking on View>Customize View. A dialog box 13, as shown in FIG. 5, will be displayed including tabs that allow the following options: selection of Columns to display in the list view by choosing and arranging the fields to display in the Modifiers and Sub-Modifiers windows; formatting Columns by specifying the column widths and justification; selecting Filter allows restricting the list to display only the items that meet certain criteria. For example, display of modifiers with codes between 500 and 550. Selecting Sort allows sorting the modifiers or sub-modifiers according to any of the available fields such as Name, Code or Price. Selecting Style facilitates choice of font type, style, size, etc. To change the font in a particular window, click on View>Fonts or right mouse click in the desired window and then click on Fonts. To change the size of the windows, drag the borders of the windows to expand or contract the size of the windows. To change the column widths, simply drag the edge of the column headers to increase or decrease the column widths.

A communications control program monitors and routes all communications to the appropriate devices. It continuously monitors the wireless network access point and all other devices connected to the network such as pagers, remote devices, internet Web links and POS software. Any message received is decoded by the software, and then routed to the appropriate device. No user action is needed during operation of the software once the application has been launched. To launch the communications control module, a Wireless Traffic icon is clicked on the desktop PC. When the program loads, the screen shown in FIG. 6 appears. Messages received are logged in the window 14 shown in FIG. 6 with a time stamp. The messages are also logged to a file on the hard drive. This provides a mechanism to monitor all traffic across the network (possibly useful for troubleshooting, or maintenance, but not necessary for normal operation). The program may be minimized so the screen is not displayed on the desktop, but it must be running for proper communications to exist between all devices on the network.

As stated, the preferred embodiment of the present invention includes the use of and compatibility with GUI technology. A drag-and-drop approach is used for organizing the tree structure 2 in the generated menu. Drag-and-drop is also used for assigning modifiers (modifiers can be dragged from the modifiers window 5 and dropped onto the menu item 4 for assignment). In-cell editing results in fast editing of items in

US 8,146,077 B2

11

building the menus. Customizable fonts enable users to change font types, style and size. Customizable layouts enable users to resize windows, change icons and display preferences. The inventive approach provides for fully persistent storage between sessions, even if a session is improperly or abruptly terminated. Font and the tree state (i.e., which nodes are expanded/collapsed) are stored between sessions. Layout for modifiers and sub-modifiers list views (filter, columns, formatting, font, etc.) are stored between sessions. The last database used is likewise stored between sessions. Splitter views allow the user to see different views at the same time. Each view is displayed on its own section of the screen. Views can be resized via the keyboard or a mouse by simply dragging the splitter in the middle.

An automated function is provided to import existing POS databases into the inventive menu generation system and, as discussed above with respect to the detailed example of how to use the preferred embodiment, an automated download procedure is provided to transfer the desktop database onto a handheld device and/or Web page. Also as discussed, the preferred embodiment facilitates preview of the handheld device or Web page version of the POS menu on the desktop before downloading and configuration. Customizable desktop menu generation is contemplated, as discussed above, in the form of customizable fonts, columns, layouts, etc. The inventive approach also includes templates for common modifiers that can be assigned to similar menu items. The preferred embodiment also supports multiple databases, thus providing for the creation and storing of different menu databases on handheld devices such as breakfast, lunch or dinner menus. The user can then select the appropriate database to reflect the time of day.

FIG. 7 is a schematic representation of a point of sale interface 15 for use in displaying a page-type menu 16 created using the inventive menu generation approach. As can be seen from FIG. 7, the page menu is displayed in a catalogue-like point-and-click format whereas the master menu, FIG. 1, is displayed as a hierarchical tree structure. Thus, a person with little expertise can "page through" to complete a transaction with the POS interface and avoid having to review the entire menu of FIG. 1 to place an order. A PDA or Web page format could appear like FIG. 7 or the display could be configured for particular requirements since fully customizable menu generation and display are contemplated.

The POS interface on the handheld device supports pricing in the database or querying prices from the POS server. The POS device also can be customized with respect to "look and feel" for the particular version. As can be seen in FIG. 7, the POS interface provides for billing, status and payment with respect to orders. A myriad of options can be provided depending on the application.

Advanced database functions are provided in the preferred embodiment of the invention, including an automated download process onto handheld devices and/or Web sites. In the preferred embodiment, the menu generation system of the present invention uses an API called ActiveX Data Objects ("ADO") for database access. ADO is useful in a variety of settings. It is built on top of OLE DB and can be used to talk to databases and, in the future, any data source with any OLE DB driver. Advanced querying is supported. The database can be queried on virtually all fields. Queries can be built using SQL syntax for experienced users or can be created using a query builder which guides users through the creating process. Advanced error handling is supported. Errors occurring at run time are trapped. A descriptive message is displayed to alert the user and provide error information. However, the application does not terminate when the errors happen. The

12

source code is easy to maintain and modify, thus allowing for on time delivery of customized versions of the software. The advanced database functions produce well-designed databases that accommodate growth and scalability

The inventive menu generation approach provides a solution for the pervasive connectivity and computerization needs of the restaurant and related markets. The inventive solution includes automatic database management and synchronization, PDA and handheld wireless operating system integration and optimization, wireless communications and internet connectivity, user interface design, and graphics design.

In the preferred embodiment, the menu generation approach of the present invention uses Windows CE® as the operating system for the handheld devices. Windows CE® provides the benefits of a familiar Windows 95/98/NT® look and feel, built-in synchronization between handheld devices, internet and desktop infrastructure, compatibility with Microsoft Exchange®, Microsoft Office 9® and TCP/IP quick access to information with instant-on feature.

Windows CE® provides a basic set of database and communication tools for developer use. However, interfacing with these tools to provide application specific results can be a complex task. In addition to the menu generation described above, a set of software libraries described herein in conformance with the present invention not only enhances the basic Windows CE® functionality by adding new features but also maximizes the full potential of wireless handheld computing devices. Such features include fast synchronization between a central database and multiple handheld devices, synchronization and communication between a Web server and multiple handheld devices, a well-defined API that enables third parties such as POS companies, affinity program companies and internet content providers to fully integrate with computerized hospitality applications, real-time communication over the internet with direct connections or regular modem dialup connections and support for batch processing that can be done periodically throughout the day to keep multiple sites in synch with the central database.

The synchronous communications control module discussed above provides a single point of entry for all hospitality applications to communicate with one another wirelessly or over the Web. This communications module is a layer that sits on top of any communication protocol and acts as an interface between hospitality applications and the communication protocol. This layer can be easily updated to work with a new communication protocol without having to modify the core hospitality applications. The single point of entry works to keep all wireless handheld devices and linked Web sites in synch with the backoffice server (central database) so that the different components are in equilibrium at any given time and an overall consistency is achieved. For example, a reservation made online is automatically communicated to the backoffice server which then synchronizes with all the wireless handheld devices wirelessly. Similarly, changes made on any of the wireless handheld devices will be reflected instantaneously on the backoffice server and the other handheld devices.

The software applications for performing the functions falling within the described invention can be written in any commonly used computer language. The discrete programming steps are commonly known and thus programming details are not necessary to a full description of the invention.

A simple point-to-point wireless capability is contemplated which permits simple digital messages to be sent from the wireless handheld devices to a receiver in a beeper and/or valet parking base-station. The POS interface of FIG. 7 is representative of the display on a typical wireless device used in conformity with the invention. A simple protocol is used to

US 8,146,077 B2

**13**

acknowledge receipt of the message and thus simultaneous communication is not necessary, which reduces the cost of the wireless link. The range of the wireless link is determined by the characteristics of the radio transceiver. Adding a wireless link allows paging of beeper equipped customers directly from the operator interface on the wireless handheld devices and communication to and from various input/output transmitters and receivers to update the status of the order, reservation or other information and thus further reduce the workload on the operator and enable operations to proceed much faster. This link could also be hardwired or otherwise implemented using any two-way messaging transport.

A further aspect of the invention is the use of the menus generated in accordance with the described technique to place orders from wireless remote handheld devices or from remote locations through the internet. The World Wide Web is a distributed hypermedia computer system that uses the internet to facilitate global hypermedia communication using specified protocols. One such protocol is the Hypertext Transfer Protocol ("HTTP"), which facilitates communication of hypertext. Hypertext is the combination of information and links to other information. In the context of the Web, hypertext is defined by the Hypertext Mark-up Language ("HTML"). The links or hyperlinks in a HTML document reference the locations of resources on the Web, such as other HTML documents. Another language used in creating documents for use on the Worldwide Web, to display on computer screens, or to create speech style sheets for use in, e.g., telephones, is the Extensible Mark-Up Language ("XML"). XML is a "metalanguage", i.e., a language for describing languages which was developed to eliminate the restrictions of HTML.

The Web is a client-server system. The HTML documents are stored on Web server computers, typically in a hierarchical fashion with the root document being referred to as the home page. The client specifies a HTML document or other source on the server by transmitting a Uniform Resource Locator ("URL") which specifies the protocol to use, e.g., HTTP, the path to the server directory in which the resource is located, and filename of the resource. Users retrieve the documents via client computers. The software running on the user's client computer that enables the user to view HTML documents on the computer's video monitor and enter selections using the computer's keyboard and mouse is known as a browser. The browser typically includes a window in which the user may type a URL. A user may cause a URL to be transmitted by typing it in the designated window on the browser or by maneuvering the cursor to a position on the displayed document that corresponds to a hyperlink to a resource and actuating the mouse button. The latter method is commonly referred to simply as "clicking on the hot-spot" or "clicking on the hyperlink". The hyperlink methodology is contemplated for use in accordance with the preferred embodiment to transmit orders via the internet.

Web server application software exists that enables a user to shop for and order merchandise. Such systems are sometimes referred to as electronic merchandising systems or virtual storefronts. Systems that enable a user to choose among several retailers' goods are sometimes referred to as electronic malls. An electronic retailer's or electronic mall operator's Web server provides HTML forms that include images and descriptions of merchandise. The user may conventionally search for an item by entering a key word search query in a box on a form. When a user selects an item, the server may provide a linked form that describes that item in further detail. The user may also conventionally enter ordering information into boxes on the form, such as the type and quantity of the

**14**

item desired. The information entered by the user is transmitted to the server. The user may select multiple items in this manner and then enter a credit card number to pay for the purchases. The retailer processes the transaction and ships the order to the customer. As can be appreciated, ordering merchandise can also be done from menus. The generation of menus of items or merchandise for sale over the internet is readily accomplished by the menu generation approach of the present invention.

Searching for items that the user is interested in purchasing is insufficient in prior merchandising systems. Database management programs use index searching to facilitate rapid searching of large amounts of data. The creator of the database may instruct the program to use specified fields in the database as indexed or key fields. The program locates all terms in the database that appear in the indexed fields and stores them in an index table. Each entry in the index table includes a term and corresponding pointer to the location in the database where the term is found. If a user initiates a search for a term that is present in the index table, the program can locate the instances of that term in the database with exceptional speed. Users who are familiar with the particular database they are searching will generally know which fields are indexed and will know the format of the data in those fields. For example, a user of a database containing the inventory of a bookstore may know that users can search for the names of authors of books and that a user who wishes to do so should enter the author's last name first. A user having such knowledge will therefore be able to search efficiently. Users of electronic merchandising systems, however, are generally end-consumers who have no knowledge of a merchant's database. If, as is very likely, such a user initiates a search for a term that is not present in the index table, the program must sequentially search through all records in the database. Sequential records are typically linked by pointers. Using pointers in this manner is very demanding on server resources, resulting not only in an exceptionally slow search, but also creating a bottleneck for other processes that the server may be executing. The menu generation approach of the present invention can be used to create customized menus from a database that includes every item of merchandise the vendor has for sale. In this manner, customers can scan the generated menu much more readily than they could view the entire database and the necessity of having familiarity with the database is eliminated as well, reducing the need for resource intensive pointers.

While the preferred embodiment of the invention is for the generation of restaurant menus and the like, the broad scope of the invention is far greater. For example, menus generated in accordance with the invention can be used in the desktop computing environment in association with the operating system or application programs. One such use is to facilitate the creation of user personalized file structures for general desktop use. Another use is to facilitate the location of customized menus from master menus for use in association with application software to make the execution of the application software more efficient by, e.g., eliminating the necessity of querying or checking every tree branch in the master menu file structure in response to user input or other criteria and to create handheld/PDA compatible versions of the software.

While the preferred embodiment of the invention includes the selection of items from a master menu wherein the master menu is displayed using a graphical user interface, it is to be appreciated that any means for displaying the master menu to the user and generating another menu in response to and comprised of the selections made is encompassed by the contemplated invention. The invention encompasses the

**Appx294**

US 8,146,077 B2

**15**                                              **16**

selection of nontextual symbols, characters, icons and the like, in addition to text, from a hierarchical tree menu or the like for generation of another menu comprised of such items.

It is also within the scope of the invention to generate menus automatically in response to predetermined criteria. For example, in the restaurant menu generation embodiment, a modified menu can be generated to comply with a particular specification or group of criteria such as, e.g., "dinner", "low cholesterol", "low fat", "fish", "chicken", or "vegetarian". In this embodiment, only items from the master menu that satisfy specified parameters will be included in the generated menu. The selection process could involve selection of master menu items based on tags or identifiers associated with the items or by checking every master menu item against a dictionary of items acceptable for inclusion in the modified menu. It should also be appreciated that the invention encompasses any combination of automatic and manual user selection of the items comprising the generated menu. For example, a user might specify criteria which would further control automatic selection or the user could manually select some items with automatic selection of others. The menu generation aspect of the invention is equally applicable to table-based, drive-thru, internet, telephone, wireless or other modes of customer order entry, as is the synchronous communications aspect of the invention.

The inventive concept encompasses the generation of a menu in any context known to those skilled in the art where an objective is to facilitate display of the menu so as to enable selection of items from that menu. The restaurant menu generation embodiment is but one example of a use for the inventive concept. Likewise, displaying menus generated in accordance with the invention on PDAs and Web pages to facilitate remote ordering are but a few examples of ways in which such a menu might be used in practice. Any display and transmission means known to those skilled in the art is equally usable with respect to menus generated in accordance with the claimed invention.

In the more general situation, menus can be generated in accordance with the present invention in a variety of situations. For example, the usable file structure for a particular data processing application can be dictated by the user or an application program prior to or during the execution of the application program. Efficiencies with respect to computational speed and equipment, e.g., storage and processor, usage can thus be achieved along with the facilitation of display of the generated menu.

While the best mode for carrying out the preferred embodiment of the invention has been illustrated and described in detail, those familiar with the art to which the invention relates will recognize various alternative designs and embodiments which fall within the spirit of practicing the invention. The appended claims are intended to cover all those changes and modifications falling within the true spirit and scope of the present invention.

That which is claimed is:

**1**. An information management and real time synchronous communications system for configuring and transmitting hospitality menus comprising:

   a. a central processing unit,

   b. a data storage device connected to said central processing unit,

   c. an operating system including a first graphical user interface,

   d. a master menu including at least menu categories, menu items and modifiers, wherein said master menu is capable of being stored on said data storage device pursuant to a master menu file structure and said master

menu is capable of being configured for display to facilitate user operations in at least one window of said first graphical user interface as cascaded sets of linked graphical user interface screens, and

   e. menu configuration software enabled to generate a programmed handheld menu configuration from said master menu for wireless transmission to and programmed for display on a wireless handheld computing device, said programmed handheld menu configuration comprising at least menu categories, menu items and modifiers and wherein the menu configuration software is enabled to generate said programmed handheld menu configuration by utilizing parameters from the master menu file structure defining at least the menu categories, menu items and modifiers of the master menu such that at least the menu categories, menu items and modifiers comprising the programmed handheld menu configuration are synchronized in real time with analogous information comprising the master menu,

wherein the menu configuration software is further enabled to generate the programmed handheld menu configuration in conformity with a customized display layout unique to the wireless handheld computing device to facilitate user operations with and display of the programmed handheld menu configuration on the display screen of a handheld graphical user interface integral with the wireless handheld computing device, wherein said customized display layout is compatible with the displayable size of the handheld graphical user interface wherein the programmed handheld menu configuration is configured by the menu configuration software for display as programmed cascaded sets of linked graphical user interface screens appropriate for the customized display layout of the wireless handheld computing device, wherein said programmed cascaded sets of linked graphical user interface screens for display of the handheld menu configuration are configured differently from the cascaded sets of linked graphical user interface screens for display of the master menu on said first graphical user interface, and

wherein the system is enabled for real time synchronous communications to and from the wireless handheld computing device utilizing the programmed handheld menu configuration including the capability of real time synchronous transmission of the programmed handheld menu configuration to the wireless handheld computing device and real time synchronous transmissions of selections made from the handheld menu configuration on the wireless handheld computing device, and

wherein the system is further enabled to automatically format the programmed handheld menu configuration for display as cascaded sets of linked graphical user interface screens appropriate for a customized display layout of at least two different wireless handheld computing device display sizes in the same connected system, and

wherein a cascaded set of linked graphical user interface screens for a wireless handheld computing device in the system includes a different number of user interface screens from at least one other wireless handheld computing device in the system.

**2**. The information management and synchronous communications system in accordance with claim **1**, wherein the system is further enabled by a communications systemic relationship providing a common, linked system comprising:

   a) A Wireless Hub Application;

   b) A Web Hub Application;

US 8,146,077 B2

17

c) Linked Databases between two or more different Hospitality Applications; and

d) A Communications Setup Application.

**3**. The information management and real time synchronous communications system in accordance with claim **1** wherein the information from the POS database is automatically imported into the system.

**4**. The information management and real time synchronous communications system in accordance with claim **1**, wherein the said Hospitality Applications include at least reservations applications.

**5**. The information management and real time synchronous communications system in accordance with claim **1**, wherein the said Hospitality Applications include at least a Ticketing applications.

**6**. The information management and real time synchronous communications system in accordance with claim **1** in which the wireless handheld computing device is a smart phone.

**7**. The information management and real time synchronous communications system in accordance with claim **1**, further enabled to facilitate and complete payment processing directly from the wireless handheld computing device including: a) Billing; b) Status and c) Payment Information.

**8**. The information management and real time synchronous communications system in accordance with claim **1**, wherein one or more of the layout, views or fonts of the programmed handheld menu configuration are created in conformity with the display screen parameters of the wireless handheld computing device and wherein the system is enabled to generate a view of the programmed handheld menu configuration for user preview from the central computing unit and which facilitates a further user manual modification prior to the transmissions of the programmed handheld menu configuration to the wireless handheld computing device.

**9**. An information management and real time synchronous communications system for configuring and transmitting hospitality menus comprising:

a) a central processing unit;

b) a data storage device connected to said central processing unit;

c) an operating system including a first graphical user interface, said operating system configured to interoperate with the central processing unit, the data storage device and application software;

d) a master menu including menu categories and menu items, wherein said master menu is capable of being stored on said data storage device pursuant to a master menu file structure and said master menu is capable of being configured for display to facilitate user operations in at least one window of said first graphical user interface as cascaded sets of linked graphical user interface screens; and

e) a modifier menu capable of being stored on said data storage device, and menu configuration software enabled to automatically generate a programmed handheld menu configuration from said master menu for display on a wireless handheld computing device, said programmed handheld menu configuration comprising at least menu categories, menu items and modifiers and wherein the menu configuration software is enabled to generate said programmed handheld menu configuration by utilizing parameters from the master menu file structure defining at least the categories and items of the master menu and modifiers from the modifier menu at least the menu categories, menu items and modifiers comprising the programmed handheld menu configuration are synchronized in real time with analogous infor-

18

mation comprising the master and modifier menus wherein the menu configuration software is further enabled to generate the programmed handheld menu configuration in conformity with a customized display layout unique to the wireless handheld computing device to facilitate user operations with and display of the programmed handheld menu configuration on the display screen of a handheld graphical user interface integral with the wireless handheld computing device, wherein said customized display layout is compatible with the displayable size of the handheld graphical user interface,

wherein the programmed handheld menu configuration is configured by the menu configuration software for display as cascaded sets of linked graphical user interface screens appropriate for the customized display layout of the wireless handheld computing device, wherein said cascaded sets of linked graphical user interface screens for display of the programmed handheld menu configuration are configured differently from the cascaded sets of related graphical user interface screens for display of the master menu on said first graphical user interface, and

wherein the system is enabled for real time synchronous communications to and from the wireless handheld computing device utilizing the programmed handheld menu configuration including the capability of real time synchronous transmission of at least the menu categories, menu items and modifiers comprising the programmed handheld menu configuration to the wireless handheld computing device and real time synchronous transmissions of selections made from the handheld menu configuration on the wireless handheld computing device, and

wherein the system is further enabled to automatically format the programmed handheld menu configuration for display as cascaded sets of linked graphical user interface screens appropriate for a customized display layout of at least two different wireless handheld computing device display sizes in the same connected system, and

wherein a cascaded set of linked graphical user interface screens for a wireless handheld computing device in the system includes a different number of user interface screens from at least one other wireless handheld computing device in the system.

**10**. The information management and real time synchronous communications system in accordance with claim **9**, further including a communications systemic relationship comprising:

a) A Wireless Hub Application;

b) A Web Hub Application;

c) Linked Databases Between two or more different Hospitality Applications; and

d) A Communications Setup Application.

**11**. The information management and real time synchronous communications system in accordance with claim **9**, wherein at least two different hospitality software applications are integrated between and with one another.

**12**. The information management and real time synchronous communications system in accordance with claim **9**, wherein the system enables automatic importation of the POS database information into the system.

**13**. An information management and real time synchronous communications system for use with wireless handheld computing devices and the internet comprising:

**Appx296**

US 8,146,077 B2

19

a) a master database connected in said system and configured to store hospitality application information pursuant to a master database file structure;

b) at least one wireless handheld computing device connected in said system and configured to display said hospitality application information;

c) at least one web server connected in said system;

d) at least one web page connected in said system and configured to display said hospitality application information; and e) real time communications control software enabled to link and synchronize hospitality application information simultaneously between the master database, wireless handheld computing device, web server and web page,

wherein the communications control software is enabled to utilize parameters from the master database file structure to synchronize the hospitality application information in real time between the master database, at least one wireless handheld computing device, at least one web server and at least one web page such that substantially the same information comprising the hospitality application information is capable of being displayed on the wireless handheld computing device, at least one web page and other display screens of the synchronized system, such that the hospitality application information is synchronized between any connected users,

wherein the communications control software is enabled to act as a real time interface between the elements of the system and any applicable communications protocol,

wherein the communications control software is enabled to automatically and simultaneously configure the hospitality application information for display on both the wireless handheld computing device and the web page in conformity with a customized display layout unique to the wireless handheld computing device or the web page, wherein said customized display layout is compatible with the displayable size of the handheld computing device display screen or the web page, and

wherein the communications control software is further enabled to automatically format a programmed handheld configuration for display as cascaded sets of linked

20

graphical user interface screens appropriate for a customized display layout of at least two different wireless handheld computing device display sizes in the same connected system, and

wherein a cascaded set of linked graphical user interface screens for a wireless handheld computing device in the system includes a different number of user interface screens from at least one other wireless handheld computing device in the system, and

wherein the system is enabled for real time synchronous transmission of the configured hospitality application information to the wireless handheld computing device, the web server and the web page and real time synchronous transmissions of inputs responding to the configured hospitality application information from the wireless handheld computing device, or the web server or the web page.

**14**. The information management and real time synchronous communications system in accordance with claim **13**, further including a communications systemic relationship comprising: a) A Wireless Hub Application; b) A Web Hub Application; c) Linked Databases Between two or more different Hospitality Applications; and d) A Communications Setup Application.

**15**. The information management and real time synchronous communications system of claim **13**, wherein the system is enabled to automatically import the information from the POS (point of sale) database into the system.

**16**. The information management and real time synchronous communications system of claim **13**, wherein at least two different hospitality applications are integrated between and with one another.

**17**. The information management and real time synchronous communications system in accordance with claim **13**, wherein the hospitality application information also includes the completion of payment processing.

**18**. The information management and real time synchronous communications system in accordance claim **13**, wherein the configured wireless handheld computing device is a smart phone.

\* \* \* \* \*

# United States Court of Appeals
# for the Federal Circuit

*Ameranth, Inc. v. and Domino's Pizza, LLC and Domino's Pizza, Inc.*,
2019-1141, 2019-1144

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by STAMOULIS & WEINBLATT LLC, Attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **December 27, 2018**, Counsel for Appellant has authorized me to electronically file the foregoing Statement of the Issues with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice upon all counsel registered as CM/ECF users, including the following principal counsel:

> Frank A. Angileri
> Brooks Kushman PC
> 1000 Town Center, 22nd Floor
> Southfield, MI 48075
> 248-358-4400
> *Principal Counsel for Appellee Domino's Pizza, LLC*

Six paper copies will be filed with the Court within the time provided in the Court's rules.

December 27, 2018                        /s/ Robyn Cocho
                                         Counsel Press

Case: 19-1141   Document: 16-1   Page: 111   Filed: 12/27/2018

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPE-FACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A), because it contains <u>13,587</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14 Point Times New Roman.


Dated:  December 27, 2018              */s/ Richard C. Weinblatt*
                                       Richard C. Weinblatt

                                       STAMOULIS & WEINBLATT LLC