**CALDARELLI HEJMANOWSKI PAGE & LEER LLP**
William J. Caldarelli (SBN 149573)
Lee Hejmanowski (SBN 166236)
Ben West (SBN 251018)
3398 Carmel Mountain Road, Suite 250
San Diego, CA  92121
Telephone: (858) 720-8080
Email: wjc@chpllaw.com; dbw@chpllaw.com; leh@chpllaw.com

Attorneys for Plaintiff Ameranth, Inc.
Additional counsel for Plaintiff listed below

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERANTH, INC. | Case No. 3:12-cv-0733 DMS (WVG) |
| v. | **AMERANTH, INC.'S OPPOSITION TO DOMINO'S PIZZA, LLC'S AND DOMINO'S PIZZA, INC.'S SECOND RENEWED MOTION TO DECLARE CASE EXCEPTIONAL AND AWARD ATTORNEYS' FEES AND NON-TAXABLE COSTS** |
| DOMINO'S PIZZA, INC. and DOMINO'S PIZZA, LLC | **Judge:** **Hon. Dana M. Sabraw** |
| | **Date:** **December 11, 2020** |
| | **Time:** **1:30 pm** |
| | **Location:** **Courtroom 13A** |

**Additional counsel for Plaintiff Ameranth, Inc.:**

**FABIANO LAW FIRM, P.C.**
Michael D. Fabiano (SBN #167058)
12526 High Bluff Drive, Suite 300
San Diego, CA  92130
Telephone: (619) 742-9631
mdfabiano@fabianolawfirm.com

**OSBORNE LAW LLC**
John W. Osborne (Appointed *Pro Hac Vice*)
33 Habitat Lane
Cortlandt Manor, NY 10567
Telephone: (914) 714-5936
josborne@osborneipl.com

**WATTS LAW OFFICES**
Ethan M. Watts (SBN #234441)
3398 Carmel Mountain Road, Suite 250
San Diego, CA  92121
Telephone: (858) 509-0808
Facsimile: (619) 878-5784
emw@ewattslaw.com

**WITKOW BASKIN**
Brandon Witkow (SBN 210443)
Erin C. Witkow (SBN 216994)
21031 Ventura Blvd., Suite 603
Woodland Hills, CA 91364
Tel: (818)296-9508
Fax: (818)296-9510
bw@witkowlaw.com
ew@witkowlaw.com

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................... 1

II.  ARGUMENT ......................................................................................................... 2

    A.   Domino's Presents Unresolved Disputes in the Motion. ................................ 2

    B.   Ameranth Had a Good Faith Belief that the Claims of Its Patents Were
         Valid. ............................................................................................................. 3

         1.   Ameranth had a reasonable belief that it earlier patents were valid
              when it filed these cases in 2011. ........................................................ 3

         2.   Ameranth had a reasonable belief that all claims of the '077 Patent
              were valid in January 2017 when the Parties and the Court agreed
              to lift the stay and proceed with litigation. ......................................... 4

    C.   Domino's Knowingly Conflates Two Different Embodiments of the
         Transpad to Fabricate the Allegation that Ameranth Presented False
         Testimony About Using the Transpad at the November 1998 FSTEC
         Show. ............................................................................................................. 5

    D.   Domino's Contrived Conspiracy Theory Allegations are Entirely False. ........ 7

         1.   Ameranth's evidence far exceeds the standards set by the Federal
              Circuit for corroborating evidence. ..................................................... 8

         2.   Two independent eyewitnesses – John Harker and Judd Goldfeder
              – confirm that Ameranth demonstrated the 21CR invention at the
              November 1998 FSTEC show. ............................................................. 8

         3.   Kathie Sanders's testimony further confirmed that Ameranth had
              both the Transpad and Ultrapad at the November 1998 show. ............ 10

         4.   Photographs, brochures, and signage from Ameranth's booth at the
              November 1998 show indisputably depict the 21CR system, the
              Transpad, and the Ultrapad. .............................................................. 11

         5.   Nella Ludlow, Ameranth's CTO in 2000-01, testified that
              Ameranth developed software that operated on different types and
              sizes of handheld devices. ................................................................. 11

         6.   Dr. Shamos further confirmed that Dr. Franz's analysis was flawed
              and wrong. ........................................................................................ 12

    E.   Ameranth Did Not Spoil Evidence or Attempt to Hide Evidence. ................ 13

         1.   The DVD image was in Defendants' possession for years while the
              DVD itself had been in Mr. Zembek's possession for even longer. .... 14

         2.   There was no conspiracy to hide the source code DVD. .................... 15

    F.   The Alleged "Baseless and Inconsistent Infringement/Validity Claims"
         are Legitimate Disputes Rooted on Claim Construction Issues. ..................... 16

1.  Domino's, not Ameranth, has taken inconsistent positions on synchronization. ........................................................ 16

2.  Domino's infringes the PHMC/PHC limitation. .................................. 18

3.  Domino's misrepresents Ameranth's consistent position on scrolling. ............................................................................ 21

4.  Domino's infringes the differing-number-of-screens limitation. .......... 22

G.  Nothing in Ameranth's Other Lawsuits Supports Domino's Motion. ............ 24

H.  Domino's Request for Fees Related to the CBM Petitions is an Overreach... 24

III.  CONCLUSION .......................................................... 25

**OPPOSITION**                    Case No. 3:12-cv-0733 DMS (WVG)

## <u>TABLE OF AUTHORITIES</u>

**Pg. No.**

### Cases

*Adaptive Streaming Inc. v. Netflix, Inc.*, No. 8:19-01450-DOC-KES, 2020
    WL 2573471 (C.D. Cal. Mar. 11, 2020) ...............................................5

*Apple v. Ameranth*, 842 F.3d 1229 (Fed. Cir. 2016) ..............................4

*Checkpoint Sys., Inc. v. All-Tag Sec., S.A.*, 858 F.3d 1371 (Fed. Cir. 2017)...........24

*Cooper v. Goldfarb*, 154 F.3d 1321, 1330 (Fed. Cir. 1998).....................................8

*Cottle-Banks v. Cox Commc'ns, Inc.*, No. 10CV2133-GPC WVG, 2013
    WL 2244333 (S.D. Cal. May 21, 2013) ...................................................13, 14

*Gust, Inc. v. Alphacap Ventures, LLC*, 905 F.3d 1321 (Fed. Cir. 2018) ...............3. 5

*Knorr v. Pearson*, 671 F.2d 1368, 1374 (C.C.P.A. 1982) ..........................................8

*Mannion v. Ameri-Can Freight Sys. Inc.*, No. CV-17-03262-PHX-DWL,
    2020 WL 417492  (D. Ariz. Jan. 27, 2020)...................................................13

*Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157 (Fed. Cir. 2006)............................7

*Montoya v. Orange Cty. Sheriff's Dep't*, No. SACV 11-1922 JGB, 2013
    WL 6705992 (C.D. Cal. Dec. 18, 2013) ........................................................13

*Munchkin, Inc. v. Luv n' Care, Ltd.*, 960 F.3d 1373, 1378 (Fed. Cir. 2020)...1, 3, 24

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014) ...........2

*Sherwood v. BNSF Ry. Co.*, No. 2:16-CV-00008-BLW, 2019 WL 1004563
    (D. Idah o Mar. 1, 2019) ...........................................................................13

*Spineology, Inc. v. Wright Medical Tech., Inc.*, 910 F.3d 1227 (2018)....................1

*SFA Systems, LLC v. Newegg Inc.*, 793 F.3d 1344 (Fed. Cir. 2015)........................5

*Stone Basket Innovs., LLC v. Cook Med., LLC*, 892 F.3d 1175 (Fed. Cir. 2018) .....5

### Statutes

34 U.S.C. § 101 ..............................................................................................2-3

35 U.S.C. § 101 .................................................................................................1

35 U.S.C. § 112(f) .............................................................................................1

35 U.S.C. § 282(a) .............................................................................................4

**OPPOSITION**                    Case No. 3:12-cv-0733 DMS (WVG)

1

2

35 U.S.C. § 285 ...................................................................................................1

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OPPOSITION**                     Case No. 3:12-cv-0733 DMS (WVG)

# I. INTRODUCTION

This is not an exceptional case. In the long history of this litigation, Ameranth repeatedly defended the validity of the '077 Patent through numerous motions before this Court and through multiple covered business method petitions before the PTAB. Ameranth successfully defeated a priority of invention challenge, it prevailed against an argument that it had assigned all rights in the '077 Patent to Six Continents Hotels, and defeated claim construction arguments that the patent claims were subject to 35 U.S.C. section 112(f). The Court also rejected the Defendants' repeated efforts to strike Ameranth's infringement contentions. Through years of hard-fought litigation, Ameranth's '077 Patent remained unscathed until, mere days before trial, the Court disagreed with the PTAB and ruled that the '077 Patent claims were ineligible under 35 U.S.C. section 101. Ameranth has consistently complied with all Court orders and rules and has never been sanctioned during prosecution of 30 cases over a nearly 10-year period.

Despite this history, and in the absence of even a single ruling that Ameranth has done anything improper, Domino's has conjured a parade of horribles to attempt to convince the Court to punish Ameranth with a $2.6M judgment for losing a good-faith argument over the controversial issue of 35 U.S.C. section 101 eligibility. The law is clear that an exceptional case finding under 35 U.S.C. section 285 must not be a penalty for failing to win a patent infringement case. *Munchkin, Inc. v. Luv n' Care, Ltd.*, 960 F.3d 1373, 1378 (Fed. Cir. 2020). Domino's Second Renewed Motion should be rejected because it relies upon innuendo, spin, unfounded accusations, a misleading declaration, the abandonment of its own expert, and the parsing of testimony taken out of context ("Motion") (Dkt. 112 in case no. 12-cv-00733).

Much of Domino's Motion is built upon an unsupported and speculative theory that Ameranth did not actually demonstrate its claimed inventions at the November 1998 FSTEC show. However, Domino's own Counterclaim, Trial Brief, and expert report contradict this newly contrived theory. More importantly, Ameranth has

1 produced sworn testimony from multiple eyewitness who were actually at that trade

2 show, and several pieces of documentary evidence (including brochures and photos),

3 showing that Ameranth possessed and demonstrated products embodying the claimed

4 inventions—evidence that Domino's chooses to ignore.

5      Domino's Motion also improperly presupposes that it would have prevailed at

6 trial on numerous complex, fact-based issues that were never resolved in Domino's

7 favor.  These include invalidity (on grounds other than 34 U.S.C. section 101),

8 infringement, and the still-pending claim construction issues as to "integration on the

9 handheld" and "master menu/database" that directly impact the disputes over

10 PHMC/PHC and synchronization.  The complex and the fact-intensive determinations

11 that Domino's now asks the Court to make include numerous disputed issues of fact,

12 unresolved claim constructions, and competing expert opinions across different cases

13 and defendants.  To accomplish this task, the Court would have to hold a post-

14 judgment "mini trial" on all of these contested issues, an action that the Federal

15 Circuit cautions trial courts not to take.  The Court should deny Domino's Motion in

16 its entirety because there is no justification to find this case exceptional.

## II. ARGUMENT

### A. Domino's Presents Unresolved Disputes in the Motion.

19      Domino's Motion asks the Court to rule in its favor on a range of factually

20 intensive and credibility-based issues that were never pled or resolved.  It is improper

21 to litigate these issues through the Motion.

22      The Supreme Court in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,

23 572 U.S. 545, 553-54 (2014), held that determination of exceptionality is a "case-by-

24 case exercise" of discretion considering the "totality of the circumstances." But

25 measuring the totality of the circumstances should not require a mini-trial on

26 previously unlitigated issues.  In *Spineology, Inc. v. Wright Medical Tech., Inc.*,

27 910 F.3d 1227, 1230 (2018), the Federal Circuit held that the Court does not need to

28 "litigate to resolution every issue mooted by summary judgment to rule on a motion

for attorney fees." *Munchkin,* 960 F.3d at 1375 (reversing a grant of attorneys' fees when the issues were never fully adjudicated before the district court.)

Those unlitigated, fact-intensive issues include: conception, the priority date of Ameranth's inventions, inventor credibility, corroboration, and infringement.  The conclusion is clear: an exceptional case motion that requires the Court to conduct a mini-trial by reconstructing and determining the minutiae of undecided factual arguments, assessing witness credibility, and assessing facts through declarations, videos, transcripts, photographs and other evidence is improper.  The Court should deny Domino's Motion on this basis alone.

## B. Ameranth Had a Good Faith Belief that the Claims of Its Patents Were Valid.

### 1. *Ameranth had a reasonable belief that it earlier patents were valid when it filed these cases in 2011.*

Domino's argues that Ameranth should have known in 2011 – when Ameranth first filed these cases – that Ameranth's '850, '325, and '733 Patents were entirely invalid because seven out of 51 claims of these earlier patents had been found invalid by a jury in the *Menusoft* action.  (Mot. at 19:13-17.)  2011 was before the effective date of the America Invents Act, the institution of the Covered Business Method review process, the Supreme Court's holding in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014), and the renewed importance on 35 U.S.C. section 101.  Ameranth certainly could not have predicted the impact these changes would bring to its patents in 2011, especially with regard to section 101. *Gust, Inc. v. Alphacap Ventures, LLC*, 905 F.3d 1321, 1329 (Fed. Cir. 2018) ("In view of the evolving nature of § 101 jurisprudence during the merits stage of this lawsuit, it is particularly important to allow attorneys the latitude necessary to challenge and thus solidify the legal rules without the chill of direct economic sanctions.")

Ameranth and Menusoft settled after Ameranth appealed the verdict. Menusoft took a license for Ameranth's patents, and the parties stipulated to vacate the verdict. The verdict was entirely vacated.  (Osborne Decl. ¶ 5, NOL Exs. 1-3.)  The

**OPPOSITION**                                          Case No. 3:12-cv-0733 DMS (WVG)

invalidation of seven claims does not mean that the 44 other claims in the same or a related patent are also invalid because each claim of an issued patent is entitled to its own statutory presumption of validity. 35 U.S.C. § 282(a).

> ### 2.   *Ameranth had a reasonable belief that all claims of the '077 Patent were valid in January 2017 when the Parties and the Court agreed to lift the stay and proceed with litigation.*

Domino's further asserts that Ameranth should have known in January 2017 that the claims of the '077 Patent were invalid after the decision in *Alice* and the Federal Circuit's decision in *Apple v. Ameranth,* 842 F.3d 1229 (Fed. Cir. 2016). (Mot. at 20:5-7.)  This assertion ignores multiple indisputable grounds supporting Ameranth's reasonable belief that the claims of the '077 Patent were valid.  The Defendants challenged the validity of the '077 Patent through CBM petitions on multiple occasions, including challenges under 35 U.S.C. sections 101, 112, and 103. (Osborne Decl. ¶ 6-7.) The PTAB repeatedly found the claims of the '077 Patent to be valid and patentable before and ***after*** both *Alice* and *Apple*.  (Osborne Decl. ¶ 6-7.) The PTAB rejected a CBM challenge to the '077 Patent brought by Starbucks on, among other grounds, section 101, as late as December 4, 2017.  (Osborne Decl. ¶ 7, NOL Ex. 4.)

It is just a self-serving exercise in hindsight for Domino's to now contend that Ameranth should have known that certain claims of the '077 Patent were ineligible in January 2017.  If, as Domino's alleges, it was so clear that these claims were ineligible, then Domino's could have moved for summary judgment at that time. Domino's did *not* do so, and it advised the Court on January 10, 2017 that it, along with the entire joint defense group, no longer opposed the lifting of the stay to proceed with litigation over the '077 Patent. (Dkt. 612 at 2.)[1]

At this critical point all parties and the Court agreed to proceed with the full knowledge of *Alice*, *Apple,* and the CBMs. Clearly, it was reasonable for Ameranth to

---

[1] All docket references herein are to Case No. 11-cv-1810 unless otherwise noted.

**OPPOSITION**                                    Case No. 3:12-cv-0733 DMS (WVG)

have proceeded at that point. Pizza Hut eventually moved for summary judgment under section 101 in June 2018.  But neither Domino's nor Papa John's filed their own motions asserting section 101 and did not initially join in Pizza Hut's motion. Domino's only sought leave to revive Pizza Hut's motion *after* Pizza Hut had settled with Ameranth.  The reason is obvious: it was not clear to Domino's after *Alice* and *Apple* that claims of the '077 Patent were ineligible.

Ultimately, however, the law does not require Ameranth to have an unassailable or a correct litigation position because those are not the standards the Federal Circuit uses to judge exceptionality. *Stone Basket Innovs., LLC v. Cook Med., LLC*, 892 F.3d 1175, 1180 (Fed. Cir. 2018).  The relevant question is whether Ameranth's position was reasonable.  *SFA Systems, LLC v. Newegg Inc.*, 793 F.3d 1344, 1348 (Fed. Cir. 2015) ("A party's position on issues of law ultimately need not be correct for them to not 'stand[] out,' or be found reasonable."); *see also Adaptive Streaming Inc. v. Netflix, Inc.*, No. 8:19-01450-DOC-KES, 2020 WL 2573471 at *2 (C.D. Cal. Mar. 11, 2020) ("Plaintiff's claims were not so baseless or 'hopeless' so as to warrant attorneys' fees. And, '[i]n view of the evolving nature of § 101 jurisprudence,' [citation], Defendant's arguments as to the "clearly" abstract nature of Plaintiff's patent are unpersuasive.") (citing *Gust*, 905 F.3d at 1329.)

**C. Domino's Knowingly Conflates Two Different Embodiments of the Transpad to Fabricate the Allegation that Ameranth Presented False Testimony About Using the Transpad at the November 1998 FSTEC Show.**

It is simply untrue, as Domino's asserts, that Ameranth mispresented facts about the Transpad being demonstrated at the November 1998 FSTEC show.  The truth is that Domino's knowingly conflates two different embodiments of the Transpad to construct this false narrative.

There were two different embodiments of the Transpad: a pre-September 1998 version preloaded with POS software and a post-September 1998 version that was not. Domino's clearly understands this distinction.  In its Counterclaim, Domino's

**OPPOSITION**                                    Case No. 3:12-cv-0733 DMS (WVG)

accused Ameranth of violating the on-sale bar rule by offering for sale and practicing the invention with the Transpad Loaded POS Device *prior to September 1998*:

> Prior to 1998, Ameranth publicly used, offered for sale, and described in printed publications the TransPad SL, a handheld POS terminal. The TransPad SL included the ability to run all existing POS systems, including hospitality applications that displayed a screen which included daily specials, appetizers, main courses, beverages, and desserts.

(Case No. 12-cv-733, Dkt. 59 at ¶ 156.)  Domino's repeated this same on-sale bar claim in its 2018 trial brief: "As Mr. Gray will explain . . . **the 21st Century Restaurant system was on-sale or in public use more than a year before Ameranth's earliest claimed parent application priority date** . . . . " (Dkt. 1380 at 10:1-10) (emphasis added.)  Thus, Domino's contrived assertion in its Motion directly contradicts its own Counterclaim, contradicts its trial position, and contradicts its own expert by now alleging that Ameranth never practiced its own invention.

Mr. McNally testified in 2010 in the *Menusoft* case that the Transpad never used the invention and that Ameranth abandoned the Transpad in September 1998. This testimony was truthful and accurate because it referred to the early embodiment of the Transpad that was preloaded with POS software and its menus.  (McNally Decl. ¶ 7-17.)  That embodiment was obsoleted in September 1998 when the inventors conceived of the "menu generation" aspect that synchronously sent the menus to wireless devices. (McNally Decl. ¶ 13-14.)  Ameranth repurposed a few of its Transpad handhelds to demonstrate the new invention after September 1998 including at the November 1998 FSTEC trade show.  But these repurposed Transpads were different from the versions that were preloaded with POS software/database because they demonstrated the new menu generation, wireless transmission, and synchronization capabilities later claimed in the '077 Patent.  (McNally Decl. ¶ 15-16.) When Mr. McNally testified in this case about Ameranth using the Transpad to practice the claims, he was speaking about these post-September 1998 repurposed

**OPPOSITION**                                  Case No. 3:12-cv-0733 DMS (WVG)

handhelds that were **not** preloaded with POS software/database.  (McNally Decl. ¶ 7-17.)

### D. Domino's Contrived Conspiracy Theory Allegations are Entirely False.

Much of Domino's Motion depends on an implausible theory that the inventors of the '077 Patent and others conspired to falsify the conception date of Ameranth's invention.  The thrust of Domino's conspiracy theory is that Ameranth did not reduce to practice two different wireless handheld devices by the time of the November 1998 FSTEC show and that Ameranth personnel and others conspired to conceal that fact. To make this argument, Domino's fabricated a conspiracy theory that stretches across decades and includes numerous Ameranth personnel, counsel, and independent, third-party witnesses who all allegedly conspired to conceal this vast scheme.

The conception date of Ameranth's invention is an undecided, fact-intensive question.  To resolve this issue now would require the Court to conduct a mini-trial because conception is fundamentally about credibility of inventor testimony and corroboration. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171-72 (Fed. Cir. 2006).  Although whether the conception requirement has been met is a question of law, the answer is predicated on the "subsidiary factual finding" of corroboration, which is fundamentally about credibility. *Id.*

Reviewing Domino's accusations in light of Ameranth's evidence, it is clear that Ameranth demonstrated both the Ultrapad and the Transpad at the November 1998 show, that Ameranth demonstrated the 21st Century Restaurant System ("21CR") starting at the show, and that Ameranth, in fact, practiced the claims of the '077 Patent. This evidence includes sworn testimony of three independent witnesses, the brochure from the show, photographs of Ameranth's booth from the show, a diagram of the 21CR system displayed at the November 1998 show, the February 3, 1999 agreement Ameranth executed with Symbol after the show, and a hand-drawn diagram of the products at the November 1998 show.

**OPPOSITION**                                    Case No. 3:12-cv-0733 DMS (WVG)

1.    *Ameranth's evidence far exceeds the standards set by the Federal Circuit for corroborating evidence.*

The Federal Circuit has held that sufficient circumstantial evidence of an independent nature is all that is required to corroborate an inventor's testimony about conception and reduction to practice: "[i]n order to corroborate a reduction to practice, it is not necessary to produce an actual over-the-shoulder observer. Rather, sufficient circumstantial evidence of an independent nature can satisfy the corroboration requirement." *Cooper v. Goldfarb*, 154 F.3d 1321, 1330 (Fed. Cir. 1998) Further, "[t]he law does not impose an impossible standard of 'independence' on corroborative evidence by requiring that every point of a reduction to practice be corroborated by evidence having a source totally independent of the inventor; indeed, such a standard is the antithesis of the rule of reason." *Id.* at 1331 (quoting *Knorr v. Pearson*, 671 F.2d 1368, 1374 (C.C.P.A. 1982).)  Ameranth's comprehensive evidence easily exceeds this standard, and there is no evidence to the contrary.

2.    *Two independent eyewitnesses – John Harker and Judd Goldfeder – confirm that Ameranth demonstrated the 21CR invention at the November 1998 FSTEC show.*

Independent witness, John Harker, formerly Director of Hospitality for Symbol, corroborates the inventors' testimony that the 21CR system was designed for two handhelds and that both the Ultrapad and Transpad were demonstrated at the November 1998 show.  Mr. Harker saw a demonstration of the 21CR menu wizard (Ameranth's inventive software) at the November 1998 show.  He prepared a memo in 2008 stating what he observed at the November 1998 show.  (McNally Decl. ¶ 33, NOL Ex. 5.) Mr. Harker wrote in that memo that Symbol was developing "two new mobile, handheld computers, (one for Palm OS and the others for Microsoft's Windows CE OS)."  About his search for a partner to help integrate both of Symbol's new handheld products with POS systems, he wrote:

> Not only did I find one in Ameranth, but they were even more than I had hoped for since they had just developed an innovate new solution – that they called their **21st Century Restaurant 'software wizard'** – which **had the capability** to interface existing 'point of sale' (POS) systems (with their intensive graphical user interfaces and complex

- 8 -

**OPPOSITION**                                         Case No. 3:12-cv-0733 DMS (WVG)

databases) to the mobile wireless ***devices*** that we were preparing to introduce to the market in 1999.

*Id.* (emphasis added.) Moreover, Mr. Harker confirmed in his May 2018 deposition that both the Ultrapad and the Transpad were shown at the November 1998 show when he was shown the 1998 21CR brochure depicting both the Ultrapad and Transpad. (Harker Dep. 5/22/2018 at 55-56, NOL Ex. 6.) In his May 2010 deposition during the *Menusoft* case, Mr. Harker was shown a supplemental declaration submitted by Mr. McNally during patent prosecution, (McNally Decl. ¶ 34, NOL Ex. 7), and confirmed his agreements with statements therein about the demonstration of Ameranth's Menu Wizard at the November 1998 show. (Harker Dep. 5/3/2010 at 118:10-119:17, NOL Ex. 8.) Mr. Harker was also shown a declaration submitted by Kathie Sanders during patent prosecution, (McNally Decl. ¶ 35, NOL Ex. 9) and confirmed the accuracy of Ms. Sanders' statements therein (Harker Dep. 5/3/2010 at 120:4-25, NOL Ex. 8.)

Ameranth's February 3, 1999 deal with Symbol that Mr. Harker facilitated confirms that Ameranth's system was designed for two different sized handhelds by specifically requiring Ameranth to design for both the Symbol Windows CE and Palm devices and noting that the screen sizes would be different between those two devices. Ameranth did so for both. (McNally Decl. ¶ 28, NOL Ex. 10.)

Judd Goldfeder, the president of Ameranth's partner The Customer Connection, was also an independent eyewitness at the November 1998 show. Mr. Goldfeder was deposed on April 22, 2010 in the *Menusoft* case. He was shown a copy of Mr. McNally's inventor declaration, (McNally Decl. ¶ 36; NOL Ex. 11), for the '077 Patent asserting that Ameranth had a working capability of the invention by the time of the November 1998 show. Mr. Goldfeder testified as follows:

> Q. So do you agree with Mr. McNally's statement that this photograph, meaning Exhibit 2, clearly shows that the Ameranth Wizard product was introduced and shown to the public at the FSTEC hospitality technology show in November 1998?
>
> A. Yes.
>
> Q. Further down Mr. McNally states Ameranth had a working capability of the invention at that time. Would you agree with that?

**OPPOSITION**                                    Case No. 3:12-cv-0733 DMS (WVG)

A. Yes.

Q. Further down Mr. McNally states "Ameranth's invention uniquely recognized, for the first time, the need for an integrated and synchronized wireless/web hospitality system." Do you agree with that?

A. Yes.

(Goldfeder Dep. 4/22/2010 at 25:4-26:7, NOL Ex. 12.) Mr. Goldfeder was also

shown Mr. McNally's supplemental declaration submitted during patent prosecution,

(McNally Decl. ¶ 34, NOL Ex. 7), and similarly confirmed his agreement with the

statements therein. (Goldfeder Dep. 4/22/2010 at 29:1-19, NOL Ex. 12.)

> 3.      *Kathie Sanders's testimony further confirmed that Ameranth had both the Transpad and Ultrapad at the November 1998 show.*

Kathie Sanders, the only Ameranth non-inventor at the November 1998 show

who demonstrated Ameranth's products, (McNally Decl. ¶ 31, NOL Ex. 9), created a

hand-drawn diagram of the devices Ameranth used at the November 1998 show

during her May 2018 deposition in this matter.  (Caldarelli Decl. ¶ 4, NOL Ex. 13.)

Her drawing accurately shows the 21CR Wizard Software, the UltraPad, and the

Transpad devices in the Ameranth booth.  (McNally Decl. ¶ 32.)  Ms. Sanders has

consistently testified about her motivations for testifying truthfully.  In the 2010

*Menusoft* trial, Ms. Sanders was asked:

> Q. Well, if after all these years you have no connection to Ameranth, no stock shares, no financial stake in the outcome of this, why would you agree to come down here to Texas and explain things to this jury?

> A. Because I believed in Ameranth. I believe in Keith McNally. I think that he is -- well, I admire him, and I find that there are very few people in this world who have the integrity, the moral compass, the leadership, the innovative style.

(*Menusoft* Trial Trans. 9/13/2010 at 5:3-11, NOL Ex. 14.)

4. *Photographs, brochures, and signage from Ameranth's booth at the November 1998 show indisputably depict the 21CR system, the Transpad, and the Ultrapad.*

A black and white photograph and a color photograph of Ameranth's booth at the November 1998 show depict both the Transpad and the Ultrapad.  (McNally Decl. ¶ 19-26, NOL Exs. 15-16.)  The signage in the photographs clearly depict the Ultrapad and the Transpad and, in fact, Ameranth demonstrated both types of handhelds at the booth.  (*Id.*) (Bergfeld Dep. 3/16/18 at 305:14-306:12, NOL Ex. 17.) Mr. McNally further explains that Ameranth had product brochures at the November 1998 show and that these product brochures depicted and explained how Ameranth's 21CR system was designed for two different types of handhelds: the Transpad and the Ultrapad. (McNally Decl. ¶¶ 22, 27-30, NOL Exs. 18-19.) Mr. McNally also explains that the diagram of Ameranth's 21CR system accurately depicted the 21CR system and that Ameranth displayed this diagram at the November 1998 show along with the Transpad and Ultrapad.  (McNally Decl. ¶¶ 27-28, NOL Ex. 18.)  Mr. McNally used this system diagram from the November 1998 show to draw Figure 9 of the '077 Patent. (*Id.*)

5. *Nella Ludlow, Ameranth's CTO in 2000-01, testified that Ameranth developed software that operated on different types and sizes of handheld devices.*

Domino's ignores the testimony of Nella Ludlow, Ameranth's Chief Technical Officer from 2000-01.  At the time of her deposition in May 2018, she was not an Ameranth witness and testified that she had not spoken with anyone from Ameranth in the 17 years since her departure.  (Ludlow Dep. at 98-99, NOL Ex. 20.)

Dr. Ludlow's deposition testimony totally refutes Mr. Franz's and Domino's contention that Ameranth did not practice its invention.  Although Mr. Franz references other testimony from Dr. Ludlow's deposition in his report, he ignores all of Dr. Ludlow's testimony that contradicts him and clearly supports the conclusion that Ameranth practiced the claims of the '077 Patent.  For instance, she testified that Ameranth's system was designed for handhelds of two different sizes:

**OPPOSITION**                                    Case No. 3:12-cv-0733 DMS (WVG)

Q. So even though there was this business relationship with Symbol that was pushing Ameranth towards the use of the Symbol devices, was the software itself designed so that it could run on different types of handhelds and not exclusively on the Symbol?

MR. MCKEEVER: Objection; vague.

A. Yes

Q. And at that time did the different types of handhelds that were available on the market have different size display screens and different types of display characteristics?

A. Yes

Q. And, again, was that one of the goals that you recall Mr. McNally describing to you in connection with your implementation of the system into software?

A. Yes

(Ludlow Dep. at 177:12 – 178:22, NOL Ex. 20.) Starbucks' counsel had personally reviewed the source code DVD discussed in Section II.E., *infra*, approximately one month before Dr. Ludlow's deposition. (Caldarelli Decl. ¶ 9.) He questioned Dr. Ludlow about how Ameranth designed the interface for the handheld devices in the 21CR system. In response to Starbucks' counsel's questions, Dr. Ludlow further testified that the screens on the system were "dynamically generated." (Ludlow Dep. at 134:4-6, NOL Ex. 20.) Totally disproving Dr. Franz's opinion that "the category and menu item buttons were hard coded into the handheld devices" in Ameranth's system, (Mot. at 15:25-16:1), Dr. Ludlow further testified that Ameranth "didn't hardwire a bunch of buttons. What we did is we – I used that language to figure out dynamically how to create the screen." (Ludlow Dep. at 135:13-16, NOL Ex. 20.)

> 6. *Dr. Shamos further confirmed that Dr. Franz's analysis was flawed and wrong.*

Dr. Shamos, Ameranth's expert, conclusively showed how Dr. Franz's opinion that Ameranth's 21CR system did not practice the claims was flawed because Dr. Franz ignored all of the evidence confirming that Ameranth's 21CR product worked with different types of wireless handheld devices with different display characteristics. (Shamos Rebuttal Rep. ¶¶ 329- 338, NOL Ex. 21.)

**OPPOSITION**                                      Case No. 3:12-cv-0733 DMS (WVG)

Ameranth has substantial direct and circumstantial evidence corroborating the inventors' testimony that they had designed their system for multiple handheld devices and that both the Ultrapad and the Transpad Device were demonstrated in November 1998. This corroborating evidence leads to the overwhelming conclusion that, in fact, Ameranth practiced its invention with two different handhelds starting at the November 1998 show.  There can be no other reasonable conclusion.

**E. Ameranth Did Not Spoil Evidence or Attempt to Hide Evidence.**

Domino's falsely accuses Ameranth of spoliation and alleged withholding of evidence.  Indisputably, Ameranth placed a litigation hold on everything in 2008, more than three years *before* commencing this litigation. (McNally Decl. ¶ 44.) The materials that Ameranth's temporary CEO, Mike Kucha, discarded as part of a routine office downsizing were likely backups and irrelevant materials because Ameranth had previously collected and produced responsive documents and source code in the *Menusoft* matter. (McNally Decl. ¶¶ 37-41.) Menusoft's counsel at the time was Richard Zembek.  (Osborne Decl. ¶ 4.)  Further, Dr. Ludlow testified in this case that she had discarded Ameranth's early source code during her tenure as Ameranth's Chief Technical Officer in 2000-01. *See infra* Section II.E.2.

Spoliation is a discovery issue that federal courts expect litigants to immediately bring to the court's attention and not wait until trial or even post-trial to raise the issue.  District courts have held that an unreasonable delay in bringing a spoliation motion makes the motion untimely.  *Mannion v. Ameri-Can Freight Sys. Inc.*, No. CV-17-03262-PHX-DWL, 2020 WL 417492, at *3 (D. Ariz. Jan. 27, 2020); *Sherwood v. BNSF Ry. Co.*, No. 2:16-CV-00008-BLW, 2019 WL 1004563, at *2 (D. Idaho Mar. 1, 2019); *Cottle-Banks v. Cox Commc'ns, Inc.*, No. 10CV2133-GPC WVG, 2013 WL 2244333 at *16 (S.D. Cal. May 21, 2013); *Montoya v. Orange Cty. Sheriff's Dep't*, No. SACV 11-1922 JGB, 2013 WL 6705992 at *6 (C.D. Cal. Dec. 18, 2013).

**OPPOSITION**                                          Case No. 3:12-cv-0733 DMS (WVG)

Moreover, Section IV.B of Judge Gallo's Civil Chambers Rules sets a strict 30-day deadline for bringing discovery disputes to his attention. That 30-day clock starts when the dispute arises.  Here, Domino's admits that it first discovered this issue in mid-April 2018 when it located the photocopy of the source code DVD in Ameranth's document production. (Mot. at 15:3-6, Cunningham Decl. ¶ 17.)  Under Judge Gallo's Civil Chambers Rules, Domino's should have brought this issue to his attention by mid-May 2018.  But Domino's did not.  Instead, Domino's saved it for the exceptional case motions.  On this basis alone, the Court should disregard Domino's belated spoliation argument. *Cottle-Banks, 2013 WL 2244333 at \*16* (Judge Curiel denying plaintiff's motion for spoliation sanctions as untimely when plaintiff waited nine months to bring the motion and citing the 30-day timeline in Judge Gallo's Civil Chambers Rules).

   1.  *The DVD image was in Defendants' possession for years while the DVD itself had been in Mr. Zembek's possession for even longer.*

Ameranth produced the photocopy of the source code DVD that identified its contents as "Restricted Confidential Source Code" during the *Menusoft* case, (Osborne Decl. ¶ 3-4), and twice in this case in April 2012 and in May 2013. (Caldarelli Decl. ¶ 8.) Ameranth also promptly produced the DVD for inspection upon request from defense counsel—including allowing Domino's consultant to make a copy of the DVD. (Caldarelli Decl. ¶ 8-10.)

Mr. Cunningham's Declaration submitted in support of Domino's Motion confirms these facts, "In early April 2018 . . . Domino's discovered a scanned picture of a computer disk in Ameranth's production (of approx. 500,000 documents) which indicated that it might contain Ameranth source code for its products." (Cunningham Decl. ¶ 17.) The phrase "in Ameranth's production confirms that this document had not been withheld by Ameranth. The words "discovered" and "might" are misleading because Domino's had this document in its possession for six years.

- 14 -

It is not true, as Mr. Cunningham alleges, that "Domino's and the other Pizza Defendants' invalidity experts did not have the opportunity to analyze this 2008 source code since it was discovered and produced after service of Defendants' invalidity expert reports." (Cunningham Decl. ¶ 18.)  Domino's had the image of this DVD in its possession since at least April 2012.  Domino's counsel advised Ameranth's counsel in an email dated April 13, 2018 that the DVD may cause Domino's to seek an extension of the case calendar, conduct additional discovery, and serve amended expert reports.  Domino's counsel concluded that email by stating "Domino's reserves it [sic] right to seek an extension of the case calendar after reviewing the original DVD, source code and technical documentation." (Caldarelli Decl. ¶ 10, NOL Ex. 22.)  But Domino's did not do so.

Domino's actions after April 13, 2018 belie the notion that Domino's was prejudiced.  While Starbucks promptly reviewed the DVD on April 15, 2018, Domino's did not request to review the DVD until May 1, 2018.  Domino's consultant did not review the DVD until May 11, 2018.  Following the consultant's review, Domino's did not seek an extension of the case calendar, did not seek to conduct additional discovery, and did not seek to serve an amended expert report. (Caldarelli Decl. at ¶ 11.)

> 2.      There was no conspiracy to hide the source code DVD.

Domino's allegation about source code revolves around equipment and materials that Mike Kucha, Ameranth's temporary CEO, discarded in 2008.  At the time, Ameranth had litigated the *Menusoft* case for almost a year and had collected and produced responsive materials to opposing counsel.  (McNally Decl. ¶ 37.) Mr. McNally's March 2018 testimony concerning Mr. Kucha's disposal of some source code was based upon his decade-old memories and were true to the best of his memory.  Mr. McNally was not present during the time of Mr. Kucha's actions. (McNally Decl. ¶¶ 38-39.)  Mr. Kucha died in 2010. (McNally Decl. ¶ 40, NOL Ex.

23.) This dispute demonstrates the fact-intensive nature of the issue that could only be resolved by a trial and not by parsed excerpts from depositions.

Domino's ignores that Nella Ludlow testified two months later in May 2018 that she was the one who threw away Ameranth's early source code during her tenure as Ameranth's Chief Technical Officer in 2000-01, long before the start of the *Menusoft* litigation and prior to the issuance of any of Ameranth's patents. (Ludlow Dep. at 41:21-42:2, NOL Ex. 20.) In light of Ms. Ludlow's testimony, the materials that Mr. Kucha discarded as part of the office downsizing were likely only backups, duplicates, and/or irrelevant information. (McNally Decl. ¶ 41-42.)

Despite Domino's accusations, the source code on the DVD is not relevant to any issue in the case. (McNally Decl. ¶ 43.) This source code DVD is irrelevant to what was demonstrated in 1998 because it did ***not*** contain source code for the much earlier versions of Ameranth's software that were actually used in 1998-99; the source code on the DVD was only for some later Ameranth's products in 2008-09 (*Id.*)

Ameranth's expert, Dr. Shamos, identified this serious error in Dr. Franz's analysis. (Shamos Rebuttal ¶¶ 329- 338, NOL Ex. 21.) Among other things, Dr. Shamos showed how Dr. Franz's analysis ignored all of the evidence confirming that Ameranth's 21CR system worked with different types of wireless handheld devices with different display characteristics. (*Id.*)

**F. The Alleged "Baseless and Inconsistent Infringement/Validity Claims" are Legitimate Disputes Rooted on Claim Construction Issues.**

   *1.*      *Domino's, not Ameranth, has taken inconsistent positions on synchronization.*

Domino's asks the Court to adopt a nonsensical construction for synchronization that Domino's first introduced in June 2018 that would require any handheld customer to be offered the entirety of all 5000+ store menus nationwide. No person of ordinary skill in the art would consider that rational/practical. (Shamos Decl. ¶ 21-28, NOL Ex. 24.) Ordering pizza from a store in Maine, for delivery to

**OPPOSITION**                                      Case No. 3:12-cv-0733 DMS (WVG)

one's home in San Diego is a nonsensical concept, just as it would be for a customer

seeking San Diego Padres tickets to receive the ticket selections for the entire Major

League Baseball or for a Ruth's Chris customer in San Diego to be offered the

reservations availability of the store in Chicago. None of the numerous prior art

references presented in the Joint Invalidity Contentions operate this way, yet the Joint

Defense Group argued that all these references were prior art to the '077 Patent.

Even Domino's invalidity expert, Stephen Gray, did not adopt this nonsensical

construction. In his invalidity contentions, for example, he opined that a restaurant

ordering app synchronizing within a single restaurant, teaches/discloses the claimed

synchronization element. (Gray Invalidity Rep. Ex B. at 29, 35-37 as to *Olewicz*,

NOL Ex. 25). This is, in fact, consistent with the single restaurant example that

Ameranth's counsel explained in the *IPDEV* case that Domino's distorts.

At the summary judgment hearing in the *IPDEV* case, IPDEV's counsel also

used an example of a single restaurant ("Enzo's") to argue that the invention

described in IPDEV's '449 Patent taught synchronization as construed by the Court.

(*IPDEV* Hr'g Tr. at 7-8, NOL Ex. 26.) In response, Ameranth's counsel argued that,

"[i]n the context of a *single* restaurant" the synchronization meant that master menu

information on the restaurant's back office server had to be substantively the same as

*all* of the menu information on the programmed handheld menu configuration. (*Id*. at

8-10) (emphasis added.) Domino's mischaracterizes these exemplary arguments to

fabricate the argument that Ameranth took inconsistent positions on synchronization.

Domino's now misleadingly attempts to utilize this single restaurant specific

example of synchronization to a multi-location chain restaurant system in which the

menu for any single restaurant is, in fact, synchronized across thousands of connected

handheld devices but in which different restaurants have the flexibility to have

different menu variations from one another. The '077 Patent claims do not prohibit

such variations between different restaurants—in fact, the patent specification even

contemplates such potential variations. ('077 Patent at 10:20-34, 11:25-32, 14:39-42,

**OPPOSITION**                                    Case No. 3:12-cv-0733 DMS (WVG)

and 15:3-18, NOL. Ex. 27.)  Thus, it is not true that Ameranth has taken inconsistent positions on synchronization.

The Court's construction of synchronization and Ameranth's application of the term, when considering the claims as a whole along with the correct constructions of master menu/master database, do not clash with or rule out the embodiments of different restaurants within a chain having variations in menu items between separate restaurants while each restaurant individually still practices the claims of the '077 Patent.  Thus, contrary to Domino's argument, Ameranth has been consistent in its positions concerning synchronization.

Domino's unjustifiably broadens the argument of Ameranth's counsel from the *IPDEV* summary judgment hearing to apply to a multi-restaurant chain in order to fabricate non-infringement arguments supported by neither the specification nor the claim terms themselves and to create the false implication that Ameranth has been inconsistent.

But as Domino's fails to acknowledge in its Motion, Domino's argument implicates and turns on the proper interpretation of "master menu/database" which remains a necessary claim construction for both synchronization and PHMC/PHC.  In fact, Domino's advised the Court of the importance of this issue in its Trial Brief:

> The parties disagree whether the menu categories, menu items and modifiers of the master menu (in claims 1, 6 and 9) must be completely, or just partially, synchronized with the claimed "programmed handheld menu configuration" ("PHMC"). The summary judgment briefing highlighted this dispute, **which needs to be resolved by the Court**.

(Dkt. 1380 at 2:2-6) (emphasis added.)  Domino's acknowledged that this is an unresolved issue, and it is not true that Ameranth's position on synchronization was baseless, inconsistent, or warrants an exceptional case determination.

### 2.  *Domino's infringes the PHMC/PHC limitation.*

Domino's Motion includes a deceptive sentence suggesting that Ameranth took inconsistent positions on this issue: "[a] PHMC/PHC can be 'generated and formatted [for display] outside the handheld device[s]' only if it contains information about the

**OPPOSITION**                                    Case No. 3:12-cv-0733 DMS (WVG)

device display size." (Mot. at 6:18-20.) This sentence is deceptive because it is totally contrary to the Court's claim construction. It is not true that the PHMC/PHC can be generated and formatted outside of the handheld only if the PHMC/PHC contains information about the device display size. The Court never construed these terms to include this requirement.

Ameranth's theory of infringement concerning the PHMC/PHC is consistent with the Court's claim construction that the PHMC/PHC be "generated and formatted outside the handheld devices." (Dkt. 908 at 13:12-14.) The Court's construction did not preclude the possibility of the PHMC/PHC being *integrated* on the handheld after being *generated* and *formatted* outside of the handheld.

Domino's seeks to read out the aspect of integration of the PHMC/PHC with the wireless handheld in the claims. But this integration aspect must be applied when considering the claims as a whole. Critically, the Court confirmed that integration and generation are two separate things: "Ameranth does not seem to dispute that the menu configuration is generated outside the handheld. Rather, it argues the menu configuration can be integrated on the handheld. However, integration and generation of the menu configuration are two separate things." (*Id*. at 12:14-17.)

Domino's Motion equates integration on the handheld with optimization. But this is an interpretation that the Court rejected when the Joint Defense Group proposed a limitation that the PHMC/PHC be "optimized" for display on a particular handheld device. (*Id*. at 11-13.) The Court clearly rejected the proposed limitation of optimization for a particular handheld to the PHMC/PHC limitation. (*Id*. at 13:1-3.)

Domino's Motion attempts to re-impose this rejected limitation. Domino's does this by arguing that the JSON file, which Ameranth cited as satisfying the PHMC/PHC limitation, contains "no display formatting logic whatsoever, let alone formatting for displaying the data as cascaded sets of linked GUI screens, such as information about the display size of the handheld device." (Mot. at 19:27-20:2.) It is not the case, as Domino's argues, that the JSON files contain no display formatting

logic at all.  Ameranth's expert, Dr. Malek, testified that the JSON files contain sufficient formatting/logic to satisfy the PHMC/PHC claim limitations:

> Q [by Mr. Cunningham for Domino's]. Sure. And that's my point is there's nothing in the JSON file itself, no formatting, no configuration, that determines that that file is going to be displayed as cascaded sets of linked graph user interface screens; isn't that true?
>
> A [by Dr. Malek for Ameranth]. No. So, you know -- so JSON data -- JSON **is encoding how that information should be** displayed, and so you have the -- when you have the software on the mobile device **reading** that JSON data, essentially **interpreting** what that JSON data is instructing it to do, **it directly determines** how the menu will be displayed.

(Malek Dep. Tran. at 127:18-129:7, NOL Ex. 28.) (emphasis added.)  Mr. Cunningham's questions, although couched in terms of **formatting**, were really directed toward the rejected **optimization** argument.  Although "customized" is a term in the claims as to the handheld display layouts, "optimized" is not in the claims."  ('077 Patent at column 16, lines 23, 28, 33, and 53, NOL Ex. 27.)

Ameranth further demonstrated Dr. Malek's point by submitting a screen capture of the actual Domino's JSON files as an exhibit to Ameranth's Opposition to Domino's Motion for Summary Judgment of Noninfringement. (Caldarelli Decl. ¶ 16, NOL Ex. 29.)  That screen capture includes graphics and annotations identifying the actual formatting data that exists in the JSON file.

Neither the claims nor the Court's construction require that the PHMC/PHC contain specific formatting logic exclusive of its integration on the handheld as Domino's claims.  This was the crux of the rejected "optimization" proposed claim construction.  Mr. Bobrow, arguing this point on behalf of the Joint Defense Group during the claim construction hearing, described what the Joint Defense Group meant by optimization: "[the PHMC/PHC] has to be optimized so that when a waiter has that handheld device that the configuration that gets transmitted to that device is appropriate for that particular handheld device.  It is optimized for it in terms of use on that device." (Claim Constr. Hr'g. Tr. at 102:6-10, NOL Ex. 30.)  Again, the

- 20 -

Court rejected this construction because optimized is not a term in the claims. It is not true that the PHMC/PHC limitation requires optimization for a particular device and it is wrong for Domino's to now argue the same point it had previously lost on while simply replacing "optimization" with "formatting."

Domino's Motion on this issue does nothing more than raise a fact-intensive, unresolved dispute over the extent of and what occurs in connection with integration of the PHMC/PHC on the handheld device and whether, in fact, Domino's system meets this claim limitation.  The existence of a disputed issue between Ameranth and Domino's does not render Ameranth's position baseless.  Ameranth's interpretation of the PHMC/PHC and its integration on/with the handheld are consistent with the Court's constructions and with reading the claim as a whole.

> 3.    *Domino's misrepresents Ameranth's consistent position on scrolling.*

Domino's claim that Ameranth has taken inconsistent positions about screen scrolling is an argument that the Joint Defense Group posed to the Court in the claim construction process and on which the Court agreed with Ameranth that: "It should be appreciated, however, that an option of scrolling of menu screens is not precluded in the context of practice of the claimed invention as long as the claimed configuration of a handheld menu from a master menu is present." (Dkt. 908 at 9:17-26.)  As the Court clearly stated, the claims do not preclude the option of scrolling. Domino's argument about scrolling in the Motion is essentially the same argument that Hyatt made during claim construction.  The Court rejected the argument then and should reject it now. (Dkt. 908 at 9:17-20 holding that "the statements Ameranth made during prosecution and the CBM proceedings do not amount to clear and unmistakable disclaimers of scrolling.") Despite this, Domino's now fabricates an argument to suggest that the claims do preclude scrolling and that Ameranth has been inconsistent on this issue.

Ameranth's statements to the Federal Circuit were similarly consistent with its position that the claims "eliminate[] *the amount* of user scrolling," yet *some amount* of scrolling is permissible. (McNally Decl. ¶ 46, NOL Ex. 31.).  Ameranth further emphasized this point: "The presently claimed invention, *inter alia*, eliminates the need to rely *entirely* on scrolling" and that it "*substantially eliminates* the need for such scrolling . . ." (*Id*.)  Ameranth's statements to the Federal Circuit regarding scrolling were consistent with its prior statements and consistent with the Court's determination made during claim construction.  Ameranth has never argued that *all* scrolling was eliminated.  Rather, Ameranth has consistently argued that the need for scrolling was *substantially* reduced.  Domino's accusation to the contrary is false.

> **4.** *Domino's infringes the differing-number-of-screens limitation.*

Screen counting is a factual inquiry appropriate for a trial on the merits not the mini-trial required by Domino's Motion.  Ameranth did not try to mislead the Court or the jury as to evidence based on videos of Domino's products in operation because such evidence speaks for itself.  (*See also* Cardinal Decl. ¶¶ 6 – 47, NOL Exs. 33 - 41.)  The alleged discrepancies in Ameranth's screen counting evidence, despite Domino's insistence, do not demonstrate that Ameranth tried to mislead the Court. (Cardinal Decl. ¶¶ 17 - 26.)

Domino's Motion mistakenly argues that the 2013 screen shots of the Domino's ordering process on an iPhone 5 and a Galaxy S3 are misleading because in the Galaxy S3 order flow "there is a screen showing that an additional small pizza with no toppings was also selected." (Mot. at 11:14-16.)  This is simply not true.  The truth is that although the Galaxy S3 order flow shows that a small pizza has been selected in the early screens, that is because "small pizza" was the system default value for that screen.  Once the user selected a different size, then that field would change to the selected value.  In other words, and contrary to Domino's assertion, it is not true that the 2013 Galaxy S3 order flow shows both a large pizza and small pizza

being order.  There was only one large pizza being ordered.  (Cardinal Decl. ¶¶ 7, 30 - 46.)

There is, instead, compelling evidence that Domino's system has met the claim limitation at various points in time (*e.g.* 2013, 2017, and 2018) or, at a minimum, that a factual dispute exists between Domino's and Ameranth over whether there are a differing number of screens in the ordering process for different handheld devices using the Domino's system.  For instance, the 2013 screen shots show a different number of screens.  Although the 2013 screenshots do not have counters imbedded in them, a simple count using Dr. Malek's method shows that the iPhone 5 produces 16 screens while the Galaxy S3 produces 14 screens.  (Dkt. 1185-13 ¶ 45.) (Cardinal Decl. ¶¶ 30 - 31.)

Ameranth's consultant also applied Dr. Malek's screen counting methodology to screen shots of the Domino's ordering process on an iPhone 4.  This resulted in 12 screens on the iPhone 4 which is different than, for example, the screen count of 16 in the Samsung Galaxy S7 screen capture video from the February 2017 Screen Capture Videos.  Even if a screen is "added" to the iPhone 4 screen shots or "subtracted" from the Samsung Galaxy S7 screen capture video per Domino's "order history" comment, there is still a screen count difference.  (Cardinal Decl. ¶¶ 22 - 26.)

Additionally, Ameranth's consultant conducted further testing and analysis of the Domino's mobile apps on different mobile devices.  For instance, on November 28-29, 2018 (and with some additional video rendering work on December 13, 2018), Ameranth's consultant tested the then-current Domino's mobile apps on different mobile devices using comparable orders.  He recorded three screen capture videos of comparable orders using the Domino's mobile apps on those dates for a Domino's order placed on an iPhone X and the same order placed on a Samsung S7 Edge and again on an iPad Pro.  Dr. Malek's counting methodology resulted in a screen count of 18 on the iPhone X, a screen count of 16 on the S7 Edge, and a screen count of 15 on the iPad Pro.  (Cardinal Decl. ¶¶ 27 - 29.)

**OPPOSITION**                                Case No. 3:12-cv-0733 DMS (WVG)

As Mr. Cardinal's Declaration makes abundantly clear, screen counting is exactly the kind of factual dispute that courts have warned against including in exceptional case motions.  Moreover, this issue is further complicated because mobile devices and applications have continued to change over the course of the litigation. (Cardinal Decl. ¶¶ 11, 12, 17, 27.)  For this reason alone, the Court should determine that any dispute between Ameranth and Domino's over the fact-intensive screen counting issue is not a basis for finding an exceptional case.

**G. Nothing in Ameranth's Other Lawsuits Supports Domino's Motion.**

Domino's accuses Ameranth of being a vexatious litigant by pointing to Ameranth's litigation in Delaware against Olo, Inc. over an entirely different Ameranth patent (U.S. Patent No. 9,747,651) that is directed to a new and different inventive concept.  This single infringement action is hardly evidence of vexatious litigation. Ameranth strongly believes that the Delaware district court's ruling on the '651 Patent as to only some claims was incorrect and filed a notice of appeal on November 11, 2020 and its Docketing Statement on November 17, 2020 (McNally Decl. ¶ 47, NOL Ex. 32.)

Domino's also refers to Ameranth's Notice to the Court following the Supreme Court's denial of Ameranth's petition for a writ of certiorari. (Mot. at 17:1-18.) Ameranth only offered proposals to the Court in the Notice it filed.  Ameranth sought to maintain the stay except for a few very limited but important actions.  By including these arguments and demanding that "this vexatious litigation must end", (Mot. at 17:17), Domino's shows that the true intent behind its Motion is to punish Ameranth for losing.  Punishment is an improper purpose for an exceptional case motion.  *See Checkpoint Sys., Inc. v. All-Tag Sec., S.A.*, 858 F.3d 1371, 1376 (Fed. Cir. 2017).

**H. Domino's Request for Fees Related to the CBM Petitions is an Overreach.**

Domino's overreaches in its claim for attorneys' fees from the CBM petitions. (Mot. at 25:9-11.)  In reaching for this argument, Domino's leaves out critical facts: 10 claims of Ameranth's '850 and '325 Patents were actually found patent eligible under

section 101 and Ameranth prevailed on all three of the CBM petitions challenging the '077 Patent. (Osborne Decl. ¶¶ 6-7.) Importantly, the CBM petitions did not make Domino's the prevailing party in this case. *Munchkin, Inc.*, 960 F.3d at 1380 (Fed. Cir. 2020) (reversing the district court's exceptional case order because it would "subject every patent owner to paying a § 285 fee award in a patent suit anytime its patent is canceled in a co-pending IPR proceeding, without any consideration of the relative strength of the patent owner's legal theories, claim construction arguments, or proffered evidence in defense of the patent.")

### III. CONCLUSION

Domino's Motion went to great length to concoct baseless and knowingly false accusations by relying on misleading and incorrect arguments, contradicting Domino's own prior positions, switching to Starbucks' expert, ignoring Ameranth's evidence, and masking unresolved claim construction issues as Ameranth's alleged inconsistent positions.  The Motion should be denied.

Respectfully submitted,

Dated:  November 20, 2020     **CALDARELLI HEJMANOWSKI PAGE & LEER LLP**

By:  */s/ William J. Caldarelli*
William J. Caldarelli
Ben West
Lee Hejmanowski

FABIANO LAW FIRM, P.C.
Michael D. Fabiano

OSBORNE LAW LLC
John W. Osborne

WATTS LAW OFFICES
Ethan M. Watts

WITKOW | BASKIN
Brandon J. Witkow
Erin C. Witkow

Attorneys for Plaintiff Ameranth, Inc.

**OPPOSITION**                                    Case No. 3:12-cv-0733 DMS (WVG)